*John Heykoop dba Eagle Towing v Michigan State Police, et al*
USDC-WD No: 1:18-cv-00632
Honorable Robert J. Jonker
Magistrate Judge Phillip J. Green

# EXHIBIT 2

JEFFREY J. WHITE, FIRST LIEUTENANT
02/05/2019
Pages 1–4

### Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE WESTERN DISTRICT OF MICHIGAN
 3
 4   JOHN HEYKOOP D/B/A EAGLE TOWING,
 5              Plaintiff,
 6        vs.                    Case No. 1:18-cv-00632
 7                               Hon. Robert J. Jonker
 8                               Mag. Phillip J. Green
 9   FIRST LIEUTENANT JEFFREY WHITE;
10   FIRST LIEUTENANT CHRIS MCINTIRE,
11              Defendants.
12   _____
13
14
15        The Deposition of FIRST LIEUTENANT JEFFREY J. WHITE,
16        Taken at 4151 Okemos Road,
17        Okemos, Michigan,
18        Commencing at 10:33 a.m.,
19        Tuesday, February 5, 2019,
20        Before Kathryn M. Standal, CSR-2966.
```

### Page 2

```
 1   APPEARANCES:
 2
 3   JOHN S. BRENNAN
 4   Fahey Schultz Burzych Rhodes, P.L.C.
 5   4151 Okemos Road
 6   Okemos, Michigan 48864
 7   (517) 381-3193
 8   jbrennan@fsbrlaw.com
 9       Appearing on behalf of the Plaintiff.
10
11   PATRICK S. MYERS
12   Assistant Attorney General
13   525 West Ottawa Street
14   Lansing, Michigan 48933
15   (517) 373-6434
16   myersp4@michigan.gov
17       Appearing on behalf of the Defendants.
18
19   ALSO PRESENT:
20   Andrew Heykoop
```

### Page 3

```
 1                     TABLE OF CONTENTS
 2
 3   WITNESS                                           PAGE
 4   FIRST LIEUTENANT JEFFREY J. WHITE
 5
 6   EXAMINATION BY MR. BRENNAN:                          4
 7   EXAMINATION BY MR. MYERS:                          179
 8   RE-EXAMINATION BY MR. BRENNAN:                     181
 9   RE-EXAMINATION BY MR. MYERS:                       184
10
11                         EXHIBITS
12
13   EXHIBIT                                           PAGE
14   (Exhibits not offered.)
```

### Page 4

```
 1   Okemos, Michigan
 2   Tuesday, February 5, 2019
 3   10:33 a.m.
 4
 5            FIRST LIEUTENANT JEFFREY J. WHITE,
 6       was thereupon called as a witness herein, and after
 7       having first been duly sworn to testify to the truth,
 8       the whole truth and nothing but the truth, was
 9       examined and testified as follows:
10                          EXAMINATION
11   BY MR. BRENNAN:
12   Q.  Good morning, Lieutenant.
13   A.  Good morning.
14   Q.  We're meeting for the first time today, right?
15   A.  Yes, sir.
16   Q.  My name is John Brennan, I'm an attorney, I represent
17       John Heykoop.  Andrew's here today.  You obviously
18       know each other, correct?
19   A.  Yes.
20   Q.  Okay.  And we're here to take the deposition in the
21       case of Heykoop vs. White and McIntire, 18-cv-00632.
22       Now, I'm guessing that you had -- you've given
23       testimony before as part of your job for many years;
24       is that right?
25   A.  Courtroom testimony, yes, sir.
```

JEFFREY J. WHITE, FIRST LIEUTENANT
02/05/2019
Pages 17–20

Page 17

```
 1      trick you or anything.
 2  A.  Right.
 3  Q.  So I'd rather have you tell me how you really came to
 4      these answers or not, so that's fine.
 5  A.  I didn't believe that there were any that I could
 6      recall, but I have relied upon the 911 director.  So I
 7      called Ray Hasil and I said, Ray, this is one of the
 8      questions on my interrogatory and what's been added,
 9      so he told me.
10  Q.  Okay.
11  A.  So I reported what I was told just because I didn't
12      know, you know.
13  Q.  Well, that kind of leads me to a question.  In your
14      post you -- whatever the no-preference list is that's
15      being sort of held by -- when I talk about
16      Oceana-Mason 911 I'm just going to refer to it as
17      911 --
18  A.  Yes, sir.
19  Q.  -- so you and I are on the same page.
20          So that list is held by 911?
21  A.  Yes, sir.
22  Q.  Okay.  You don't have in your office an independent
23      list that you can refer to say here's who's on the
24      State Police's no-pref list for this post?
25  A.  Yeah, I don't.
```

Page 18

```
 1  Q.  Okay.  Do you know whether you're supposed to keep
 2      that in-house?
 3  A.  I don't.
 4  Q.  Okay.  Fair enough.  And number 2 on page 2 there you
 5      stated that to your knowledge no towing company
 6      besides -- I'm going to refer to Eagle Towing instead
 7      of Plaintiff.
 8  A.  Okay.
 9  Q.  Besides Eagle Towing has been removed from the Hart
10      post no-preference list in the past ten years.  And as
11      a follow-up, is it fair then to say that you haven't
12      been involved in any investigation of towing
13      complaints for other companies that led to their being
14      removed from the list?
15  A.  Correct.
16  Q.  Okay.  Now, we're going to talk about official
17      number -- Official Order No. 48 later, but just
18      confirming that as far as you're concerned you
19      followed Official Order 48 when it comes to the towing
20      list?
21  A.  You know, that's -- I regret that language too because
22      everywhere I've worked it's different the way towing
23      companies -- Official Order 48 is a guideline for
24      towing and it's basically I think predicated on the
25      Metro Detroit area.  As you move into rural Michigan
```

Page 19

```
 1      every 911 authority -- every area is a little bit
 2      different.  When I worked at the Mount Pleasant post
 3      there is no towing list whatsoever.  It's a laminated
 4      card that each officer, deputy, trooper has and we
 5      show it to the customer, the person that hit a deer or
 6      was in a crash, saying which one of these companies do
 7      you want and they point and pick --
 8  Q.  Okay.
 9  A.  -- so there is no rotating list.
10  Q.  Okay.  I understand.
11  A.  And they're all different.
12  Q.  I understand that different posts operate their lists
13      differently and the order itself has situations where
14      some posts don't have lists and some do, but what I
15      guess I'm trying to ask is -- well, let's -- let's
16      step back for a second.
17          So official orders of the department, tell
18      me what you understand about official orders of the
19      department?
20  A.  Well, the official orders are the guideline by which
21      the Michigan State Police operates.
22  Q.  Okay.  So in my mind there is a difference between an
23      order and a guideline.  If I'm in a military or police
24      situation I view an order as something that I don't
25      have a choice obeying, it's an order.
```

Page 20

```
 1  A.  Right.
 2  Q.  Guidelines are more suggestions but not necessarily
 3      orders, okay?  So the Michigan State Police official
 4      orders come out of Lansing; is that correct?
 5  A.  Yes, sir.
 6  Q.  And they go through some process before they get
 7      adopted I presume; is that correct?
 8  A.  Yes, sir.
 9  Q.  Okay.  Once they are official orders or given that
10      name official order that means that everybody in the
11      department is bound by that order; is that not
12      correct?
13  A.  I would -- I would say you're held to that standard,
14      but I'm not the expert or an expert in that area.  I
15      know where the rubber meets the road and where a post
16      interacts with their local partners.
17  Q.  Yeah, I'm not talking about --
18  A.  The Official Order 48 --
19  Q.  I'm talking about -- I'm just talking about in general
20      Michigan State Police, the expectation is if they
21      issue an official order --
22  A.  Yes.
23  Q.  -- that the troopers and the members at the post are
24      supposed to comply with that official order?
25  A.  Yes, sir, in general.
```

Page 21

1  Q. That makes sense to me.
2  A. It does. It does.
3  Q. Okay.
4  A. In practice --
5  Q. In practice --
6  A. -- little different.
7  Q. Some people may not obey the orders the way they're
8     supposed to?
9  A. And sometimes they're just not possible to.
10 Q. Okay.
11 A. Especially with the outdated -- at different times the
12    orders are outdated and they're constantly being
13    rewritten, thankfully. I think Official Order 48 was
14    just recently rewritten within the last year.
15 Q. Okay. So -- but in any event, Official Order 48 like
16    any other official order you guys are expected to
17    comply with it, and if you don't there better be a
18    reason why you're not doing it?
19 A. Yes, sir.
20 Q. Okay. Or a reason that's acceptable to your superiors
21    I would presume?
22 A. Yes, sir.
23 Q. Okay. Okay. So if you look at page -- page 3 your
24    answer to that question number 4 is that you checked
25    with 911 and they told you that your list contained

Page 22

1     Gundy's Garage & Towing and Neal's Auto Towing; is
2     that correct?
3  A. Yes, sir.
4  Q. So those are the only two as of now that are on the
5     no-preference list as far as you know?
6  A. You know, I think so, but it seems like there is
7     another McGahan's is also in Oceana.
8  Q. What makes you think that?
9  A. Well, because just recently I got an e-mail from the
10    director of 911 via AJ where --
11 Q. Who's AJ?
12 A. Mr. Heykoop.
13 Q. Okay.
14 A. Where McGahan's Towing and a towing company in Mason
15    County had allowed -- or had lapsed on one of their
16    certificates, and I know Mr. McGahan came into the
17    post to meet with the motor carrier officer, who told
18    him how to get himself straight on that, and then he
19    came back into the post the next day with the proper
20    certifications.
21 Q. Okay.
22 A. So I know McGahan's must be on the list as well.
23 Q. Okay.
24 A. But again, I don't call wreckers. I'm not
25    absolutely -- yeah.

Page 23

1  Q. Right. I'm just going back on what you said earlier
2     that you're the only person in your post who deals
3     with the no-preference list administratively.
4  A. Correct.
5  Q. Okay. So it -- whether you call them or not is not
6     that relevant, but you're the one that deals with it
7     administratively?
8  A. Right.
9  Q. Okay. All right. Now, the number 7, which starts at
10    the bottom of page 3 and then your response is on page
11    4, we asked you to identify the grounds for
12    Plaintiff's removal from the no-preference wrecker
13    call list, and you stated in your response that it was
14    due to the quality of service; is that correct?
15 A. Yes, sir.
16 Q. Okay. What -- and service, it's not defined anywhere,
17    but -- that I can see at least, but service in my mind
18    anyway deals with how they perform their job as
19    towing; is that correct?
20 A. Yes. How they perform their job as towing. How they
21    interact with the other agencies involved. With --
22    any time a tow company comes out to a scene there may
23    be fire there, there may be police there, there's
24    citizens there, there's the input from central
25    dispatch 911, so they're all involved, and the service

Page 24

1     in my mind is the overall interaction.
2  Q. Okay. So the complaints that you would have received
3     that led to removing Eagle Towing off the list would
4     have dealt with those complaints that you received
5     that came in to you would have dealt with the quality
6     of services that they were providing; is that correct?
7  A. Correct.
8  Q. Okay.
9  A. That would be my dissatisfaction anyway. The
10    complaints are -- they stand on their own, whatever
11    citizen or agency would complain about, and then in
12    trying to look into the complaints to get all sides of
13    the story I'm unable to, so...
14 Q. I'm sorry, you're unable to what?
15 A. Yeah. The Eagle Towing doesn't respond. They won't
16    have conversation about complaints lodged against
17    them.
18 Q. Okay. Okay. I didn't see that in your response.
19 A. Well, yeah, that's -- you know, that's what I mean is
20    it's the service, you know, because we're all serving
21    each other and working together to handle whatever
22    incidents are out there.
23 Q. Okay.
24 A. So again, my language, I'm sorry.
25 Q. That's okay. And in number 8 it's clear that you

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 37

1  A.  Yeah, I'm not an expert on -- I think maybe clarify
2      your question.  Try that again.
3  Q.  Okay.  Well, it says work site shall establish a local
4      policy for areas not covered by this order or where
5      local policy development is required, and I guess your
6      answer is yes, the 911 -- 911 had a local policy,
7      you're not sure whether it's still in force, but there
8      was a local policy dealing with some of the towing
9      procedures and towing lists; is that correct?
10 A.  Yes, sir.
11 Q.  Okay.  And what I want to figure out is, and I have no
12     idea is if this is true or not, but if the local
13     policy is in conflict with the official order, okay,
14     your -- the official order would be what you would
15     have to follow?
16 A.  Yeah, based on reading this I don't think so.  I've
17     never been --
18 Q.  You don't think what?
19 A.  I don't think that it would supersede whatever the
20     local agreement is.
21 Q.  Okay.  It would not supersede the local agreement?
22 A.  Right.  I think locally -- because, for example, when
23     I worked at the Mount Pleasant post there was no -- no
24     wrecker list, no rotating, no preference list.  It was
25     strictly -- you know, that's covered anywhere in the

Page 38

1      order that I know of, you know, putting the choice on
2      the consumer.
3  Q.  Okay.
4  A.  So, you know, that's locally what everybody does there
5      in Isabella, the post --
6  Q.  Right.
7  A.  -- the campus police, you know.
8              So every one runs a little bit different.
9  Q.  Actually I think Order 48 says you don't have to have
10     a no-pref list.
11 A.  Right.
12 Q.  So that would still be in compliance.  All I was
13     trying to figure out is as a general proposition it
14     would be -- well, it would be surprising to me anyway
15     if this order basically says this is what you have to
16     do unless you decide differently?
17 A.  Yeah, but I think this says -- this establishes a
18     policy and outlines procedures and gives guidelines
19     except where locally you do it differently as long as
20     it -- you know, I have never encountered a problem
21     with any of our wrecker lists where different areas
22     where I've worked.  That each area is a little bit
23     different.  And even within the post area there will
24     be different authorities.  So, yeah, I don't -- I've
25     always known Official Order 48 is there and, you know,

Page 39

1      as an official order you shouldn't cross it, but I've
2      never worked exactly Official Order 48.
3  Q.  Okay.
4  A.  I mean, I know you're going to be asking me questions
5      about Official Order 48 and I could kind of dance
6      around it all day with answers, but, you know, what
7      locally is established when you come to a work area as
8      long as it's not illegal or immoral or fattening, you
9      know, you continue to do it.  So this Mason-Oceana 911
10     center was established while I was gone, if you
11     remember in my background between 1994 and when I
12     returned, and they had a working order of how they
13     handle wreckers, and when I got here we just -- I just
14     picked up with that.
15 Q.  Okay.
16 A.  Yeah.
17 Q.  And you're not -- well, I'm going to actually get into
18     that later.  I'll talk about that local policy later.
19     So you can understand why I'm trying to figure out
20     what's going on?
21 A.  Yeah, right.
22 Q.  Hold on, hold on.
23 A.  Okay.
24 Q.  You know, I'm given this policy and I'm trying to
25     figure out whether this is just something that is just

Page 40

1      honored in the breach or whether this is something
2      that you all acknowledge that you're supposed to do.
3      It's certainly on the department's website and it's
4      labeled Official Order No. 48, so I think, you know,
5      the understanding in my mind would be is that you all
6      are bound by it, and you seem to have acknowledged
7      that, but again, to use your words, I sort of feel
8      like maybe there's some dancing around it.  I mean,
9      are you bound by this order or not?
10 A.  It's my understanding that it gives me the flexibility
11     to work with the local agreement.
12 Q.  Okay.  What language gives you the flexibility?
13 A.  That included are operational guidelines to provide
14     efficient and equitable delivery of qualified and
15     courteous wrecker service -- or just before that, work
16     site shall establish a local policy for areas not
17     covered by this order or where local policy
18     development is required.
19 Q.  Okay.
20 A.  And in order to stay homogenous with the other members
21     in the geographical area and make it easier and more
22     efficient for 911 to select from a list we all work
23     together on how the list is put together.
24 Q.  And that can be done -- that can be done without -- or
25     in conjunction with Official Order 48, correct?

### Page 49

```
 1       narrowed, okay, with regard to a Michigan State Police
 2       tow where they've been called because they were on the
 3       no-preference list, okay, are you aware of any
 4       concealing or misrepresentation of any material fact?
 5   A.  On any Michigan State Police tow?
 6   Q.  Uh-huh, on a Michigan State Police tow in your post.
 7   A.  I would have to, you know, have everything in front of
 8       me to look back over things to be sure.  So I would
 9       say that I wouldn't at this time commit to anything on
10       A.
11   Q.  You can't remember?
12   A.  Right.  I wouldn't commit to anything on A then.
13   Q.  Okay.  So you're not -- as you're sitting here right
14       now you don't know if there are, right?
15   A.  I don't recall.
16   Q.  All right.  Go ahead then.
17   A.  Well, letter D, drivers and representatives of the
18       wrecker service shall be professional and courteous in
19       their dealings with the public.
20   Q.  Okay.  What instances were there that you investigated
21       about that?
22   A.  People that have complained to me have told me of
23       their contact with the wrecker service and that they
24       were basically told that we're not talking to you
25       about it, you know, have your insurance company call
```

### Page 50

```
 1       us.  The director of the 911 center receiving
 2       complaints about calls for service that we had handled
 3       had the same experience.  We held a special meeting
 4       through the 911 board to meet with the wrecker
 5       companies to specifically deal with communications and
 6       how service is provided.
 7   Q.  With several carriers, correct?
 8   A.  Correct.
 9   Q.  I guess what I'm asking is do you have any official,
10       you know, written complaints that you received that
11       you then acted upon with regard to professional and
12       courteous conduct where you conducted an investigation
13       and went through the procedures of Official Order 48?
14   A.  Not -- I don't know.  I didn't familiarize myself with
15       the procedures or an investigation through Official
16       Order 48 in conjunction with our partners in
17       Mason-Oceana 911, and as it regards to our
18       no-preference wrecker list we did consult with each
19       other.
20   Q.  Okay.  So with regard to official 48 the answer though
21       is no?
22   A.  Correct.
23   Q.  Okay.  All right.  Go ahead.
24   A.  And, you know, I don't know if LARA -- a lot of things
25       I can't -- insurance and things like that I don't look
```

### Page 51

```
 1       into.
 2   Q.  Well, I'm not so sure you should have, but my point is
 3       as you sit here today do you have personal knowledge
 4       that they were out of compliance with any of these?
 5   A.  Yeah, I'm saying I have no way --
 6   Q.  If the answer is I don't have personal knowledge, then
 7       just say no, okay?
 8   A.  Okay.  You said to go to K, sir?
 9   Q.  Uh-huh.  Yeah.
10   A.  To K or through K?
11   Q.  Through K.
12   A.  Okay.
13   Q.  Okay.  So do you have any personal knowledge after
14       that review of any instances in which Eagle Towing was
15       out of compliance?
16   A.  Yeah, as stated.
17   Q.  Just the ones we talked about before, but after we
18       left -- I guess what was it?  Okay.  So after D you
19       didn't find any that you had personal knowledge of
20       anything being out of compliance; is that right?
21   A.  D?
22   Q.  Our last discussion was about letter D.
23   A.  I'm looking at sub D, right.
24   Q.  So E through K there's nothing that you -- after
25       reading through that there's none of those --
```

### Page 52

```
 1   A.  Not that I'm aware of.
 2   Q.  Excuse me.  You don't have any personal knowledge that
 3       Eagle Towing was out of compliance with any of those
 4       conditions, correct?
 5   A.  E through K, not that I'm aware of, yes, sir.
 6   Q.  Now, with regard to L I know that there's been quite a
 7       bit of discussion about the rates which Eagle Towing
 8       has been charging, and so I'd like to talk a little
 9       bit about this section.  So section 2 says basic and
10       special service charges, and then it states reasonable
11       rates based on local industry standards shall be used
12       for all services provided.  How do you determine what
13       reasonable rates are or do you determine what
14       reasonable rates are?  I guess that's two questions in
15       one, so I'm going to rephrase that.  Are you the
16       person who determines what the reasonable rates are?
17   A.  No.
18   Q.  Okay.  Do you know how to determine what the
19       reasonable rates should be?
20   A.  I guess it's like the Supreme Court's definition of
21       pornography, you know, you know it when you see it,
22       but as far as is there a dollar amount, a penny over,
23       no.  Every -- every situation is different.  I could
24       see and have seen situations, you know, horrible
25       weather conditions, you know, the amount of line --
```

Page 81

1   A.   I'm assuming, you're right.
2   Q.   Okay. Let's turn to page 153. Okay. I'm looking at
3        section 48.3.12, complaint procedures. Okay. So the
4        first sentence states in paragraph 1 problems with or
5        complaints about a wrecker service shall -- again,
6        shall I presume means no option, correct?
7   A.   Yes, sir.
8   Q.   That's your understanding. Shall be documented by the
9        work-site commander. Okay. So when you get problems
10       or complaints you're supposed to create a document; is
11       that correct?
12  A.   Well, I've saved documentation that I've gotten on
13       them, but I've not -- I've not opened a criminal
14       complaint investigation --
15  Q.   No one said anything about criminal here.
16  A.   Well, yeah, you know what I mean. We typically -- we
17       very rarely take civil -- but yeah, no, I've not
18       created a document and open complaint at the post
19       ever. Nothing in our report-writing system.
20  Q.   Okay. It states that the documentation shall be
21       retained for the duration of the wrecker service's
22       contract with the department or their time on the
23       wrecker list plus two years. You don't have that
24       retention policy because you don't -- you don't create
25       the documentation; is that correct?

Page 82

1   A.   I retain the -- I hold onto them. I keep copies of
2        it.
3   Q.   Documents that you received from somebody else; is
4        that correct?
5   A.   Yes. Yes, sir.
6   Q.   Okay. And have you -- looking at number 3, and this
7        is where the word members is used, and I presume that
8        means members of your post?
9   A.   Yes, I think so.
10  Q.   Okay.
11  A.   Yes, sir.
12  Q.   So members who become aware that a wrecker service has
13       intentionally violated chapter 2 of the Michigan
14       Vehicle Code shall inform their work-site commander of
15       the reported violations. Have you received any of
16       those reported violations from members of your --
17  A.   What are the violations enumerated in chapter 2?
18  Q.   Any of them.
19  A.   Offhand I don't know what is in chapter 2.
20  Q.   Okay. Well, have you received any -- any reports from
21       members about any intentional violation of the law at
22       all on the part of Eagle Towing?
23  A.   I don't think so.
24  Q.   Okay. Now, number 4 here states that each wrecker
25       service shall be held to the identical standards of

Page 83

1        conduct or performance. Do you see that?
2   A.   Yes, sir.
3   Q.   Okay. So Eagle Towing shouldn't be treated any
4        differently than the other ones that are on your tow
5        list, correct?
6   A.   I agree, yes, sir.
7   Q.   So if Eagle Towing has provided you with documentation
8        and the others have not, they should be required to
9        provide you with documentation, correct?
10            MR. MYERS: Objection as to form.
11            What documentation?
12            MR. BRENNAN: Sure. I'll reask it.
13  BY MR. BRENNAN:
14  Q.   If Eagle Towing has provided you with the
15       documentation required under Official Order 48, the
16       other towing companies should provide you with that
17       documentation as well; is that correct?
18  A.   And we go back to just a few minutes ago I agreed with
19       you. I stipulated that I'm not necessarily in lock
20       step with the Official Order 48.
21  Q.   Okay.
22  A.   But you can ask this question over and over and the
23       answer is going to be the same, that I'm not doing it.
24  Q.   But I'm asking whether you should do it, in your mind?
25  A.   And you've asked me that before --

Page 84

1   Q.   Okay.
2   A.   -- and, you know, I agree with you, and I think
3        that -- I think that in Official Order 48 it says that
4        the post commander can enter into local agreements --
5   Q.   We're traveling -- I'm sorry, we're traveling far
6        afield here. All I want to know is do you agree that
7        each wrecker service shall be held to identical
8        standards of conduct or performance if you are
9        complying with Official Order 48, yes or no?
10  A.   Why are you asking me if I'm complying with Official
11       Order 48? I told you I'm not.
12            MR. BRENNAN: Read the question back. Read
13       the question back.
14            MR. MYERS: I'm sorry, would you mind if we
15       just take a short break? I think we can -- we might
16       be able to make sure that this goes smoothly.
17            MR. BRENNAN: That would be awesome,
18       because I'm getting a little frustrated.
19            THE WITNESS: I'm sorry, I just don't
20       understand.
21            (Recess taken at 12:31 p.m.)
22            (Back on the record at 12:43 p.m.)
23  BY MR. BRENNAN:
24  Q.   Okay. So I'm just -- I don't even know if I remember
25       the last question, but I'm just going to reask it and

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**Page 101**

1  I -- if they came -- again, they came in this order
2  from you so I presume these are the attached
3  documents, but it says that Eagle Towing is no longer
4  on the Oceana County Sheriff's non-preference rotation
5  list, that Ray Hasil is aware of it, and then if a
6  driver requests Eagle Towing make that arrangement for
7  that, but they're not on our no-preference list until
8  further notice.
9       Now, our no-preference list refers to the
10 sheriff's no-preference list; is that correct?
11 A. Yes, sir.
12 Q. He couldn't remove someone off of your list unless you
13 agreed with that; is that correct?
14 A. Yes, sir.
15 Q. Okay. All right. And if you turn to the next page,
16 163, these are apparently the documents that were
17 attached to this e-mail, at least until we get to page
18 168 anyway it appears where we run into another
19 e-mail, and you reviewed this letter to John Heykoop
20 from Craig Mast, Sheriff Mast?
21 A. Are you talking 163?
22 Q. 163, correct.
23 A. Yes, sir, I believe I did.
24 Q. And did this letter in any way -- did this letter
25 form -- were these one of the complaints that you're

**Page 102**

1  referring to as it relates to removing Eagle Towing
2  from the list?
3  A. Are you referring to 164?
4  Q. 163 and 164, yes.
5  A. Yes, sir.
6  Q. Okay. Now, if you look at 164 the -- if you reviewed
7  this letter, this letter doesn't say anything about a
8  failure to -- of the failure of Eagle Towing to
9  communicate with the owner, does it?
10 A. No, sir, they're isn't.
11 Q. Okay. But nevertheless, you just testified that this
12 was one of the complaints that you based your decision
13 on; am I wrong or am I right about that?
14 A. You're right.
15 Q. Okay. And at the time do you know whether there was
16 an official local policy still in force at 911?
17 A. Yes.
18 Q. As far as you remember that was in force, and that was
19 the policy that, as you said earlier, didn't have
20 anything about rates included in it, correct?
21 A. You know, without having it in front of me I'm
22 agreeing. If you're telling me it's not in there I
23 agree.
24 Q. Okay.
25 A. Yep.

**Page 103**

1  Q. Okay. And then the next page, which is page 1 --
2     well, there is supporting documents, but if we go to
3     page 168 we have another e-mail. This one is dated
4     November 13th.
5  A. 168, sir?
6  Q. Yeah. Uh-huh.
7  A. Okay. Yes, sir.
8  Q. And this is from you. And you're sending a copy of
9     the letter that we've been looking at a little bit --
10    the next page is your letter?
11 A. Yes, sir.
12 Q. And you sent this to several folks, most of them from
13    MSP, and I'm curious as to why you included Lieutenant
14    McIntire on this.
15 A. I included Lieutenant McIntire because we're bordering
16    posts and I know that the company works outside of my
17    post area, but also into Lieutenant McIntire's, so as
18    a courtesy to Lieutenant McIntire I let him know what
19    was going on with my post area vis-a-vis this towing
20    company.
21 Q. Why -- why is that? Why would that be important for
22    him to know if there were not any -- were you aware of
23    any complaints in the Rockford post?
24 A. I believe that there had been, but I didn't delve into
25    that or dive into that.

**Page 104**

1  Q. So you don't know?
2  A. I don't.
3  Q. Okay. Was it your intention to influence these
4     other -- this post to adopt your decision to remove
5     them from the list?
6  A. No, sir.
7  Q. Okay. You just did is at a, quote/unquote, courtesy?
8  A. Correct.
9  Q. What did you expect the result of sending this to
10    them -- to McIntire to be?
11 A. I was just notifying my neighboring post commander of
12    the policy change or a change in my status with the
13    company that I know he also does business with.
14 Q. Okay.
15 A. Yeah, that's all.
16 Q. Did you have any conversation with Lieutenant McIntire
17    after this?
18 A. I'm sure I did.
19 Q. Did you have -- do you recall any conversations with
20    Lieutenant McIntire in which you discussed your
21    decision to remove Eagle Towing off the list?
22 A. I would think so, yes, sir.
23 Q. Did you recommend to Lieutenant McIntire that he --
24    that Eagle Towing should be removed from the Rockford
25    list?

**Page 105**

1  A.  No, I didn't.
2  Q.  Did you express any opinion about it?
3  A.  No.
4  Q.  Did you discuss with Lieutenant McIntire that you were
5      or had conducted an investigation?
6  A.  Yeah, I did.  I'm sure that I did tell him about the
7      last few years and the contacts and meetings and what
8      had led up to the culmination of what I did, so yeah,
9      I'm sure we discussed that.
10 Q.  Okay.  And why did you get into that kind of detail
11     with him?
12 A.  Because it's very, very odd and out of the ordinary to
13     remove a tow company from your list.
14 Q.  So he asked about it, is that what you're saying?
15 A.  No, I --
16 Q.  You offered the information?
17 A.  I sent -- in that e-mail I sent it and from there I'm
18     not sure how -- but you're asking me if I had either a
19     phone conversation --
20 Q.  Yeah.
21 A.  -- or face to face, and I'm certain I did because I
22     talked to my peers quite a bit and we meet, we have
23     monthly post commander meetings, so I'm sure at some
24     point we had a contact where this topic would have
25     come up, but I don't believe that this was ever a

**Page 106**

1      topic-specific contact.
2  Q.  This wasn't on any agenda at your post commander
3      meetings?
4  A.  Oh, boy, I don't think so.  I don't think my troubles
5      amount to the agenda to the captain.  I don't think
6      it's ever been on an agenda, but I would hate to say
7      that and to be wrong.  I don't ever recall it being on
8      the agenda.
9  Q.  Okay.
10 A.  Now, we do have a round table, you know, at the end
11     of --
12 Q.  What's that about?
13 A.  At the end of every post commander's meeting, you
14     know, it's like round table, tell me what you got and,
15     you know --
16 Q.  Swapping stories and stuff?
17 A.  Yeah, we got three pregnant wives or whatever, and I
18     may have mentioned it in a post commander meeting at
19     the round table --
20 Q.  Okay.
21 A.  -- but I don't know, and I don't think -- unless the
22     secretary put it in the minutes, which she does,
23     whether or not it was discussed.
24 Q.  But there are no minutes at the round table?
25 A.  Oh, yeah, there are.

**Page 107**

1  Q.  Oh, there are?
2  A.  Yeah, yeah.  The district secretary takes the minutes
3      and whatever each post commander throws in at the end
4      is part of the round table and that's bulleted out.
5  Q.  I see.  Okay.
6  A.  Yeah.
7  Q.  Okay.
8  A.  So I would say if you look for a document it might be
9      there.  I don't recall doing that, but it wouldn't be
10     out of the realm of possibility.
11 Q.  Well, you were asked for communications that involved
12     Eagle Towing internal communications and so I would
13     expect if there was you would have produced those?
14 A.  Yeah, if I knew about it I would have, yes, sir.
15 Q.  Not a question about knowing.  If you investigated --
16     Let me back up.
17         When you get a document request no one
18     expects you to know all the documents in your head,
19     you have to go look for them, right?
20 A.  Right.
21 Q.  Did you look in the minutes for the round table to see
22     if there had been any communications?
23 A.  I didn't, because I don't believe there is -- you
24     know, you jogged my thought like gosh, I hate to say
25     that and be wrong.

**Page 108**

1  Q.  No, and I appreciate it, and I guess I would request
2      that you do such a search and see if there are any
3      communications via the round table or the post -- the
4      commander post minutes to see if there was any
5      discussion.
6  A.  You're asking me to do that?
7  Q.  Yeah, I think we did ask you to do that and you just
8      may have realized that's part of what you should be
9      looking at.
10 A.  Yeah, I didn't think there was one there but I'll
11     check.
12 Q.  That would be really appreciated.
13 A.  Yes, sir.
14 Q.  Okay.  If you could look at page 170, this is an
15     e-mail from Ray Hasil to you and Craig Mast and
16     there's a forwarded message from Ray Hasil to -- is
17     that the board basically?
18 A.  No, this would be -- I don't know who -- I'm not sure
19     who Robert Robles is, but this looks like the chiefs
20     in Oceana County of the various departments.
21 Q.  Yeah, various departments, township departments,
22     village departments and whatever?
23 A.  Yes, sir.  Yep.
24 Q.  And it states in the second paragraph there for
25     specifics on why the changes occurred, and the change