*John Heykoop dba Eagle Towing v Michigan State Police, et al*
USDC-WD No: 1:18-cv-00632
Honorable Robert J. Jonker
Magistrate Judge Phillip J. Green

# EXHIBIT 3

## Page 1

```
 1        IN THE DISTRICT COURT OF THE UNITED STATES
 2           FOR THE WESTERN DISTRICT OF MICHIGAN
 3
 4
 5   JOHN HEYKOOP D/B/A
 6   EAGLE TOWING,
 7              Plaintiff,
 8        vs.              Case No. 1:18-cv-00632
 9                         Hon. Robert J. Jonker
10
11   FIRST LIEUTENANT JEFFREY WHITE;
12   FIRST LIEUTENANT CHRIS
13   MCINTIRE,
14              Defendants.
15   _____
16
17
18       The Deposition of FIRST LIEUTENANT CHRIS MCINTIRE,
19       Taken at 4151 Okemos Road,
20       Okemos, Michigan,
21       Commencing at 10:34 a.m.,
22       Monday, February 4, 2019,
23       Before Rebecca L. Russo, CSR-2759, RMR, CRR.
24
25
```

## Page 2

```
 1   APPEARANCES:
 2
 3   JOHN S. BRENNAN
 4   Fahey Schultz Burzych Rhodes PLC
 5   4151 Okemos Road
 6   Okemos, Michigan 48864
 7   517.381.0100
 8   jbrennan@fsbrlaw.com
 9       Appearing on behalf of the Plaintiff.
10
11   PATRICK S. MYERS
12   Assistant Attorney General
13   Civil Litigation Employment & Elections Division
14   525 West Ottawa Street
15   Lansing, Michigan 48933
16   517.373.6434
17   myersp4@michigan.gov
18       Appearing on behalf of the Defendants.
19
20   ALSO PRESENT:
21   John Heykoop
22
23
24
25
```

## Page 3

```
 1                    TABLE OF CONTENTS
 2
 3   WITNESS                                         PAGE
 4   FIRST LIEUTENANT CHRIS MCINTIRE
 5
 6   EXAMINATION BY MR. BRENNAN                      5
 7   EXAMINATION BY MR. MYERS                        123
 8   RE-EXAMINATION BY MR. BRENNAN                   126
 9
10                        EXHIBITS
11
12   EXHIBIT                                         PAGE
13   (Exhibits attached to transcript.)
14
15   DEPOSITION EXHIBIT 1                            9
16   DEPOSITION EXHIBIT 2                            17
17   DEPOSITION EXHIBIT 3                            35
18   DEPOSITION EXHIBIT 4                            77
19   DEPOSITION EXHIBIT 5                            78
20   DEPOSITION EXHIBIT 6                            81
21   DEPOSITION EXHIBIT 7                            83
22   DEPOSITION EXHIBIT 8                            87
23   DEPOSITION EXHIBIT 9                            92
24   DEPOSITION EXHIBIT 10                           102
25   DEPOSITION EXHIBIT 11                           102
```

## Page 4

```
 1   DEPOSITION EXHIBIT 12                           104
 2   DEPOSITION EXHIBIT 13                           105
 3   DEPOSITION EXHIBIT 14                           105
 4   DEPOSITION EXHIBIT 15                           106
 5   DEPOSITION EXHIBIT 16                           107
 6   DEPOSITION EXHIBIT 17                           108
 7   DEPOSITION EXHIBIT 18                           109
 8   DEPOSITION EXHIBIT 19                           110
 9   DEPOSITION EXHIBIT 20                           110
10   DEPOSITION EXHIBIT 21                           113
11   DEPOSITION EXHIBIT 22                           114
12   DEPOSITION EXHIBIT 23                           114
13   DEPOSITION EXHIBIT 24                           117
14   DEPOSITION EXHIBIT 25                           119
15   DEPOSITION EXHIBIT 26                           120
16   DEPOSITION EXHIBIT 27                           121
17   DEPOSITION EXHIBIT 28                           121
18
19
20
21
22
23
24
25
```

**Page 9**

1  Q.  You understand what the case is about?
2  A.  I do.
3  Q.  Okay. I'm going to -- the first thing I want to do
4      is, I want to go over some of the answers that you
5      gave in your interrogatories and clarify a few things.
6  A.  Okay.
7  Q.  Okay.
8          MR. BRENNAN: So if you could mark that for
9      me, please?
10             MARKED FOR IDENTIFICATION:
11             DEPOSITION EXHIBIT 1
12             10:38 a.m.
13 BY MR. BRENNAN:
14 Q.  So I'm showing you what's been marked as Exhibit 1,
15     and if you could, just page through that.
16             When I show you documents, take as much
17     time as you want to. Just make sure you're familiar
18     with the documents.
19 A.  Sure.
20 Q.  I don't care about time or silence, it's not a big
21     deal.
22 A.  Okay.
23 Q.  I'm not going to ask you questions about Lieutenant
24     White's portion of it --
25 A.  Okay.

**Page 10**

1  Q.  -- but the back end of that you might want to look at,
2      because that's your response to the document request.
3      I just want to make sure you're familiar with that, as
4      well. I'll kind of be using that as we go through the
5      whole deposition today, actually.
6  A.  Okay.
7  Q.  Okay. So you, you obviously saw these interrogatories
8      and provided the answers to your attorney with regard
9      to how you wanted to respond to these, is that
10     correct?
11 A.  I did.
12 Q.  Okay. And is that your signature also on page 5?
13 A.  It is.
14 Q.  Okay. And you were under oath when you signed that,
15     or I presume you were under oath. It says you were,
16     right?
17 A.  Yes.
18 Q.  Okay. If you could look at number 1, we asked if you
19     could identify all the wreckers or towing companies
20     that have been placed on your no-preference wrecker
21     rotation list, and you state that you have no personal
22     knowledge of which towing companies are on the list
23     since 2014.
24             And that seems to assume that you do have a
25     list, is that correct --

**Page 11**

1  A.  Yes.
2  Q.  -- there is a no-pref towing list?
3  A.  There is a list, that's correct.
4  Q.  Okay. And just for shortness I'm going to use
5      "no-pref" --
6  A.  Sure.
7  Q.  -- instead of "no-preference," okay?
8            All right, and is that because you just
9      haven't seen it or it's not available at the post
10     or ...
11 A.  I don't deal with it. It's maintained by Muskegon
12     County Central Dispatch, and I just don't know what
13     wrecker companies are on that list.
14 Q.  Okay. And you didn't, you didn't make an attempt to
15     find that list when you were answering the
16     interrogatory?
17 A.  No.
18 Q.  Okay. And then the second question asks you to
19     identify the wreckers and towing companies that have
20     been removed from the list in the past ten years, and
21     your answer says, to your knowledge, no towing company
22     besides plaintiff has been removed. And I guess I'm
23     tying to figure out -- the question said please
24     identify all wreckers or towing companies that have
25     been, that have been removed, and I guess what I'm

**Page 12**

1      trying to get at here is -- so you're saying that
2      within the past ten years, only Eagle Towing has been
3      removed from the list. Is that correct?
4  A.  Well, first of all, to make -- the ten-year part is
5      kind of a problem for me, in the sense that I wasn't
6      involved with Muskegon County for ten years. We
7      combined the Rockford and Grand Haven post about four
8      or five years ago.
9  Q.  Okay.
10 A.  I took over Grand Haven at that point in time, so
11     prior to that I would have had no working knowledge of
12     anything in Muskegon County.
13 Q.  Okay, so how about if we just go back five years for
14     clarification, then?
15 A.  Sure.
16 Q.  Okay. So, as far as you know, no other towing company
17     was removed from the list in that period of time
18     except for Eagle Towing?
19 A.  That's what I understand, yes.
20 Q.  Okay. Now, you state -- and we're going to go over
21     Official Order 48 --
22 A.  Okay.
23 Q.  -- but I just want to get the sense that what you're
24     saying in response to question 3, which asks you to
25     identify the process used for reviewing applications

MCINTIRE, FIRST LIEUTENANT CHRIS
02/04/2019

Pages 13–16

Page 13

1  and removing, and also removing wreckers or towing
2  companies from the list, you're basically saying here,
3  and correct me if I'm wrong, please, that your post
4  follows Order 48 for both considering, placement, and
5  removing companies from that list.  Is that correct?
6  A.  Yes.
7  Q.  Okay.  So you're acknowledging here that Order 48 is
8  what you have to abide by for doing those things.  Is
9  that correct?
10 A.  Yes.
11 Q.  Okay.  And then, and then we've asked for, in number 4
12 we've asked for the names of companies that have been
13 on the list since plaintiff's removal, and again,
14 you're just referring to the Muskegon County Central
15 Dispatch for that information.  Is that right?
16 A.  Correct.
17 Q.  Did you actually -- it looks like you may have called
18 them or got the information from them because you do
19 list names.  Is that right?
20 A.  Yes, I did deal with the Muskegon County Central
21 Dispatch.
22 Q.  Okay.  So would it be fair to say that they're kind
23 of, I don't know, the caretaker of the list --
24 A.  They are.
25 Q.  -- so to speak?

Page 14

1  A.  Yes.
2  Q.  Okay, but they take direction from you as to who's on
3  and who's not on that list, is that correct?
4  A.  Correct.
5  Q.  Okay.  Then in number 5 we asked if you could identify
6  complaints made to you about or related to any wrecker
7  or towing company in which the subject matter involved
8  was related to a deficiency in the quality or type of
9  service provided, or the fee or rate charged.
10         And your response is the only company
11 you've ever received a complaint about was about
12 Plaintiff.  Is that right?
13 A.  Correct.
14 Q.  Do you know how many -- it says identify them, but you
15 didn't really identify them.  I'm just trying to --
16 and it may just be a misunderstanding, because I said
17 please identify any complaints, and you identified the
18 company, and what I'm trying to figure out is how many
19 complaints did you -- have you received.
20 A.  About the company?
21 Q.  About, yes, how many complaints about them.
22 A.  I firsthand received one complaint about them.
23 Q.  Okay.  And do you know offhand, and maybe we'll run up
24 against it in the documents, but do you remember
25 offhand who filed that complaint or who sent that

Page 15

1  complaint?
2  A.  I don't.  It was back in I think 2000 ...
3  Q.  '17?
4  A.  No.  I don't know, '14 or so, '13, '14 or '15.
5  Q.  Okay.  So the only complaint that you received that
6  you're aware of was 2014?
7  A.  Correct.
8  Q.  Okay.  And do you know what you did in response to
9  that complaint?
10 A.  I listened to the complainant's complaint, and then I
11 talked to Mr. Heykoop about it and resolved it.
12 Q.  Okay.  And do you know what the complaint was about?
13 A.  The guy thought he was overcharged.
14 Q.  Okay.  And you resolved it; how did you resolve it?
15 A.  Talked to Mr. Heykoop about the overcharging.  First I
16 took, and I can't remember the dollar amount the guy
17 said that he actually was, thought he was overcharged,
18 but it was several thousands of dollars.
19         I took that information from him, and I
20 went to some of the companies in Muskegon County, I
21 can't remember which ones I went to, and just asked
22 them what they would charge for the type of incident
23 the person was involved with, and the two places that
24 I talked to were right around four to five hundred
25 dollars.

Page 16

1  Q.  Okay.
2  A.  I talked with Mr. Heykoop about that incident, and he
3  acknowledged that -- he acknowledged what he charged,
4  and I believe the reasons that he gave were he has a
5  lot of certifications, that his people go through a
6  lot of extra training they go through, therefore he
7  charges extra money based on the certifications and
8  things he does at the scene.
9          I explained to him that I thought it was in
10 excess of what he should be charging, and that if I
11 were to receive any more complaints from citizens that
12 they were being overcharged, I would come back to him
13 then and I would have to take a look at removal from
14 the no-preference list for overcharging.
15 Q.  Okay.  Do you know whether that person filed any
16 formal complaints or sought any remedy through the
17 judicial system?
18 A.  I don't believe so.  He told me that he -- he said,
19 "The reality of it is, I'm not out any money.  It
20 didn't cost me anything.  My insurance company paid
21 it.  I just think that it was excessive."
22 Q.  Okay.
23 A.  But from there what he did, I really don't know.
24 Q.  Okay.  And this is the only one that your post has
25 ever received, is that correct?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

### Page 17

1  A.  Me, personally.
2  Q.  Okay. Can you just give me a sense, on number 6, what
3      this Rudd versus City of Norton Shores case was about?
4  A.  Mr. Rudd asked me to investigate an incident with the
5      Norton Shores Police Department, and there was no
6      incident to investigate, so I didn't investigate it.
7      And then he filed a lawsuit against me, more so than
8      Norton Shores Police Department, but me for failing to
9      do my duties as a police officer to investigate this
10     crime.
11 Q.  Okay.
12 A.  And it was dismissed.
13 Q.  Okay. I'm just going to interrupt this for just a
14     second and go over this real quick.
15              MARKED FOR IDENTIFICATION:
16              DEPOSITION EXHIBIT 2
17              10:49 a.m.
18 BY MR. BRENNAN:
19 Q.  Okay, Lieutenant, I'm just going to show you what's
20     been marked as Exhibit 2, and if you could just leaf
21     through that for a minute and let me know when you're
22     ready. The last couple pages are photographs that
23     didn't really turn out, but it's not important.
24 A.  Okay.
25 Q.  All right. So the first page of this Exhibit

### Page 18

1      Number 2, this is a copy, a true copy of a letter that
2      you sent to John Heykoop regarding placement on the
3      no-pref list?
4  A.  It is.
5  Q.  Okay. And it states that as of December 14th, 2017 --
6      now, that's three years after the event that you just
7      told me about, correct?
8  A.  Correct.
9  Q.  Or at least three years?
10 A.  Mmm-hmm.
11 Q.  And you've also testified that you haven't received
12     any other complaints personally since then, is that
13     correct?
14 A.  Correct.
15 Q.  Okay. It says: Eagle Towing has been removed from
16     the Michigan State Police Rockford Post 61 no-pref
17     wrecker list. Your removal from the list is a direct
18     result of the unacceptable service that you have
19     provided within the post area.
20              Now, could you tell me, what does "post
21     area" refer to, please?
22 A.  My Rockford post area.
23 Q.  Okay. And unacceptable service, that's the only
24     stated reason in your letter, is that correct?
25 A.  Correct.

### Page 19

1  Q.  Okay. Now, what complaint are you referring to that
2      established the unacceptable service that you're
3      talking about here in this letter?
4  A.  Well, it would be a combination of a couple different
5      things. It would be a combination of the complaint
6      that I received back in 2014, and then it's known in
7      the law enforcement community and at least in my
8      county, Muskegon County, that I service -- well, I
9      service three counties, but while Eagle's been working
10     in Muskegon County, it's known or heard of that Eagle
11     Towing overcharges people. Not just from the
12     complaint that I had, there was also, I guess, an
13     exposé, is the best way to put it, from one of the
14     news stations that covers Muskegon County that -- they
15     did a part on companies that were overcharging
16     citizens, and they highlighted two companies in the
17     Muskegon County area, one of them being Eagle Towing
18     and one of them being a company that I can't remember
19     who they were.
20 Q.  I've seen that.
21 A.  That information was out there. And then because, you
22     know, I'm a different agency than the other agencies,
23     obviously, in Muskegon County, everybody else had
24     kicked him off the list. The most important to me
25     would be the Muskegon County Sheriff's Department,

### Page 20

1      because we have kind of concurrent jurisdiction where
2      we work.
3               They kicked him off quite some time ago,
4      and I didn't because I didn't have, I didn't have the
5      due process that I have to go through in order to make
6      that happen. I can't speak to what other departments
7      can do and why they would or wouldn't remove somebody
8      from the list, but I was the last agency that had them
9      on the list.
10              I knew that the Hart post was going through
11     some things with wrecker companies in Oceana County,
12     and in particular Eagle Towing, and Lieutenant White
13     had conducted an investigation for some things that he
14     had happen up in Oceana County, and at the conclusion
15     of his investigation he made the decision then to
16     remove them from the no-preference list in Oceana
17     County.
18              And I took a look at the investigation that
19     another State Police agency did that basically
20     bordered my jurisdiction in regards to a company that
21     was operating in Muskegon County, as well. I felt
22     comfortable then that there was, there was enough
23     through his investigation to remove them through the
24     policies and procedures of our official orders, and
25     then I removed him, as well.

**Page 45**

1  possession to refer to, is that right?
2  A. That's correct.
3  Q. Okay. Is that just an oversight or, you know, do you
4  know what the reason for that is?
5  A. I don't know. Probably oversight on my part. I guess
6  I'm supposed to actually ask for all of those, all of
7  those things listed in this order, all their
8  insurances, all their -- all those things, and I
9  haven't done it.
10 Q. And in order to be on the no-pref list, everyone's
11 supposed to provide that information for you, is that
12 right?
13 A. Correct.
14 Q. Okay. All right, with regard to storage charges and
15 mileage charges, is your answer the same with regard
16 to how you determine reasonable fees?
17 A. My answer is the same as to?
18 Q. You said a minute ago that you don't know how, how
19 reasonable rates are determined, and I just asked if
20 that's the same thing for storage fees and mileage
21 charges.
22 A. Yes.
23 Q. Okay. All right, have you ever, looking at page 17,
24 letter M, have you ever found -- no, I'm sorry, one
25 other question.

**Page 46**

1  In your letter of December 14th, 2017,
2  where you sort of officially told Eagle Towing that
3  they were off your list, you did not make any
4  reference to the rates they were charging in that
5  letter, is that correct? And that's Exhibit 2 here.
6  A. I did not.
7  Q. Okay. So as far as Eagle Towing is concerned, when
8  they received this letter, they would have no basis
9  for knowing that the reason they were taken off the
10 list was because for some reason you felt that their
11 charges were in violation of Order 48, is that
12 correct?
13      MR. MYERS: Objection, calls for
14 speculation.
15 BY MR. BRENNAN:
16 Q. You can answer.
17      MR. MYERS: You can answer.
18 A. Yeah, I don't know what they would think after reading
19 that.
20 BY MR. BRENNAN:
21 Q. Okay. Moving on to page 17, then, looking at M and N,
22 same question as I had for A through K; is there
23 anything in those two subsections that you can see in
24 which Eagle Towing was not in compliance?
25 A. Regarding letters M and N, I don't find them to be in

**Page 47**

1  violation of that at all.
2  Q. Okay. They never have, and you don't know of any
3  facts that they were?
4  A. Not that I know of.
5  Q. Okay. Now, the next section is 48.3.6, the
6  "No-Preference Wrecker Call List," under section A(1)
7  it says that: If a no-preference wrecker call list is
8  created -- and one was created, correct?
9  A. Correct.
10 Q. -- only wrecker services which have requested
11 placement on the list and have met the requirements of
12 this order shall be included.
13      Is that correct?
14 A. Correct.
15 Q. Okay. Now, in order to be placed on the list -- it
16 states "Application for Placement on No-Preference
17 Call List," and there is a form designated UD-041. Do
18 you see that?
19 A. I see that, yes.
20 Q. Okay. So in order to be placed on the list, they have
21 to request placement, and the way to do that is by
22 submitting a UD-041, is that correct?
23 A. That's correct.
24 Q. Okay. And it states in B(3): The original signed
25 UD-041 and all other required documents shall be

**Page 48**

1  maintained at the worksite for the year the wrecker
2  service is removed from the no-preference wrecker call
3  list plus two years.
4      Do you see that?
5  A. I do.
6  Q. Okay. So you are required to maintain this form, is
7  that right?
8  A. By the order, I am, yes.
9  Q. Okay. And not just the order, not just the form, but
10 also other required documents, it states there, is
11 that right? It says the original signed form and
12 other required documents; do you see that?
13 A. I do.
14 Q. Okay. And, in fact, you have to keep it two years
15 beyond the time that they would have been removed from
16 the list, is that right?
17 A. That's what it says, yes.
18 Q. Okay. How many wrecking companies in your post do you
19 have a UD-041?
20 A. I don't know.
21 Q. You did research your records to comply with the
22 document request, correct?
23 A. I did what?
24 Q. Well, you got a document request, right, the
25 Exhibit 1? I had you go through these responses to

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

### Page 53

1   A.   Correct.
2   Q.   You understand that?
3   A.   Yeah.
4   Q.   Because other towing -- other agencies may have their
5        own qualifications, correct?
6   A.   Correct.
7   Q.   Okay, so I'm just -- it's kind of important. I want
8        to make sure -- I'm not relying on anyone else's at
9        this point here, I'm just relying on -- or I'm
10       investigating what you've done with regard to your
11       post's lists.
12  A.   Okay.
13  Q.   Okay. Have you heard of Twin Cities Towing Company or
14       Wrecking Company?
15  A.   Not sure.
16  Q.   Not sure, okay. You don't know -- you can't confirm
17       whether they were put on the no-pref list in January
18       of '15?
19  A.   No.
20  Q.   And as far as you know, you don't have any UD-041s or
21       accompanying documentation for that company at your
22       post, as far as you know?
23  A.   Not that I know of.
24  Q.   Okay. I'm sorry if this sounds like I'm asking the
25       same question again, but let's say since the merger,

### Page 54

1        okay, as far as you know, you have not personally
2        received updated UD-041s or the insurance and the
3        other documentation from the various towing companies
4        that are on your no-pref list?
5   A.   Not that I know of.
6   Q.   Okay. And you haven't asked for them, correct?
7   A.   Correct.
8   Q.   Okay. So unless you've looked at those, you have no
9        idea whether any towing company is in compliance with
10       Official Order 48 as far as getting on the no-pref
11       list, is that correct?
12  A.   Correct.
13  Q.   Okay. So you may be in a situation where you have --
14       let me go back to your interrogatories here for a
15       moment, Exhibit 1. On page 3 of Exhibit 1, you
16       received the names from the Muskegon County Central
17       Dispatch of several towing companies.
18            You have no idea, as you're sitting here
19       today, whether any of those towing companies are
20       appropriately qualified under Official Order 48, is
21       that correct?
22  A.   Correct.
23  Q.   Okay. If you can go back to the order again?
24  A.   Okay.
25  Q.   All right, so on page 21, 48.3.11, there's a section

### Page 55

1        called "Central Dispatch Centers," and Muskegon has a
2        central dispatch center, is that correct?
3   A.   They do.
4   Q.   Okay. And it says: Central dispatch centers
5        administered by the department. What department are
6        they referring to there?
7   A.   I don't know. I would suspect our department. We
8        have, we have regional dispatch centers, too.
9   Q.   Right. And the regional dispatch center doesn't have
10       a towing list, is that correct?
11  A.   Correct.
12  Q.   Okay. Now, 48.3.12 outlines complaint procedures,
13       right?
14  A.   Yes.
15  Q.   Okay. And it's your understanding that these
16       procedures are required when dealing with complaints
17       against a wrecker service, is that right?
18  A.   Correct, yes.
19  Q.   Okay. So the first requirement is: Problems with or
20       complaints about a wrecker service shall be documented
21       by the worksite commander.
22            So going back to your December 14th letter,
23       the complaints or problems that you now have
24       articulated are behind this letter, you don't have any
25       documentation for those, is that correct?

### Page 56

1   A.   For the one complaint that I got against Eagle Towing
2        back in 2014, I do not have any documentation. I
3        never completed any written documentation.
4   Q.   Okay. And for any of the other reasons that you have
5        stated here today on the record -- and you went
6        through the television thing, and all that stuff?
7   A.   Yes.
8   Q.   Okay. You don't have any documentation, you didn't
9        keep any documentation with regard to any of that, is
10       that correct?
11  A.   Correct.
12  Q.   Okay. And the 2014 incident, you don't have
13       documentation regarding that, either, is that right?
14  A.   I do not, no.
15  Q.   Okay. You're only supposed to retain that for two
16       years, so ...
17            "Members," does that refer to -- I'm
18       looking at number 2 now, when it says "members." Does
19       that refer to other officers?
20  A.   Members of my department.
21  Q.   Okay. So that's other state troopers?
22  A.   Correct.
23  Q.   Okay. Have you received any reports from the members
24       of your office about Eagle Towing or their employees
25       regarding rendering poor service?

Page 57

1  A. Overcharging, yes.
2  Q. From your members?
3  A. Yes.
4  Q. Which ones?
5  A. Trooper Phil Marshall and Trooper Hugh Welsh.
6  Q. And, specifically, when did -- let's start with
7     Marshall. When did that -- when did he complain to
8     you about Eagle Towing, the overpricing?
9  A. I don't recall. It's been several years.
10 Q. Okay.
11 A. About the same time the complaints came in from the
12    gentleman that I talked to and Mr. Heykoop and I
13    talked about.
14 Q. Did you keep any documentation of Trooper Marshall's
15    complaints?
16 A. It's all verbal.
17 Q. All verbal?
18 A. Yeah.
19 Q. And the other member, what was his name again?
20 A. Trooper Hugh Welsh.
21 Q. Hugh Welsh?
22 A. Mmm-hmm.
23 Q. And was his complaint also about the way the services
24    were priced?
25 A. Yes.

Page 58

1  Q. Okay. Did you keep any documentation about that?
2  A. Verbal, as well. No.
3  Q. Do you remember when that was made?
4  A. The one, it was -- back in 2014 there was a couple
5     different times that Trooper Welsh had come to me,
6     saying that people had said they were overcharged, but
7     it was his case that the gentleman I spoke to -- the
8     only real complaint that I ever had a person come to
9     me with was from an incident Trooper Welsh had.
10 Q. Okay. And now A(2) says: Members shall report to
11    their immediate supervisors the name of any wrecker
12    service or their employee that renders poor service.
13       That's not involving charging, correct?
14    Talking about the service.
15 A. Sure, no.
16 Q. Or that is incapable of providing quality service
17    because of inadequate equipment or personnel --
18 A. Correct.
19 Q. -- neither of those involve that, is that right?
20    Inadequate equipment or personnel.
21 A. Well, I would, I would back up and say render poor
22    service, kind of the basis, and I use in the letter
23    here when I talked about, you know, providing
24    unacceptable service, I think that encompasses -- at
25    least the way I thought about it was the overcharging,

Page 59

1     as well.
2  Q. So that's just your personal interpretation?
3  A. Yes.
4  Q. Okay. Now, it says in, in 3, it refers to wrecker
5     services intentionally violating Chapter 2 of the
6     Michigan Vehicle Code. That never happened with
7     respect to Eagle Towing, is that right?
8  A. I'm not sure what Chapter 2 actually speaks to, so I
9     can't say for sure.
10 Q. Well, let's try it this way. Intentional violations
11    of Chapter 2. Did any member report to you, "I think
12    we've got someone who's in violation of Chapter 2,
13    intentional violation of Chapter 2"?
14 A. I can't say for sure, because I don't know that
15    Chapter 2 speaks to overcharging people. If it does,
16    then they would have violated that. But I don't know
17    what it says in Chapter 2.
18 Q. Okay. And they never made reference to Chapter 2, as
19    far as you know?
20 A. Correct.
21 Q. Okay. It states that: Each wrecker service shall be
22    held to identical standards of conduct or performance.
23    Is that correct?
24 A. Yes.
25 Q. Okay. So when you investigated -- well, I don't know

Page 60

1     if I want to -- if it's necessarily an investigation,
2     but when you received information about the television
3     report and what the word on the street was at other
4     posts and sheriff departments about Eagle Towing, did
5     you do anything to investigate the bills or invoices
6     from other towing companies?
7  A. I never received any complaints about other towing
8     companies.
9  Q. Right. But it states that, it states that: Each
10    wrecker service shall be held to identical standards
11    or conduct of performance.
12       So my question is, did you look to see if
13    other companies were charging about the same as Eagle
14    Towing?
15 A. Yes.
16 Q. I'm not talking about rates, I'm talking about
17    invoices. Did you look at invoices?
18 A. No.
19 Q. Okay.
20 A. Did not look at their invoices.
21 Q. You did not look at their invoices?
22 A. Correct.
23 Q. Okay. I mean, it's one thing to state a rate. It's
24    something else to find out how much they're actually
25    charging to somebody, is what I'm trying to get at

Page 125

1     charged. I told him I still didn't think that was a
2     fair amount and that I was considering it done at this
3     point in time, but if I received further complaints of
4     overcharging, I may have to take a different course of
5     action.
6 Q. So a lot of this investigation was verbal
7     conversation?
8 A. It was all verbal, yes, sir.
9 Q. And if you received complaints about a towing company,
10    is that how you would typically handle it, in more of
11    an informal, not written manner?
12 A. No. I think that in the future -- this has been kind
13    of a learning process for me -- I probably would
14    document it.
15 Q. I mean in the past.
16 A. Oh, right. No, no, yeah.
17 Q. And why was that? Did you have a reason that you
18    would just typically contact these companies over the
19    phone or --
20 A. I've never had one. I've been a post commander for
21    eleven years and never had complaint against a wrecker
22    company. So I thought it was just a dispute I could
23    handle over the phone and ...
24 Q. Okay. I have no further questions.
25           MR. BRENNAN: Okay.

Page 126

1           RE-EXAMINATION
2 BY MR. BRENNAN:
3 Q. You know, I have one follow-up on that, which is that
4    you said that you contacted one other towing company?
5 A. Two others. I'm sorry, I don't recall which ones they
6    were. I know they worked in Muskegon County.
7 Q. But you don't know which ones they were?
8 A. I don't remember, no.
9 Q. And you don't know how much they were charging?
10 A. It was much less. I know that it was enough to have
11    me -- I did that before I called Mr. Heykoop, because
12    then I had a basis in my own mind -- because when this
13    guy said he was charged whatever it was, two, three
14    thousand dollars, I didn't have any real basis to say
15    that that was right or wrong, so ...
16 Q. Right. And you got these -- and you did this verbally
17    over the phone, right?
18 A. Yes, sir.
19 Q. You didn't show them Eagle Towing's invoice, is that
20    correct?
21 A. I didn't have an invoice. I just had a dollar amount,
22    and I did not, no.
23 Q. And you didn't ask him for that?
24 A. No.
25 Q. Okay, so you don't know what the itemization of that

Page 127

1    invoice even was for?
2 A. I do not know.
3 Q. Because I'm going back to something you testified to
4    earlier, which is that every incident is different.
5 A. Correct.
6 Q. You didn't make any investigation, at least in terms
7    of documentation, to determine what was or what was
8    not unique about this particular event, is that
9    correct?
10 A. It was that -- I can tell you the case that -- I
11    remember the case, as it was explained to me, is that
12    a person went off the road, about fifty to a hundred
13    feet, and they were upside down into a creek which was
14    about one foot deep of water.
15           And so that was the conversation I had with
16    the wrecker companies; if you had this happen, what
17    would it take to tow that person out.
18 Q. Okay. And neither of those companies went and did an
19    investigation where the creek was --
20 A. No.
21 Q. -- where the accident happened?
22 A. No.
23 Q. It was just a hypothetical creek, with a hypothetical
24    car being tipped into a creek?
25 A. Yes, sir.

Page 128

1 Q. Okay. So you had no -- and you didn't converse with
2    Eagle Towing to determine what the unique
3    circumstances were about that particular incident?
4 A. I did talk to him and I asked him, "Why is this charge
5    so much," and it was explained to me there were
6    different things that were done. They have different
7    certifications, different vehicles, different this --
8 Q. Okay, and the factual circumstances of the accident,
9    is that right?
10 A. And the?
11 Q. The factual circumstances of the accident, the unique
12    factual circumstances of the accident, what it took to
13    get that particular car out.
14 A. No.
15 Q. Oh, so you didn't find out whether it was difficult or
16    easy, or whether they had to make two or three
17    attempts, or anything like that?
18 A. No.
19 Q. Okay. Which would make a difference in terms of how
20    much you'd have to charge, is that correct?
21 A. It may.
22 Q. Okay. All right, I'm done.
23           Signature reserved, thank you.
24           (Deposition concluded at 1:44 p.m.
25           Signature of the witness was requested.)

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy