## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

_____

JOHN HEYKOOP D/B/A EAGLE
TOWING,

     Plaintiff,

v

FIRST LIEUTENANT JEFFREY
WHITE; FIRST LIEUTENANT CHRIS
MCINTIRE.

Defendants.

Case No.: 1:18-cv-00632

Hon. Robert J. Jonker

Mag. Phillip J. Green

_____/

John S. Brennan (P55431)
Christopher S. Patterson (74350)
FAHEY SCHULTZ BURZYCH RHODES PLC
Attorneys for Plaintiff
4151 Okemos Road
Okemos, Michigan 48864
Tel: (517) 381-0100
Fax: (517) 381-5051
jbrennan@fsbrlaw.com
cpatterson@fsbrlaw.com

Patrick S. Myers (P81444)
Assistant Attorney General
Attorney for Defendants
Complex Litigation Division
P.O. Box 30736
Lansing, MI 48909
Tel: (517) 373-6434
myersp4@michigan.gov

_____/

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTIONS TO AMEND COMPLAINT AND FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 (ORAL ARGUMENT REQUESTED).

## INTRODUCTION

The gravamen of Plaintiff John Heykoop's ("Heykoop") complaint against

Defendants, Lt. Jeffrey White and Lt. Chris McIntire ("White" and "McIntire") is

that both Defendants violated his constitutional rights in summarily removing

1

Heykoop's company, Eagle Towing[1] from what is called a "no-preference towing list," a rotating list of towing companies called by members of Defendants' posts to respond to accidents, abandoned vehicles, forfeitures, and the like. Heykoop makes his claims under 42 U.S.C. §1983 for Defendants' violations of his equal protection rights, (Count I) rights to due process, (Count II) and for conspiracy to violate the same (County IV)[2].

A significant portion of Eagle Towing's revenue comes from referrals from law enforcement agencies, including the Michigan State Police ("MSP"). Because White and McIntire improperly removed Eagle Towing from their Posts' no-preference lists, Eagle Towing is no longer referred by MSP to provide towing services within the area patrolled by the Hart and Rockford Posts. This area is large and contains parts of Kent, Muskegon, Ottawa, Lake, Mason, Newaygo, and Oceana counties. These no-preference list removals have significantly and negatively impacted Eagle Towing's business.

Defendant McIntire's deposition was taken on February 4, 2019. Defendant White's deposition was taken the next day on February 5, 2019. After taking both Defendants' depositions, there are no genuine disputes as to any material facts and

---

[1] Heykoop's business is a sole proprietorship.  This brief shall use "Heykoop" to refer to the Plaintiff personally and "Eagle Towing" to refer to the business entity.
[2] Count II alleges a claim based upon retaliation for exercising First Amendment rights.  Plaintiff does not seek summary judgment on this claim, because there are material facts in dispute.

Heykoop is entitled to judgment as a matter of law related to his equal protection and procedural due process claims. Therefore, Heykoop requests that this Court enters summary judgments on Counts I, III, and IV, and enter an injunction against Defendants, ordering them to restore Eagle Towing to the no-preference towing lists for the Hart and Rockford Posts.

## ISSUES PRESENTED

1. Whether the Defendants violated Heykoop's right to equal protection of the laws under 42 U.S.C. § 1983.

2. Whether the Defendants violated Heykoop's right to procedural due process under 42 U.S.C. § 1983.

3. Whether Plaintiff should be permitted to amend his complaint to allege that Defendants' conduct also violated Heykoop's right to substantive due process under 42 U.S.C. § 1983.

4. Whether Plaintiff is entitled to injunctive relief.

## STATEMENT OF UNCONTESTED FACTS

### *The No-preference Towing Lists*

No-preference towing lists are commonly kept by law enforcement agencies throughout the state. When law enforcement agencies encounter an abandoned, damaged or impounded vehicle needing to be removed and stored, and there is no owner present, or the owner of a vehicle expresses no preference for a particular

towing company, this "no-preference list" is consulted. A towing company is selected from the list to perform the work. The no-preference list is rotated so that all towing companies receive an equal opportunity to perform work.  By agreeing to be placed on the no-preference list, the towing company is obligated to respond to any call it receives but can look only to the owner of the vehicle for compensation for the work.  Often, those services are never paid for by owners of severely damaged, totaled, or abandoned vehicles. Nevertheless, most owners do reclaim their vehicles, and thus placement on the list is a significant source of income for towing companies.

### Maintaining the List – Official Order No. 48

Each law enforcement agency creates its own non-preference towing list.  At the Hart and Rockford Posts, the creation and maintenance of the list is governed by MSP's "Official Order No. 48", ("Order 48") often in coordination with other local law enforcement agencies. (Exhibit 1, attached)  Members of the MSP must follow official orders and policies such as Order 48.[3]  The Hart and Rockford Posts' lists are administered by the areas' 911 Call Centers'.

---

[3] Please see the following quote from the Michigan State Police's website. "Members of the MSP shall adhere to the Official Orders throughout the course of their duties and follow all applicable policies and procedures provided by the Official Orders when taking action." https://www.michigan.gov/msp/0,4643,7-123-1579_78902---,00.html. Order 48 is available on the webpage under "Vehicles: Towing, Reporting, Inspection, and State-Wide Wrecker Policy."

Order 48 sets out extensive qualifications that a towing company must meet to be placed on the list. (Order 48, ¶ 48.3.5, Exhibit 1) Some of these qualifications, such as maintenance of worker's compensation insurance, go beyond what some towing companies might need to do in order to simply be licensed in the State of Michigan. Order 48 requires that towing companies desiring to be placed on the list provide documentation to the MSP Post proving that they meet all of the requirements set out by the Order. In addition, the application to be placed on the list requires the towing company to complete a form UD-041, which sets out the obligations of Order 48 and requires acknowledgement that the towing company will comply with its obligations under the Order. (Exhibit 2) Each MSP Post is required to keep the UD-041 and all of the required documentation on file. Towing companies are required to submit annual updates to their documentation. ***Order 48 specifically states that each towing company "shall be held to identical standards of conduct or performance."*** (Order 48, ¶ 48.3.12 (4), Exhibit 1)

Order 48 also sets out procedures for handling complaints against towing companies that are on the list. (Order 48, ¶ 48.3.12, Exhibit 1) All complaints must be documented by the Post and an investigation initiated. Order 48 does not permit removal from the towing list without an investigation, absent extenuating circumstances. The Order anticipates a two-tiered process: the first offense, if found to have merit, results in a written warning to the towing company, advising what

corrective steps must take place to remain on the list, and a warning that a subsequent offense may result in removal from the list.  A second offense, if it occurs within a year of the first offense, must also be investigated; however, the investigation results must be sent to MSP's Hazardous Materials and Investigation Unit Commander (Commercial Vehicle Enforcement Division -- CVED), for further review.  This unit then reports back to the Post the results of its investigation.  As noted above, this second offense may result in removal from the list; however, the towing company is permitted an appeal of the decision to the Post Commander.

### Hart Post – Defendant White's Violations

White serves as a first lieutenant in the Michigan State Police and is the post commander of the Hart, MSP Post (Exhibit 3, Dep., White Deposition, p. 8, hereinafter referred to as "Exhibit 3, Dep., Dep. ___").  On Monday, November 13, 2019, Defendant White wrote to Heykoop advising him that Eagle Towing was being removed from the Hart Post's no-preference list.[4]  (Exhibit 4)  This two-sentence letter stated that the reason for the removal was due to the "quality and type of service" rendered by Eagle Towing.  No documents, and, in particular, ***no complaints*** were attached to this notice.  There was no reference to an investigation having been performed by Defendant White, nor was there a reference to Order 48's

---

[4] The Hart (White) and Rockford (McIntire) Posts have not removed any other towing companies from their No-preference lists in the last 10 years (Exhibit 3, Dep., Dep. 18; Exhibit 8, Dep. 12).

procedures or a right to appeal. This letter, (and the similar letter later sent by Defendant McIntire) are the only communications that Heykoop received before being removed from the Hart and Rockford No-preference lists (Exhibit 3, Dep., Dep. 30; Exhibit 8, Dep. 71).

At his deposition, Defendant White made several admissions regarding Order 48. He testified that he was aware of it, that he was bound by it, and that he was in non-compliance with the Order. (Exhibit 3, Dep., Dep. 21, 38-39, 50, 72, 74, 77, 83-84)[5] His office has no applications, completed forms UD-041, nor any of the required documentation for any towing company on the Post's no-preference list. (Exhibit 3, Dep., Dep. 77-78). As a result, Defendant White has no idea whether towing companies on the Hart Post's no-preference list are insured, whether their vehicles are properly registered, or whether they comply with the multiple requirements listed in Order 48. *Id.*[6] In fact, his Post does not even keep a copy of the no-preference list; it is housed with the 911 Call Center. (Exhibit 3, Dep., Dep. 17-18) Although admitting that he is bound by Order 48, Defendant White contended that he felt Order 48 could be supplanted by local policies developed by

---

[5] Defendant White readily admitted on several occasions that he does not and is not in compliance with Order 48, so much so that he answered the question, "So you'll stipulate that you're not in compliance with Official Order 48?" with this response: "I would have to say that's true." (Exhibit 3, Dep., Dep. 77)

[6] Defendant White "assumed" that his motor-carrier office would know these facts, but he's never asked him, and he doesn't have the documents that would inform him. (Exhibit 3, Dep., Dep. 80-81)

the 911 Call Center Board, yet he was unable to point to any specific language or directive to that effect. (Exhibit 3, Dep., Dep. 74-76)

Defendant White's letter advising Heykoop that Eagle Towing was being taken off the no-preference list referenced only the "quality and type of service" rendered. (Exhibit 4)[7]. Although Defendant White referred to "numerous" complaints[8], these dealt with the charges for service, which Defendant White agreed were not the "quality and type of service." (Exhibit 3, Dep., Dep. 92). Defendant White testified plainly that charging excessive rates was *not* the reason he removed Eagle Towing from the no-preference list. (Exhibit 3. Dep. 178) The only written complaint in 2017 forming the basis for Defendant White's decision to remove Plaintiff's towing company from the no-preference list was a communication from Craig Mast, Oceana County Sheriff, stating that he was removing Plaintiff's company from the county no-preference towing list, and attaching a complaint from one vehicle owner, which complained about excessive charges, not the service Eagle Towing provided. (Exhibit 5) (Exhibit 3. Dep. 100-102)[9]

---

[7] Defendant White's difficulty in articulating his true reason for removing Eagle Towing from the no-preference list is demonstrated by his sworn answer to interrogatories, which claim that Eagle Towing was in violation of Order 48, and his deposition testimony recanting that answer. (Exhibit 1. Dep. 159).

[8] Defendant White initially referred to "seven, eight, nine ten" complaints, but later admitted that he could remember only three complaints: one in 2017 and two complaints in 2016. (Exhibit 3, Dep., Dep. 91, 176)

[9] Later in his deposition, Defendant White referred to the complainant's reference to the driver's refusal to tow the vehicle to a repair shop in Muskegon. The repair shop, however, was closed. (Exhibit 3, Dep., Dep. 174-176)

Defendant White understood that the 911 Call Center's policy, the local policy he claims he was following, did not include "reasonableness of charges" as a qualification to be placed on, nor as a basis for removal from, the no-preference list. (Exhibit 3, Dep., Dep. 102; 95-96; 140-144)  In fact, he testified that he was unable and unqualified to determine what a "reasonable charge" should be for such services and acknowledged that every towing situation is unique and thus cannot be easily compared to other towing situations. (Exhibit 3, Dep., Dep. 52-58; 94)  Yet, one of his stated bases for removing Eagle Towing is that the company would not discuss with him the explanation for its charges when a customer registered a complaint with the board about towing charges, despite being told that there is a statutory procedure for resolving such disputes. (Exhibit 3, Dep., Dep. 97-99)

The 2017 service call in question was not made by MSP, but by the sheriff's department.  No investigation was conducted by Defendant White. *Id.* Nor was an investigation made by the director of the 911 Call Center, and no hearing was provided to Heykoop. (Exhibit 3, Dep., Dep. 146-149)  All of these were required by the local policy of the 911 Call Center, which Defendant White testified he was following, and was to follow, rather than Order 48. (Excerpt of 911 Call Center Policy, Exhibit 6) In fact, Defendant White did not conduct an investigation and did not know whether any investigations were performed in response to the other complaints that were the stated basis for his decision. (Exhibit 3, Dep. 136-137)

Following notice of its removal from the no-preference list, Heykoop attempted to submit to Defendant White a complete application and documentation for replacement on the list in accordance with Order 48. Heykoop's certified letter was initially refused by the Hart Post before finally being accepted; however, no response to this application and documentation was ever received. (Exhibit 3, Dep., Dep. 118-119)(Submitted packet, Exhibit 7) Plaintiff remains off the no-preference list, and no other towing companies have been required to submit applications and documentation to qualify for their placement on the list.

***Rockford Post – Defendant McIntire's Violations.***

Like Defendant White, Defendant McIntire serves as a first lieutenant and post commander of the Rockford, MI Post (Exhibit 8, McIntire Deposition, p. 7, hereinafter referred to as "Exhibit 8, Dep. ___"). Defendant McIntire's version of Eagle Towing's removal from the Rockford Post's no-preference list takes a different tack. Defendant McIntire also sent Heykoop a two-sentence letter summarily removing his towing company from the no-preference list. (Exhibit 9) This letter referred only to "unacceptable service" as the cause and made no reference to any particular complaint or investigation. Nor did this letter refer to Eagle Towing's fees for its services.

Defendant McIntire also acknowledged that he and his Post are and were subject to Order 48, (Exhibit 8, Dep. 39), but, unlike Defendant White, he did not

rely upon any local policy that would supplant the Order.  Also unlike Defendant White, Defendant McIntire testified that his reason for removing Eagle Towing from the no-preference list *was* due to unreasonable charges by Plaintiff for its services.

Defendant McIntire relied upon no documentation for his decision, other than a three-year old complaint that he had already discussed with Heykoop and "resolved" as of 2014. (Exhibit 8, Dep. 15) Beyond that, Defendant McIntire relied upon a dated television news story (which he did not claim he had viewed) and hearsay, ***including oral discussions with Defendant White***.[10] (Exhibit 8, Dep. 19 – 21; 32, 74, 84)  Defendant McIntire had himself not received any complaints about Eagle Towing since the 2014 complaint.  Defendant McIntire testified that he had no written complaint in 2017 against Eagle Towing and admitted that his office had none of the documentation for any towing companies on the list as required under Order 48.  No formal investigation took place, and no notice of an appeal right was ever sent to Heykoop. (Exhibit 8, Dep. 66 – 67) Nor was any report sent to CVED for its review prior to removing Eagle Towing from the no-preference list.

As best as can be determined, Defendant McIntire's decision was based upon his personal perceptions based upon hearsay and conversations with Defendant White to the effect that he had removed Eagle Towing from the Hart Post's list.  No

---

[10] White spoke to McIntire on two occasions about aspects of McIntire's deposition before his deposition (Exhibit 3, Dep., Dep. 14-15).

interviews with Heykoop occurred, no written documentation was taken or maintained, no notice of any rights under Order 48 were provided to Heykoop. Heykoop was simply summarily dropped.  To the extent that Defendant McIntire claims that his decision was based upon a finding that Eagle Towing's charges were unreasonable, *he admitted that he is not qualified to determine what a reasonable rate or charge is, and that each towing instance is unique.* (Exhibit 8, Dep. 80)

As he had done with the Hart Post, Heykoop sent a complete application, including the form UD-041, and complete documentation as required under Order 48 to the Defendant McIntire at the Rockford Post.  Defendant's post refused delivery more than once. (Exhibit 8, Dep. 88-89, Exhibit G) The Rockford Post has no records whatsoever of any towing company's qualifications and compliance with Order 48.  Eagle Towing, although tendering the required documentation, remains off the list. (Exhibit 8, Dep. 50 – 51, 62).

## **GOVERNING LEGAL STANDARD**

Fed. R. Civ. P. 56(a) mandates that a party is entitled to partial summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing a motion for partial summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 US 574, 587 (1986). The moving party carries the burden of showing

that there is no issue as to any material fact where a rational trier of fact could find for the non-moving party. *Id.*

## ARGUMENT

### I.   Defendants Violated Heykoop's Right to Equal Protection by Treating His Towing Service Differently Than Other Towing Services on their No-preference lists.

Defendants violated Heykoop's constitutional right to equal protection of the laws by removing Eagle Towing from their Posts' no-preference lists. Defendants treated Eagle Towing singularly and differently than other similarly situated towing companies on their no-preference lists. This disparate treatment is profound given the rarity of removing towing businesses from such lists.

42 U.S.C. § 1983 makes the Defendants liable for violations of Heykoop's right to equal protection of the laws. The United States Constitution's Equal Protection Clause provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  The Equal Protection Clause prohibits disparate treatment of similarly situated individuals as a result of government action that has no rational basis. *Cahoo v. SAS Analytics Inc.,* 912 F3d 887, 905 (CA 6, 2019).

MSP's Order 48 echoes this standard in the context of the department's relationship with towing companies it engages.  Order 48 specifically commands that each Post treat every towing company on an equal basis.

Individual plaintiffs (or "classes of one") can prove disparate treatment absent any rational basis by either negating every conceivable basis which supports a government's action or by showing that either animus or ill-will motivated the disparate treatment. *Id.* The Defendants' conflicting and confusing testimony, in which each admit that they honored Order 48 only in the breach, demonstrate irrational bases for their action, based on years-old events and hearsay, and/or for charging rates they each admit they were unqualified to evaluate. Given the policies each of them admits applied to the situation, neither of them had any conceivable basis for removing Eagle Towing from their no-preference lists.

In Defendant White's case, he flatly admits that he and the Post he commands do not follow MSP's Official Order 48.  Although he attempts to take cover under the Oceana-Mason 911 local policy, he unequivocally acknowledges that the policy was not followed in connection with his removal of Eagle Towing from the list. While this treatment clearly implicates Heykoop's Due Process rights (discussed below), it also demonstrates the complete lack of a conceivable basis for his decision, because no proper evidence was before him.  His concocted rationale, that Heykoop would not discuss pricing or rate issues with him, is not a conceivable (or rational)

basis for his action, ***because the local policy he relied upon did not permit removal from the no-preference list for rate or towing charge complaints.*** And, in any event, Defendant White admitted that ***he was not qualified to determine what a reasonable towing charge would be.***

McIntire's removal of Heykoop from Rockford's no-preference list also lacks any conceivable basis. Like Defendant White, Defendant McIntire is not aware of his Post removing a towing service from its No-preference list in the last ten years. McIntire did not investigate or follow through with Order 48's complaint review procedures to determine the validity of customer complaints against Heykoop's towing service. McIntire's basis for his actions is best summarized in this exchange during his deposition:

> A.  **I kicked Eagle Towing off because of the 2014 incident, the exposé on the TV, what I had heard from people in the law enforcement community, as well as the investigation done by the Hart post.  All those things played in my determination to kick them off. Not just '14, and not just the exposé, and not just things I heard, and not just Lieutenant White's investigation.**
> Q.  Okay.
> A.  **All those things.**
> Q.  I understand that.  But all those other things, none of those were a formal complaint that was received by your office.  Is that correct?
> A.   **Correct.**
> Q.  Okay.  So if you had contacted Eagle Towing, for example, to say, "Look, I'm going to take you off the list because I have a complaint," and he said, "Well, where's the complaint; did someone file something,"

you would say, "I don't have anything"?

**A.   Correct.**

As the evidence reveals, however, Defendant White never conducted an investigation, and did not remove Eagle Towing for overcharging customers. So, Defendant McIntire relied upon an investigation that never happened[11], a three-year old complaint that had already been resolved, and hearsay.  His reliance on the TV station report is especially notable, because the report (or "expose" as he referred to it) discussed *two* towing companies' practices in Defendant McIntire's Post, but he has taken no action whatsoever regarding the other company. (Exhibit 8, Dep. 12, 84) Defendant McIntire's lack of personal knowledge of how Eagle Towing is actually treating customers belies any rational basis to remove Eagle Towing from his Post's no-preference list.  In addition, his failure to investigate similar complaints against another towing company in his Post area demonstrates a lack of equal protection as guaranteed by the constitution and specifically commanded by his department in Order 48.

Thus, neither of the Defendants' conflicting, confusing, and unsubstantiated reasons demonstrate a rational basis for their action. "Conceivable" must be conceivable under the facts, not the imagination.

---

[11] Defendant McIntire testified that he only had a "conversation" with Defendant White about his decision to remove Eagle Towing from the Hart Post list.  He never saw any documents, and in fact didn't even *know* if White had any documentation about Eagle Towing. (Exhibit 8, Dep. 32)

## II.    Defendants Violated Heykoop's Procedural Due Process Rights by Removing his Towing Service from their No-preference lists Inconsistent with Order 48 and Local Policy.

Because both Posts did not comply with Order 48's (and/or the local 911 Call Center policy) notice and hearing provisions before removing Heykoop's from their no-preference lists, Defendants violated Heykoop's right to procedural Due Process.

Through 42 U.S.C. § 1983, the state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Generally, the concept of procedural due process requires that a party must receive notice and have an opportunity to be heard before the deprivation of a property interest. *Cleveland Board of Education v. Loudermill*, 470 US 532, 542 (1985). Property interests protected by procedural due process extend well beyond traditional notions of "property" such as chattels, real property, and money. *Board of Regents of State Colleges v. Roth*, 408 US 564, 571–72 (1972). When determining if there is a constitutionally-protected property interest in a non-traditional property right such as a right to an entitlement (e.g. being on a no-preference list), courts look to the establishment of rules or procedures. *Bailey v. Floyd Cty. Bd. of Educ. By & Through Towler*, 106 F3d 135, 141 (CA 6, 1997).

The right to remain on a no-preference list is a property interest protected by procedural due process when there is an established policy regulating the operation of a no-preference list.  In the specific context of no-preference lists, a property right

to remain on a no-preference list exists when there are established procedures for the suspension or removal of towing services from such a list. *Lucas v. Monroe County*, 203 F3d 964, 978 (CA 6, 2000). In *Lucas*, the Sixth Circuit found that a towing company had no property interest in remaining on a certain law enforcement department's no-preference list because the no-preference list's policy allowed for the discretionary, immediate removal of a towing companies upon customer complaints. However, courts have specifically held a constitutionally-protected property interest exists in remaining on a no-preference list where there are established procedures for removal from a list. *Gregg v. Lawson*, 732 F Supp 849, 853 (ED Tenn 1989).

Order 48 and the 911 Call Center's local policy relied upon by Defendant White have specific, established procedures governing how a towing service can be removed from a no-preference list. Order 48 includes many safeguards in Section 48.3.12 that establish what processes an MSP Post must follow to remove a towing service from a no-preference list. Of those, Section 48.3.12(5)(a) requires that a towing service shall not be removed from a no-preference list without an investigation absent extenuating circumstances. Section 48.3.12(5)(b) and (c) comports with procedural due process and requires post commanders to send written notices to towing companies who violate Order 48. It requires an investigation. In the case of an alleged second offense, it requires a higher-level review within the

department.   Order 48 also provides an appeal process for towing companies to dispute allegations before any post-commanders can pursue disciplinary actions. Disciplinary action includes removing a towing company from a no-preference list. In all, Order 48's Complaint Procedures section (48.3.12) provides many established safeguards that prevent the unilateral removal of towing companies from a Post's no-preference lists.

In the case of Defendant White, assuming that a local policy could supplant an official MSP order, the local policy in question, Section 3(b), clearly establishes that the county 911 director must provide notice and hold a hearing with a towing company before the towing company can be forcibly removed from its no-preference list. That, of course, did not happen in Eagle Towing's case.

Defendant's "procedure" was the mere act of sending Heykoop a termination letter. Heykoop was not allowed to attend a hearing and was not notified of any pending investigation by either post commander pursuant to Order 48. Not only was there no Due Process, there was really no process at all.  The policies that provided Heykoop's property interest were simply eschewed by the Defendants.

Unlike the law enforcement department's discretionary ability to remove a towing service from a no-preference list in *Lucas*, the normal course of action under Order 48 is to investigate and provide a procedure following customer complaints before removing a towing service from a Post's no-preference list.  Order 48, Section

48.3.12(5)(a) only provides a limited exception for the unilateral removal of a towing company without an investigation. The exception only applies if "extenuating circumstances" exist. Neither of the Defendants acknowledged the existence of any extenuating circumstances in their depositions.

As such, Order 48's (and the 911 Center's "local policy") established procedures that comport with the requirements of procedural due process by regulating the removal of towing services from no-preference lists. Instead, Defendants unilaterally removed Heykoop from their no-preference lists without notice and an opportunity for a hearing. Defendants' actions blatantly violated Heykoop's procedural due process rights.

### III.   Defendants Violated Heykoop's Substantive Due Process Rights by by Precluding his Right to Operate a Towing Business, and Heykoop Should be Permitted Leave to Amend His Complaint to so Claim.

The standard for reviewing a motion to amend the complaint at this stage in the litigation was well-stated by this Court in *Burland v. Bradshaw*, 2017 WL 2964720 (WD Mich April 28, 2017, Jonker, C.J.):

> Under Federal Rule of Civil Procedure 15(a)(2), a party seeking to amend its pleadings at this stage of the proceedings must seek leave from the Court. Although Rule 15(a)(2) instructs that "[t]he court should freely give leave when justice so requires," leave may be denied on the basis of undue delay, bad faith by the moving party, repeated failure to cure defects by previously-allowed amendments, futility of the proposed new claim, or undue prejudice to the opposite party. *Foman v. Davis*, 371 US 178, 182 (1962)*; Duggins v. Steak'N Shake*, Inc., 195 F3d 828, 834 (CA 6, 1999); *Fisher v. Roberts*, 125 F3d 974,

977 (CA 6, 1997). "Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted." *Wade v. Knoxville Utils. Bd.*, 259 F3d 452, 458-59 (CA 6, 2001). Additionally, a motion for leave to amend should be denied when the proposed amendment is futile. *Head v. Jellico Housing Auth.*, 870 F2d 1117, 1123 (CA 6, 1989); *Martin v. Associated Truck Lines, Inc.*, 801 F2d 246, 248 (CA 6, 1986). A proposed amendment is futile if it could not withstand a motion to dismiss. Head, 870 F2d at 1123.

Although delay alone does not justify denial of a Rule 15(a)(2) motion to amend, the party seeking to amend must "act with due diligence if it wants to take advantage of the Rule's liberality." *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F3d 99, 306 (CA 6, 2000) (internal quotation marks omitted). Where "amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." Wade, 259 F3d at 459."[A]llowing amendment after the close of discovery creates significant prejudice." Duggins, 195 F3d at 834 (*citing Moore v. City of Paducah*, 790 F2d 557, 562 (CA 6, 1986)). *Id.* at *5

Discovery has only recently closed in this matter. The depositions of the Defendants and documents that have been produced have revealed evidence that, as outlined below, establish a basis for an additional alternative theory explaining Defendants' violation of Section 1983. Heykoop will seek no additional discovery in pursuit of this claim, which arises substantially out of the same conduct that underlies Heykoop's other claims. Essentially, discovery has revealed that not only was Heykoop denied procedural due process, but Defendants, as law enforcement officers, knowingly ignored and flaunted their department's own Official Orders to Heykoop's significant detriment, placing him at a substantial competitive disadvantage in an area where the work deprived establishes a vital source of revenue

to sustain his business.  Defendants' actions are severe deprivation and the manner in which it occurred, which has now been revealed through discovery, is shocking and establishes a good faith basis to permit this count to be added to Heykoop's complaint.

Should this Court permit Heykoop to amend his complaint, along with violating Mr. Heykoop's procedural due process rights, the uncontested facts demonstrate that Defendants violated Heykoop's rights to substantive due process by impairing his liberty interest in practicing his chosen occupation, operator of a towing service, within the jurisdiction of the Hart and the Rockford Michigan State Police Posts.

42 U.S.C. § 1983 prevents the state from violating individuals' substantive due process rights. Specifically, state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Unlike procedural due process, substantive due process reviews deprivations of protected liberty and property interests protected by due process regardless of adequacy of process. *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 833 (CA 6, 2009). The Sixth Circuit recognizes that precluding a party from choosing their profession of choice under certain conditions qualifies as a deprivation of a property and liberty interest in violation of substantive due process. *Jackson v. Heh*, 215 F.3d 1326 (CA 6, 2000) at *6.

In *Heh* the Sixth Circuit, in an unpublished opinion, analyzed a Fifth Circuit case involving the removal of a towing company from a sheriff's on-call towing list. *Heh*, 215 F3d 1326 (CA 6, 2000) at *6 citing *Cowan v. Corley*, 814 F2d 223, 227-28 (CA 5, 1987). The Sixth Circuit determined that the removal of the tow truck service from the sheriff's on-call list in *Cowan* constituted a violation of substantive due process because it precluded the business owner from working in the towing industry. *Id.* The removal was a violation of the towing service owner's substantive due process rights because the sheriff's on-call tow list served as a comprehensive framework for referring tow trucks to vehicles for both governmental and private tows. *Id.*

By removing Heykoop from the Hart and Rockford no-preference lists, the Defendants are precluding Heykoop's right to operate a towing business in violation of substantive due process. Section 48.1 outlines the scope of Order 48 as applying to all tows referred by the Michigan State Police (both public and private). Like *Cowan*, Order 48 provides a comprehensive tow referral framework. As the MSP patrol and respond to many accidents and inoperable vehicles requiring tows, their referrals for both private and government tows amount to a significant amount of the towing business.

Further, the action of a government violates substantive due process if it shocks the conscience of this Court. *Collins v. City of Harker Heights*, Tex., 503 US

23

115, 126 (1992). MSP has a clear, uniform policy that specifically prohibits removing towing companies from no-preference lists without notice. State troopers respond to many roadside accidents and inoperable vehicles. With both of the Posts blackballing Eagle Towing from their no-preference lists, Heykoop's ability to maintain a profitable towing business is severely inhibited to the point where it precludes Heykoop from competing and operating any form of an efficient towing service. Moreover, Defendants' scramble for after-the-fact justification for their groundless action, and their complete and utter disregard for MSP Official Orders, meets the "shocks the conscience" standard.

With both the Rockford and Hart Posts no longer referring tows to Heykoop, Heykoop is deprived of a liberty and property right to operate in his chosen profession, an owner of a towing service business. Defendants caused this illegal deprivation by removing Heykoop from their no-preference lists. Therefore, Defendants violated Heykoop's substantive due process rights by precluding him from competitively operating a towing services company within their Posts.

## IV.   The Undisputed Evidence Clearly Establishes that the Defendants Engaged in a Civil Conspiracy.

In *Bazzi v. City of Dearborn*, 658 F3d 598, 602 (CA 6, 2011), the Sixth Circuit stated the elements of a civil conspiracy claim: a plaintiff must show that (1) a single plan existed, (2) the alleged coconspirator shared in the general conspiratorial

objective, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff. *Id*.

Those elements have been plainly met here.  The nearly identical letters to Heykoop within weeks of each other demonstrate both a single plan and a sharing in the conspiratorial objective. Both Defendants admitted that they communicated regarding Eagle Towing's removal from the list, and both admitted to violations and disregard of Official Order 48. Their post-complaint attempts to distinguish the basis for their removal, especially when it is clear that Defendant McIntire's action was heavily, if not exclusively, reliant upon his discussions with Defendant White, do not lessen the significance of their cooperation or negate the conspiracy. The injury to Heykoop is obvious and significant: his loss of opportunity to perform a substantial amount of roadside towing and extraction, a major source of revenue for the company.

### V.     Should this Motion be Granted, Heykoop is Entitled to Injunctive Relief Placing his Business Back on the Posts' No-preference lists

If in the event this Court rules in favor of any part of this Motion, it is appropriate to issue a permanent injunction placing Heykoop's towing business back on both Posts' no-preference lists and requiring the Posts to comply with the terms of Order 48, both as it applies to qualifying other towing companies for inclusion on the no-preference list and before taking any disciplinary action against Eagle Towing for alleged complaints.

To obtain a permanent injunction, a plaintiff must show (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 US 388, 391 (2006). The Sixth Circuit recognizes that irreparable harms include harms where money damages are difficult to calculate. *Basicomputer Corp. v. Scott*, 973 F2d 507, 511 (CA 6, 1992).

Briefly, putting Heykoop's business back on each Posts' no-preference lists is necessary to remedy the harms in this case. Heykoop continues to suffer an irreparable injury as his towing business is no longer receiving referrals from the MSP to tow disabled vehicles. Towing service referrals from the MSP made up a significant portion of Heykoop's business. Second, the injury is ongoing, and it is difficult to anticipate how long Eagle Towing would be forced off of the list, or how much in damages it would suffer through the indefinite future.  This would require Heykoop to bring successive lawsuits against Defendants. Third, there is relatively little hardship on Defendants if they put Heykoop back on their no-preference lists. Both Posts can refer tows to Eagle Towing and regulate his towing business pursuant to the text of Order 48.  In addition, the extra work of keeping documents required

by Order 48 and forcing other towing companies to comply is, by definition, *not* a burden, because it is already required by Defendants' employer.

Finally, the injunction will serve the public interest, because requiring law enforcement to follow its own properly established policies and procedure is *per se* in the public interest. The public and the commercial towing industry will be assured of evenhanded and objectively reasonable standards being applied to their operations. As such, injunctive relief is proper should this Court grant any claim of this Motion.

## CONCLUSION

For the reasons state above, Plaintiff Heykoop respectfully requests that this Court grants this Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure Rule 56.

Respectfully submitted,

/s/ John S. Brennan
John S. Brennan (P55431)
Fahey Schultz Burzych Rhodes, PLC
Attorney for Plaintiff
4151 Okemos Road
Okemos, MI 48864
(517) 381-3193

Dated: April 1, 2019

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief is drafted in compliance with the standards set forth in W.D. Mich LCivR 7.2(b)(i) as required by W.D. Mich LCivR 7.2(b)(ii). This Brief's Word Count is 6,433 Words out of 10,800. I prepared this Brief on Microsoft Word and relied upon its word count function for the purposes of this certificate of compliance.

Respectfully submitted,

/s/ John S. Brennan
John S. Brennan (P55431)
Fahey Schultz Burzych Rhodes, PLC
Attorney for Plaintiff

Dated: April 1, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2019 I electronically filed the forgoing paper with the Clerk of the Court using ECF system which will send notification of such filing on the attorneys of record.

/s/ Adrienne Monahan
Adrienne Monahan
Fahey Schultz Burzych Rhodes PLC
4151 Okemos Road
Okemos, Michigan 48864
(517) 381-3202
amonahan@fsbrlaw.com

# Exhibit 1



**SUBJECT:**   Vehicles:  Towing, Reporting, Inspection, and State Wide Wrecker Policy

**TO:**   Members of the Department

This Order establishes department policy and member responsibilities for the following:

| **Section 48.1** | **PROCEDURES FOR REMOVING, REPORTING, AND INVENTORYING VEHICLES** | 2 |
|---|---|---|
| 48.1.1. | Vehicles Involved in Custodial Arrests | 2 |
| 48.1.2. | Inventorying Vehicles | 3 |
| 48.1.3. | Abandoned Vehicles | 3 |
| 48.1.4. | Impounded Vehicles | 3 |
| 48.1.5. | Towed Vehicles | 4 |
| 48.1.6. | Removing Abandoned, Impounded, or Towed Vehicles | 4 |
| 48.1.7. | Towed Vehicle - Private Property | 4 |
| 48.1.8. | Immediate Removal Procedures | 5 |
| 48.1.9. | Removal of Tagged Vehicles | 6 |
| 48.1.10. | Disposition of Abandoned, Towed, and Impounded Vehicles | 7 |
| 48.1.11. | Incident Reports | 8 |
| 48.1.12. | Enforcement Action | 8 |
| **Section 48.2** | **MOTOR VEHICLE INSPECTION** | 8 |
| 48.2.1. | Non-Commercial Vehicle Inspection Procedures | 8 |
| 48.2.2. | Commercial Vehicle Inspection Procedures | 9 |
| 48.2.3. | School Bus Inspection | 10 |
| **Section 48.3** | **STATE WIDE WRECKER POLICY AND PROCEDURES** | 10 |
| 48.3.1. | General | 10 |
| 48.3.2. | Types of Towing Services | 10 |
| 48.3.3. | Requests for Wrecker Service | 12 |
| 48.3.4. | Work Site Wrecker Service Geographical Areas | 12 |

| 48.3.5. | Contract or No-Preference List Requirements | 12 |
|---|---|---|
| 48.3.6. | No-Preference Wrecker Call List | 17 |
| 48.3.7. | Contracting for Wrecker Services | 18 |
| 48.3.8. | Metro South Post Provisions | 20 |
| 48.3.9. | Special Investigation Division Provisions | 20 |
| 48.3.10. | Wrecker Services Paid With Department Funds | 20 |
| 48.3.11. | Dispatch Centers | 21 |
| 48.3.12. | Complaint Procedures | 21 |
| **Section 48.4** | **ADMINISTRATIVE FEES AND OTHER CHARGES** | 22 |
| **Section 48.5** | **REVISION RESPONSIBILITY** | 22 |

**48.1      PROCEDURES FOR REMOVING, REPORTING, AND INVENTORYING VEHICLES**

This section shall be followed to process abandoned, abandoned scrap, impounded, and towed vehicles since most of the procedures outlined are required by law.  This section also establishes department policy for inventorying personal property left in impounded vehicles.

Enforcement members shall not operate an abandoned, impounded, or towed vehicle except when the vehicle is stopped, parked, or standing in a manner that creates an immediate hazard to life and/or safety, and immediate action is required on behalf of the enforcement member to mitigate the hazard.

48.1.1.   VEHICLES INVOLVED IN CUSTODIAL ARRESTS

A.   Release to Passenger

When the driver of a vehicle is subjected to a custodial arrest and separated from the vehicle, a properly licensed passenger may be allowed to take custody of the vehicle (with authorization of the driver) as long as the passenger would not violate any law by doing so. This section shall not apply when the vehicle is being seized as evidence or for forfeiture.

B.   Vehicles on Limited Access Highways

If a vehicle is not turned over to a passenger or immediate removal cannot be arranged, the vehicle shall be inventoried and impounded as provided in this Order.

C.   Vehicles on Non-Limited Access Highways

(1)   When a vehicle is lawfully parked and not turned over to a passenger, the enforcement member shall offer to call a wrecker to remove the vehicle for safekeeping.  If the driver declines the offer, he or she will be presumed to have assumed the risk for any claims of loss or damage that may arise and the vehicle may be left at the scene.

(2)   If the vehicle is parked in a way that it may create an immediate public hazard or an obstruction to traffic and immediate removal cannot be arranged, the vehicle shall be inventoried and impounded as provided in this Order.

    D.   Vehicles seized as evidence or forfeiture shall not be considered impounded vehicles.  See Official Order No. 62, Section 62.1.4.A.

## 48.1.2.  INVENTORYING VEHICLES

A.   Vehicles seized as evidence or towed because they are abandoned, abandoned scrap, impounded vehicles, or vehicles seized in a forfeiture action shall be inventoried by one of the investigating enforcement members.

    (1)   All areas of the vehicle that may contain property, including any containers, shall be checked.

    (2)   Only a visual inspection shall be conducted from outside the vehicle if it is locked and access cannot be gained without causing damage, unless a search warrant is obtained.

B.   An Impounded Vehicle Report, UD-091, shall be completed on each vehicle inventoried by a member.  All items of an unusual nature located in the vehicle shall be recorded on the form, including evidence or contraband.

It is not necessary to list items normally found in a vehicle.

C.   Items of unusual value which will be held to protect the owner's interest or evidence seized from the vehicle shall be recorded on an electronic record management system property report.  An electronic record management system property report is not required for the vehicle unless it will be stored at a department facility or held as evidence of a crime.

## 48.1.3.  ABANDONED VEHICLES

For statutory definitions and procedures pertaining to abandoned vehicles, see MCL 257.252a and 257.252b.

## 48.1.4.  IMPOUNDED VEHICLES

Vehicles seized as evidence or forfeiture shall not be considered impounded vehicles.  See Official Order No. 62, Section 62.1.4.A.  For purposes of this Order those vehicles defined as "Impounded" are described as follows:

A.   If the vehicle is in such a condition that the continued operation of the vehicle on the highway would constitute an immediate hazard to the public.

B.   If the vehicle is parked or standing on the highway in a manner that may create an immediate public hazard or an obstruction of traffic.

C.   If a vehicle is parked in a posted "tow away" zone.

D.   If there is reasonable cause to believe that the vehicle or any part of the vehicle is stolen.

E.   If removal of the vehicle is necessary in the interest of public safety because of fire, flood, storm, snow, natural or man-made disaster, or other emergency.

F.   If the vehicle is hampering the use of private property by the owner or person in charge of that property, or is parked in a manner that impedes the movement of another vehicle.

G.   If the vehicle is stopped, standing, or parked in a space designated for handicapped parking and is not permitted by law to be stopped, standing, or parked in a space designated for handicapped parking.

H.   If the vehicle is located in a clearly identified access aisle or access lane immediately adjacent to a space designated as parking for persons with disabilities.

I.   If the vehicle is interfering with the use of a ramp or curb-cut by persons with disabilities.

48.1.5.   TOWED VEHICLES

For purposes of this Order a "towed vehicle" is defined as a vehicle removed from private property at the direction of a person other than the registered owner or a police agency and reported to this department by the custodian of the vehicle.

48.1.6.   REMOVING ABANDONED, IMPOUNDED, OR TOWED VEHICLES

The process for removal of abandoned, impounded, or towed vehicles depends on where the vehicle is located and the particular type of abandoned, impounded, or towed vehicle. Enforcement members may immediately remove any of the following vehicles.

A.   Any vehicle that has remained on a state trunk line without a valid registration plate, as provided in MCL 257.252a.

State trunk line highways are described in MCL 247.651 and include the majority of signed highway routes including Interstate highways (e.g. "I-75"), U.S. highways (e.g. "US-27") and "M" marked routes in Michigan (e.g. "M-35").

B.   Any registered abandoned scrap vehicle, as defined in MCL 257.252b and described in MCL 257.252a and MCL 257.252b, from either public or private property.

C.   Any unregistered abandoned scrap vehicle, as defined in MCL 257.252b, and described in MCL 257.252a and MCL 257.252b, from either public or private property.

D.   Any impounded vehicle as provided in MCL 257.252d or as described in Section 48.1.4 of this Order from either public or private property.

48.1.7.   TOWED VEHICLE - PRIVATE PROPERTY

A.   If a vehicle has remained on private property without the consent of the property owner, the property owner may have the vehicle removed immediately as an abandoned vehicle by contacting a local towing agency.

B.   Prior to removing the vehicle, the towing agency shall notify a police agency having jurisdiction over the location where the vehicle has been abandoned that the vehicle is being removed.

C.   Upon receiving notification from the towing agency that a vehicle is being towed from private property, the work site shall:

(1)   Check through the Law Enforcement Information Network (LEIN) to determine if the vehicle has been reported stolen.  Such checks shall be made on both the registration plate, if any, and the VIN.

(2)   Within 24 hours, the vehicle shall be entered into LEIN as an abandoned vehicle.  For vehicles abandoned on private property under MCL 257.252a, any such LEIN entry

must notify the Secretary of State that the abandoned vehicle was taken into custody and shall include the information described in MCL 257.252a(11).

(3) An incident report is required, but an on-scene investigation is not necessary. However, prior to entering the vehicle into LEIN an enforcement member must ensure that the VIN and/or registration information supplied by the towing agency is correct and applicable to the vehicle removed.

(4) Once informed of the disposal of the vehicle by the custodian of the vehicle, the LEIN entry shall be canceled and the incident closed as provided in Section 48.1.10.

48.1.8.   IMMEDIATE REMOVAL PROCEDURES

The following procedures shall be utilized when removal of abandoned or impounded vehicles occurs immediately and an enforcement member is present at the scene.

A.   Initial Action

(1) An enforcement member shall physically check the vehicle before its removal.

(2) A check shall be made through LEIN to determine if the vehicle has been reported stolen.  Such checks shall be made on both the registration plate, if any, and the VIN.

(3) If the vehicle is abandoned scrap, the enforcement member shall take two photographs of it.

(4) The vehicle shall be inventoried as provided in Section 48.1.2 of this Order.

(5) The vehicle shall be towed for safekeeping.

Towing and reporting procedures must comply with Section 48.4 of this Order.

(6) An electronic incident report (or Traffic Crash Report, UD-010, if towed from the scene of a crash) shall be submitted.  A property report is not required.

If the vehicle is abandoned scrap, the report shall contain the following information:

a.   Year, make, and VIN (if available).

b.   Date of abandonment.

c.   Location of abandonment.

d.   A detailed listing of the damage or missing equipment.

e.   Location where the vehicle is being held.

(7) Any abandoned vehicle shall be entered into LEIN within 24 hours as an abandoned vehicle.

(8) Except as provided in Section 48.1.8.(9), any impounded vehicle removed from public or private property as provided in MCL 257.252d or as described in Section 48.1.4 of this Order, shall be entered into LEIN as abandoned not less than 7 days after the enforcement member authorized removal and followed the procedures set forth in MCL 257.252a.

(9)   A vehicle which was impounded for any of the reasons listed in this subsection shall not be entered into LEIN as abandoned as otherwise provided in Section 48.1.8.(8) and must be released by the department prior to the towing agency or custodian releasing it to the vehicle owner.  Once released by the department, the towing agency or custodian must wait at least 20 days, but not more than 30 days, to request the department enter the impounded vehicle as abandoned in LEIN and follow the procedures set forth in MCL 257.252a.  This subsection applies to vehicles impounded by the department for one or more of the following reasons:

a.   There was reasonable cause to believe that the vehicle or any part of the vehicle is stolen.

b.   The vehicle was seized to preserve evidence of a crime, or there was reasonable cause to believe that the vehicle was used in the commission of a crime.

c.   The vehicle has been involved in a traffic crash and cannot be safely operated from the scene of the crash.

B.   Vehicle Status

For abandoned scrap vehicles skip to Section 48.1.8.B.(3).

(1)   Not less than 30 days after the date the vehicle was entered into LEIN as an abandoned vehicle, the custodian of the vehicle shall be contacted to see if the vehicle has been redeemed by the owner or sold at auction as provided in MCL 257.252g.  See Section 48.1.10 of this Order.

(2)   If at any time the owner or secured party redeems the vehicle, the incident shall be closed in accordance with the instructions in Section 48.1.10 of this Order.

(3)   If the vehicle is registered abandoned scrap:

a.   Within 24 hours enter the vehicle into LEIN as an abandoned vehicle.  A purge date of 30 days after taking custody of the vehicle shall be entered on LEIN Scan Line 29.

b.   The custodian of the vehicle will dispose of the vehicle according to Section 48.1.10 of this Order.

(4)   If the vehicle is unregistered abandoned scrap:

a.   The vehicle shall be entered into LEIN within 24 hours as an abandoned vehicle.

b.   Within 24 hours, excluding weekends and legal holidays, after removing the vehicle, the enforcement member or designee shall complete a release form provided by the Department of State, and release the abandoned scrap vehicle to the custodian of the vehicle.

c.   The custodian of the vehicle will dispose of the vehicle in accordance with MCL 257.252b.

48.1.9.   REMOVAL OF TAGGED VEHICLES

A.   Initial Investigation

(1)   An enforcement member shall physically check every vehicle considered abandoned.

(2)   A check shall be made through LEIN to determine if the vehicle has been reported stolen.  Such checks shall be made on both the registration plate, if any, and the VIN.

(3)   An Abandoned Vehicle Tag, UD-070, shall be affixed to the vehicle when first checked by the enforcement member.

B.   After the required 18 or 48-hour waiting period and before removal of the vehicle:

(1)   Recheck both the registration plate, if any, and the VIN through LEIN to determine if the vehicle has been reported stolen.

(2)   Proceed with the appropriate steps outlined in Section 48.1.8 above.

48.1.10.   DISPOSITION OF ABANDONED, TOWED, AND IMPOUNDED VEHICLES

A.   Release to Owner

(1)   The owner may secure release of the vehicle by paying the accrued charges to the custodian of the vehicle, along with the abandoned vehicle fee outlined in MCL 257.252a.

(2)   Vehicle bonds shall not be accepted by this department.  These bonds shall be posted with the court.

(3)   When the owner redeems the vehicle or upon disposition of the hearing, the LEIN entry shall be canceled and the incident may be closed.

B.   Release to Secured Party

(1)   If the owner fails to redeem the vehicle or request a hearing and the secured party wishes to redeem the vehicle, they may secure release of the vehicle by paying the accrued charges to the custodian of the vehicle, along with the abandoned vehicle fee outlined in MCL 257.252a.

(2)   When the owner redeems the vehicle, the LEIN entry shall be canceled and the incident may be closed.

C.   Sale at Auction--MCL 257.252g

(1)   If there are no bidders on the vehicle, the Michigan Vehicle Code allows police agencies to obtain title to the vehicle.  The department however, does not allow the purchase of these vehicles except in extraordinary circumstances and with the prior approval of the Budget and Financial Services Division.

(2)   Once informed of the disposal of the vehicle by the custodian of the vehicle, the LEIN entry shall be canceled and the incident closed.

D.   Unregistered Abandoned Scrap Vehicles

(1)   Within 24 hours after taking an unregistered abandoned scrap vehicle into custody, the custodian of the vehicle may apply for a certificate of scrapping from the Department of State as outlined in MCL 257.252b.  The enforcement member or designee shall complete the release form and release the vehicle to the custodian.

(2)   Once the unregistered abandoned vehicle has been released the LEIN entry can be cancelled and the incident report closed.

48.1.11. INCIDENT REPORTS

Any time a vehicle is deemed abandoned, impounded, or towed, and entered into LEIN, an incident report shall be completed.  The incident report shall remain open until the vehicle has been disposed of in accordance with MCL 257.252g and the LEIN entry has been cancelled.

48.1.12. ENFORCEMENT ACTION

The investigating enforcement member may cite the last titled owner for violation of the Michigan Vehicle Code or the Natural Resources and Environmental Protection Act.  The decision as to which Act to cite the last titled owner under shall be based on the condition of the vehicle and contents.

**48.2     MOTOR VEHICLE INSPECTION**

This section establishes guidelines for inspection of motor vehicles operating on the highways, including non-commercial and commercial vehicles, school buses, and department vehicles.  This section also provides uniformity for inspection of vehicles by department members.

48.2.1.  NON-COMMERCIAL VEHICLE INSPECTION PROCEDURES

A.   Authority for non-commercial motor vehicle inspections

Enforcement members are prohibited from establishing temporary check lanes for the inspection of non-commercial motor vehicles.

B.   The primary method to inspect motor vehicles operating on the public highways is road patrol inspections.

(1)   When a vehicle is legally stopped for a violation of the Michigan Vehicle Code, enforcement members of the department may conduct a vehicle inspection.

(2)   Road patrol vehicle inspections shall be recorded on the enforcement member's daily report.

C.   Every vehicle inspected shall be checked according to the Michigan Vehicle Code.

At a minimum, a vehicle inspection should include inspection of lights, brakes, tires, steering, vision requirements, and exhaust system.

D.   When a vehicle is inspected and found to have defective equipment, one or more of the following actions shall be taken:

(1)   The driver and vehicle may be released with instructions to make the necessary repairs.

(2)   A citation may be issued for the violations.

(3)   If it is determined that the mechanical condition of the vehicle may create an immediate hazard to the public, the vehicle shall not be allowed to continue operating on the highway.  If impoundment of the vehicle is necessary, the procedures outlined in Section 48.1.4 of this Order shall be followed.

48.2.2.   COMMERCIAL VEHICLE INSPECTION PROCEDURES

A.   Authority for Commercial Vehicle Inspections

Legal authority for inspection of commercial motor vehicles is found in the Motor Carrier Safety Act.  This Act authorizes a peace officer or an officer of the Commercial Vehicle Enforcement Division (CVED), on reasonable cause to believe that a motor vehicle is being operated in violation of the Act or a rule promulgated pursuant to the Act, to stop the motor vehicle and inspect it.  If a violation is found, the enforcement member may issue a citation for that violation.

B.   Commercial vehicle inspections may be conducted at scale locations, highway locations, or alternative inspection sites according to the CVED Command.

(1)   Inspections shall be conducted by enforcement members assigned to scales and patrol units.  Other enforcement members, when properly trained, shall also conduct inspections when assigned.  Inspections performed on public highways shall be conducted in a manner to ensure safety of the officer and the public.

(2)   Special inspection operations may be established and conducted at alternate inspection sites.  These projects shall be conducted according to CVED Command.

C.   Inspections shall be conducted on commercial vehicles that have been legally stopped with probable cause and or violations of rules and regulations.

D.   Each commercial vehicle inspected shall be checked as closely as possible according to the items listed in the Commercial Vehicle Safety Alliance (CVSA) policy manual. /, . Instructions for the Driver/Vehicle Examination Report are available from the CVED Headquarters.  Officers shall complete the Driver/Vehicle Examination Report in compliance with the CVSA Policy Manual and CVED policy.

(1)   A printed copy of the Driver/Vehicle Examination Report shall be provided to the driver of the commercial vehicle inspected.  The electronic copy of the Driver/Vehicle Examination Report shall be uploaded to the safer mailbox at the completion of the traffic stop.

(2)   Commercial Vehicle Safety Alliance (CVSA) decals shall be issued to inspected vehicles meeting the criteria for decal issuance as established by the CVSA Policy Manual.

a.   When a decal is issued, the officer shall attach it to the lower right-hand corner of the passenger side windshield for power units.  Decals shall be attached on trailing units on the lower right corner as near the front as possible.

b.   Decals are available from the CVED Headquarters.

c.   Officers shall not stop a vehicle with a valid CVSA decal unless a critical safety defect as identified in the CVSA Policy Manual is observed or other violations of law not related to equipment have been observed.

48.2.3.   SCHOOL BUS INSPECTION

    A.   Authority

       Legal authority to conduct inspections of public and non-public school buses is contained in MCL 257.715a and MCL 257.1839, respectively.

    B.   Members Assigned

       Vehicle Safety Inspectors are assigned to the CVED under the supervision of the Bus Inspection Unit commander.

    C.   CVED shall administer the bus inspection program.

    D.   Refer to Official Order No. 17, Section 17.3, for the department's policy on enforcement of laws pertaining to the operation of school buses.

**48.3      STATEWIDE WRECKER POLICY AND PROCEDURES**

This section establishes policy and outlines operational procedures for the use of wrecker services.  Included are operational guidelines to provide efficient and equitable delivery of qualified and courteous wrecker service to protect the safety of people and property.

48.3.1.   GENERAL

    A.   Work sites shall establish a local policy for areas not covered by this Order, or where local policy development is required.

       (1)   Work site commanders shall work with their local prosecutor(s) to develop a work site policy for vehicles seized and held for evidence.

       (2)   Policies shall be approved by the district or division commander and become part of the local work site policy book.

    B.   Work site commanders have the option of establishing a no-preference wrecker list or contracting with wrecker services in their area, depending on what best suits their area's operational needs.

    C.   State and county facilities, such as county road commission garages, shall be used for storing seized and/or recovered items to the extent possible.  Many of these government facilities are available for secure storage areas at no cost.

48.3.2.   TYPES OF TOWING SERVICES

    A.   Basic Services

       General towing services utilizing small- and medium-duty wreckers that include the following:

       (1)   Providing towing and roadside assistance services to automobiles and light-duty trucks.

       (2)   Removal of:

          a.   Abandoned vehicles.

      b.    Vehicles involved in a traffic crash.

      c.    Emergency vehicle removal (upon the direction of an enforcement member).

      d.    Impound and secure storage of removed vehicles.

(3)    Hook-up for tow on or immediately adjacent to normally maintained right-of-way or maintained private road, drive or parking lot.

(4)    Straight pull or winching.

(5)    Clean-up at a collision scene requiring one employee to perform manual labor, including up to 30 minutes of on-scene standby.

      a.    Per MCL 324.8902, it is the wrecker service's legal responsibility to clean up the debris at the scene of a traffic crash.

      b.    Clean up shall be done as quickly as possible, and shall involve the removal of all crash-related debris including debris from scene policing (i.e., spent flares).

      c.    Clean up shall not include the removal of hazardous or bio-hazardous materials except for fluids normally used to operate a vehicle.

      d.    If the required clean-up necessitates the use of motorized equipment to pick up debris, the wrecker service shall be entitled to charge a reasonable fee.

B.    Special Services

(1)    Services using medium or heavy-duty wreckers that include, but are not limited to, the following:

      a.    Excess winching.

      b.    Use of tow dollies.

      c.    Recovering, or towing/stabilizing, a vehicle that is located beyond a normal roadside ditch.

      d.    Unusually large clean-ups

      e.    Class B or C vehicle towing.

      f.    Up righting cargo tanks.

      g.    Providing assistance at hazmat incident scenes with specially trained wrecker operators.

      h.    Any removal or assistance duties the contract wrecker service cannot provide with its small and medium duty wreckers.

(2)    Subcontracting for Special Services

      a.    Wrecker services shall be responsible for subcontracting with other wrecker services to provide any special services within the contract area that they cannot.

b. The wrecker service shall ensure that companies they sub-contract with meet the specifications listed in their contract and agree to abide by the requirements listed in Section 48.4.5 of this Order.

c. The wrecker service shall provide the work site commander with the names of the companies with which they have subcontracted.

d. It is the responsibility of the wrecker service to inform the caller at the time of the request for service which subcontractor company will be responding to the scene.

e. The wrecker service shall respond to the scene with their subcontractor and ensure that the vehicles are towed to the wrecker service's storage lot.

(3) Special agreements, policies, and contracts may be developed by a work site to accommodate unique circumstances (e.g., special equipment needs, lack of sufficient wrecker services in remote areas, central and regional dispatching), and shall be approved by the district/division commander.

## 48.3.3.   REQUESTS FOR WRECKER SERVICE

A. Members of the department shall not recommend one wrecker service over another to the public.

B. Enforcement members calling for a no-preference wrecker shall not request a wrecker service which is not contracted or on the no-preference wrecker call list, nor direct that a particular wrecker service be called out of order.  The only exception is if the particular service required is only available through the towing service requested.

C. Motorist-Preferred Wrecker Service

(1) Regardless of whether a no-preference wrecker list or contract wrecker service is used, motorists in need of wrecker service shall be asked if they have a preferred service.  Their request shall be honored so long as the wrecker service is readily available and public safety is not an immediate concern.

(2) Motorists shall also be asked if their insurance company or vehicle's manufacturer offers roadside assistance.  If so, they shall be given an opportunity to call their service provider for a wrecker as long as public safety is not an immediate concern.

## 48.3.4.   WORK SITE WRECKER SERVICE GEOGRAPHICAL AREAS

A. The work site commander may establish wrecker service geographical areas within their area of a number, size, shape, and location deemed necessary.

B. Wrecker services meeting the requirements outlined in this Order shall be used by the work site within the wrecker service's requested geographical area.

## 48.3.5.   CONTRACT OR NO-PREFERENCE LIST REQUIREMENTS

Wrecker services interested in working with the Michigan State Police shall agree to abide by the following requirements for the duration of their association with the department.  Failure to comply with all of these requirements may be cause for termination of the contract or removal from the no-preference wrecker call list as provided in this Order.

A.   The wrecker service shall neither conceal nor misrepresent any material facts when applying for or performing services under this agreement.

B.   The wrecker service shall be legally established as a towing business with a minimum of five years of towing and recovery operations experience (e.g., registered with the County Clerk as an assumed name business, or registered with the State of Michigan as a corporation) with operations within the post area.

   (1)   Post office box numbers shall not be accepted.

   (2)   All necessary equipment and storage facilities shall be located in the area to be served.  Exceptions may be made for specialized equipment needs, as dictated by unique or emergency conditions.

   (3)   The wrecker service shall be registered with the Michigan Secretary of State website, Michigan's Auto Lost and Found.

   (4)   The wrecker service shall be registered with the National Motor Vehicle Title Information System (NMVTIS).

C.   The wrecker service shall comply with this Order, all rules and regulations prescribed by the MPSC (as applicable), local ordinances, zoning requirements, and state laws pertaining to this type of business.

D.   Drivers and representatives of the wrecker service shall be professional and courteous in their dealings with the public.

E.   The wrecker service shall maintain an effective means of communication with their trucks and drivers at all times.

F.   Insurance

   (1)   The wrecker service shall maintain insurance coverage with a limit of $1,000,000 for liability and $100,000 in cargo on its fleet and drivers.

       Wrecker service insurance coverage shall include workers' compensation.

   (2)   The work site commander shall require that wrecker services provide a copy of their valid insurance policy, as well as copies of each renewal as long as their contract is in effect or they are listed on the no-preference wrecker list.

       All wrecker services shall have the Michigan State Police listed as additional insured, to insure notification of canceled coverage.

   (3)   If the wrecker service does not maintain insurance coverage or cannot provide proof of insurance coverage, they shall immediately have their contract canceled or be removed from all no-preference wrecker call lists until the work site commander is satisfied that the wrecker service is in compliance with insurance requirements.

G.   Indemnification

The department shall not be held responsible for liabilities incurred while the wrecker service is providing service at a scene to which they were dispatched by the department. The wrecker service agrees that it is not acting as, nor will it represent itself as, an agent of the department while performing services.

H.   Storage Facilities

(1)   The wrecker service shall own or have an exclusive, signed lease to a secure vehicle storage area of suitable size, properly zoned and adequately fenced, within the work site's assigned area.  If the storage area is leased, the lease shall be valid through the term of the contract or no-preference list.

a.   Documentation of zoning compliance and ownership or exclusive lease of the storage facility are required and shall be submitted with the wrecker service's application.

b.   If the storage area location is different from the wrecker service's business location, it shall identify the physical location of the storage facility on the application.

(2)   The storage area shall only be accessible by the wrecker service.

(3)   The storage area shall be capable of simultaneously holding a minimum of 20 passenger vehicles and at least four maximum-size tractor-trailer combinations if they are able to perform heavy-duty tows.

(4)   If the wrecker service is unable to store a vehicle because there is insufficient storage area, they shall immediately notify the work site's on-duty supervisor.  The wrecker service shall be financially responsible for any additional towing or storage charges associated with this situation.

(5)   Seized and Evidence Vehicles

a.   The wrecker service shall provide a separate area within their storage area for vehicles that have been identified as stolen or involved in criminal investigations, forfeitures, or other police-related matters.

b.   After having stored the vehicle for 20 days, the wrecker service agrees to contact the work site commander to initiate the abandoned and unclaimed vehicle procedures specified in Section 48.4.5.K of this Order.

Under no circumstances shall the work site or department be charged for the storage of seized vehicles and vehicles held as evidence.

(6)   The wrecker service shall be solely responsible for any damage or theft of vehicles and/or personal property while such vehicle and/or personal property stored on the wrecker service premises.

(7)   When requested by a police agency, the wrecker service shall provide written notification identifying where a towed vehicle is physically being held.

I.   Equipment

(1)   The wrecker service agrees to properly maintain its trucks and clearly mark them as required by state law.  The trucks shall not bear markings which would suggest or indicate that they are police vehicles.

(2)   The wrecker service shall ensure that its drivers and equipment used for department requests are qualified under the provisions of the Motor Carrier Safety Act, 1963 PA 181, and the Michigan Vehicle Code, 1949 PA 300, as amended.

a.   The wrecker service shall maintain a minimum of two Class A-B-C trucks and two drivers on call to respond to requests for services under this contract 24 hours per day, 365 days per year.

b.   The wrecker service shall provide the work site commander with the following information for each of their trucks:

   i.    Vehicle class

   ii.   Make Year, Model and GVWR (rating of chassis)

   iii.  Number, capacity and type (e.g., fixed or moveable, manual or hydraulic) of booms

   iv.   Number and size of winches

   v.    Size and quantity of cable for each winch

   vi.   Lift type(s) (e.g., sling, wheel lift, chassis lift, roll back)

   vii.  Rear wheel/axle configuration (i.e., duels, tandem duels)

   viii. Any additional equipment

   ix.   Copy of each vehicle's registration

   x.    If leased, a copy of each vehicle's lease agreement

   xi.   A copy of the last annual (periodic) certification inspection completed (shall be within the three months prior to the date of their application)

c.   The wrecker service shall maintain all equipment in safe, legal operating condition at all times and shall equip all vehicles with rotating amber lights visible from 360 degrees.

d.   If the wrecker service fails to maintain its equipment in good repair, the work site commander may immediately cancel the contract or remove the service from the no-preference wrecker call list at any time during this contract.

J.   Response to Calls for Service

(1)   Requests for service received from enforcement members shall receive first response priority.

(2)   The wrecker service shall be available by telephone 24 hours a day, 365 days per year, with at least one wrecker immediately available, unless another schedule is deemed appropriate by the work site commander.

(3)   Answering Telephone Calls

a.   The wrecker service shall answer telephone calls for service within ten rings.

b.   If the wrecker service fails to answer its telephone after ten rings, or if it indicates that it cannot immediately handle a call, the work site commander shall notify the wrecker service in writing of noncompliance with their agreement.

      c.    Upon the occurrence of three such written notices within a 12-month period, the work site commander shall have the right to immediately cancel the contract or remove the service from the no-preference list.

    (4)    Response time to calls from the department shall be reasonable, as determined by the work site commander.

    (5)    The wrecker service shall abide by all laws when responding to a scene and/or towing vehicles for the department, including equipment and traffic laws.

    (6)    The wrecker service shall not send a truck to a police incident outside the agreed upon geographical area unless requested by an enforcement member.

K.    Abandoned and Unclaimed Vehicles

    (1)    The wrecker service shall comply with all applicable provisions of MCL 257.252a-g as they apply to abandoned vehicles.

    (2)    The wrecker service shall not remove an abandoned vehicle from private property in accordance with MCL 257.252a without first notifying their affiliated work site.

    (3)    The wrecker service agrees to serve as the custodian of the vehicle to ensure disposal of unclaimed vehicles as outlined in MCL 257.252g.

    (4)    Unclaimed vehicles shall be disposed of at public auction held by the work site commander or their designee, per the instructions in this Order.

L.    Charges

    (1)    The wrecker service shall be paid by the registered owner of the serviced vehicle.

    (2)    Basic and Special Service Charges

         Reasonable rates based on local industry standards shall be used for all services provided. The wrecker service shall provide a written copy of its rates detailing charges for all basic and special services to the work site commander no later than January 31st of each year.

    (3)    Storage Charges

        a.    The wrecker service may charge reasonable fees in addition to the basic and/or special charges for services performed in addition to the basic service. These charges may vary based on the size of the vehicle stored.

        b.    Vehicles Excluded from Storage Charges

             In the event a vehicle is towed and/or stored but a court later determines that it was improperly moved, the department shall not be charged a fee by the wrecker service unless payment is required by court order under MCL 254.252f.

    (4)    Mileage Charges

        a.    A local industry standard amount may be charged per mile for mileage driven in excess of five miles from the point of hook-up to the storage facility or other designated destination. All mileage charges shall be calculated based on one way mileage.

      b.    The wrecker service shall provide a written copy of its mileage rates to the work site commander no later than January 31st of each year.

   (5)   Charges for Canceled Calls

      If a call requesting wrecker service is canceled prior to the service being provided (e.g., hooking up the vehicle), neither the work site nor the vehicle's owner/operator shall be obligated to compensate the towing company.

M.   Towing Documentation

   (1)   Before towing any impounded vehicle from a scene as requested by an enforcement member, the wrecker service shall:

      a.    Obtain the vehicle's identification number from the vehicle, or from the enforcement member at the scene.

      b.    Take an inventory listing the vehicle's contents.

         i.    Jointly sign this inventory with the enforcement member.

        ii.    The wrecker service may also verify and sign an inventory taken by the enforcement member instead of completing their own.

   (2)   The wrecker service shall not remove a wrecked vehicle from the scene of an accident without authorization by a law enforcement agency.

N.   Vehicle Redemption

   (1)   The wrecker service shall allow for the redemption of vehicles from their storage area at least eight hours per day, five days per week, and shall make their facility reasonably available after normal business hours upon receiving a telephone call from a post department member.

   (2)   The wrecker service shall not permit a vehicle owner to redeem an impounded vehicle or remove any of its contents without permission from the work site commander or their designee.  Failure to comply with this section is grounds for termination of the contract or removal from the no-preference wrecker list.

O.   The wrecker service agrees that intentional violations of Chapter II of the Michigan Vehicle Code for financial gain will result in their immediate termination of the contract or removal from the no-preference wrecker list and criminal prosecution where applicable.

P.   Upon approval of their district or division commander, a work site commander may establish additional requirements if unique circumstances exist in their area.

## 48.3.6.   NO-PREFERENCE WRECKER CALL LIST

A.   Work site commanders may establish a no-preference wrecker call list for each assigned geographical area where there is more than one qualified wrecker service.

   (1)   If a no-preference wrecker call list is created, only wrecker services which have requested placement on the list and have met the requirements of this Order shall be included.

(2) If a wrecker service has been contacted and cannot respond, it shall be placed at the end of the no-preference wrecker call list, and the next wrecker service on the list in the corresponding geographical area shall be contacted.

B.  Application for Placement on No-Preference Wrecker Call List

(1) Work sites shall provide a copy of the Requirements for Placement on No-Preference Wrecker Call List, UD-041, to the representative of a wrecker service requesting to be placed on the work site's no-preference wrecker call list.  This document defines the department's standards and service expectations.

(2) The wrecker service representative shall sign and date the form indicating he or she has read and understands the requirements, that the wrecker service is willing to adhere to the requirements, and shall provide all required information specified in the UD-041.

It is the wrecker service's responsibility to ensure that the work site commander is provided with updated information required by the UD-041 by January 31st of each year.

(3) The original signed UD-041 and all other required documents shall be maintained at the work site for the year the wrecker service is removed from the no-preference wrecker call list plus two years.

C.  Working Outside of the No-Preference Wrecker List

Enforcement members may work outside the no-preference wrecker list and contact the nearest available wrecker service if any of the following situations occur:

(1) The wrecker service notifies the work site that it cannot immediately handle a call for service.

(2) The wrecker service does not respond to the call within 20 minutes after being notified by the work site.

(3) On occasions when an injured person is pinned in a wreck or when there is a danger of fire or explosion and expedient wrecker service is required.

(4) Traffic conditions are such that immediate removal of a vehicle is necessary to resume the flow of traffic.

(5) Once on the scene, the wrecker service is unable to handle the tow and cannot respond with the necessary equipment in a timely manner.

(6) If the next wrecker service on the list is based a considerable distance from the scene to make it impractical to wait for its arrival.

48.3.7.  CONTRACTING FOR WRECKER SERVICES

A.  In areas where circumstances make the use of the no-preference list impossible or impractical (e.g., there are a limited number of potentially qualified wrecker services, or central dispatch is unwilling to use the compiled list), work site commanders may contract with one or more wrecker service.

B.  In contracting with a wrecker service, the work site commander reserves the right to reject any and all bids, to waive or not waive informalities or irregularities in bids or bidding procedures, and to accept or further negotiate cost, terms, or conditions of any bid

determined by the Michigan State Police or its designee to be in the best interest of the department even though not the lowest bid.

C.   If a contract is awarded, the selected wrecker service shall be required to adhere to the requirements listed in this Order, which shall become a part of a formal agreement between them and the Michigan State Police.

   (1)   The contract shall represent the entire agreement between the parties and supersedes all prior representations, negotiations or agreements, whether oral or written.  Any modifications of this contract shall be mutually agreed upon with written amendments signed by all parties.

   (2)   In the event that it becomes necessary to revise any part of the agreement, an addenda shall be provided.  Deadlines for submission of agreement may be adjusted to allow for revisions.

   (3)   This contract shall commence upon its execution by all parties and shall stand valid and binding for a period of four years.

D.   Proposals shall be signed by an official authorized to bind the wrecker service to the contract provisions for a period of at least 90 days.  Failure of the successful bidder to accept the obligation of the contract may result in the cancellation of any award.

E.   Working Outside the Contract

Enforcement members may work outside the contract and contact the nearest available wrecker service if any of the following situations occur:

   (1)   The wrecker service notifies the work site that it cannot immediately handle a call for service.

   (2)   The wrecker service does not respond to the call within 20 minutes after being notified by the work site.

   (3)   On occasions when an injured person is pinned in a wreck or when there is a danger of fire or explosion and expedient wrecker service is required.

   (4)   Traffic conditions are such that immediate removal of a vehicle is necessary to resume the flow of traffic.

   (5)   Once on the scene, the wrecker service is unable to handle the tow and cannot respond with the necessary equipment in a timely manner.

F.   Termination of Contract

   (1)   The contract may be terminated by any party to it without cause upon 30 days' notice to the other party.  If the contract/agreement is terminated or the department cancels this contract for failure of the wrecker service to comply with the terms of this contract, it shall do so in writing, specifying the violated sections.

   (2)   Either party may complete revocation of the contract at any time.  Just cause and prior notification will be afforded all parties concerned before revocation.

48.3.8.   METRO SOUTH POST PROVISIONS

A.   The Detroit City Code - Traffic and Motor Vehicles, Section 55-15-8, defines the Standards for Authorized Towers, Payments.  It requires that a "police authorized tower's business is based within the City of Detroit as determined by payment of city income and property taxes."

   (1)   The Metro South Post shall use a tow list approved by the Detroit City Code.

   (2)   The Metro South Post shall not establish a rotational call list due to the unique circumstances within the post area.

B.   Wrecker services listed on the Metro South Post tow list shall abide by the requirements listed in this Order.  Wrecker services are required to meet the criteria established by the Metro South Post for the selection of wrecker services.

C.   The commander of the Metro South Post may establish wrecker service geographical areas within the post area, if necessary.

D.   The Metro South Post shall follow the procedure outlined in Section 48.4.13 of this Order whenever a complaint is received concerning a wrecker service or if a wrecker service files a complaint.

E.   Special agreements or contracts developed to meet the needs of the Metro South Post shall comply with this Order and be approved by the district commander, bureau commander, and the Budget and Financial Services Division.

48.3.9.   SPECIAL INVESTIGATION DIVISION PROVISIONS

A.   Section commanders may deviate from the requirements outlined in this Order during the course of sensitive and/or covert investigations when confidentiality shall be preserved.

B.   Wrecker services used by multijurisdictional task forces shall abide by the requirements listed in this Order unless otherwise directed by a multijurisdictional task force board of directors.

C.   Multijurisdictional task forces shall follow the procedures outlined in Section 48.4.13 of this Order whenever complaints are received concerning a wrecker service, or if the wrecker service has concerns or complaints.

D.   Special agreements or contracts developed to meet the needs of multijurisdictional task forces shall be approved by the appropriate division and bureau commanders and multijurisdictional task force board of directors.

48.3.10.   WRECKER SERVICES PAID WITH DEPARTMENT FUNDS

A.   Work sites which use department funds to pay for wrecker services may be required to establish a contract for services if the total amount paid to a single vendor exceeds $100 per incident or $400 per year.  When it is anticipated that expenditures will exceed these amounts, Purchasing shall be contacted.

B.   If the costs associated with the towing, storage, and disposal of vehicles are paid with multijurisdictional team funds, or other funds which have not been appropriated, it is not necessary to follow these requirements.

48.3.11.   DISPATCH CENTERS

    A.   Central Dispatch Centers

        (1)   Central dispatch centers administered by the department shall establish a local policy to address the wrecker needs of the service area.

        (2)   Contractual or other agreements between government entities and a wrecker service shall be honored, and the appropriate service shall be dispatched.

    B.   Regional Dispatch Centers

        (1)   Work sites participating in regional dispatch centers shall forward a copy of their work site wrecker service policy and contract or no-preference wrecker call list to the regional dispatch center.  The center shall use the work site's contracted wrecker service or no-preference wrecker call list when dispatching for the work site.

            The work site shall continue to abide by the contract or use a no-preference wrecker call list and towed vehicle log whenever it is dispatching its own patrols.

        (2)   Complaints received by a regional dispatch center concerning a wrecker service, or a complaint from a wrecker service, shall be forwarded to the respective work site's commander for follow up.  See Section 48.4.13 of this Order.

    C.   It is not necessary for a work site which participates in a central or regional dispatch center to contract with a wrecker service, maintain a no-preference wrecker call list, or towed vehicle log, provided that all wrecker service is dispatched by the central or regional dispatch center.

48.3.12.   COMPLAINT PROCEDURES

    A.   Complaint Against a Wrecker Service

        (1)   Problems with or complaints about a wrecker service shall be documented by the work site commander.  The documentation shall be retained for the duration of the wrecker service's contract with the department, or their time on the wrecker list, plus two years.

        (2)   Members shall report to their immediate supervisors the name of any wrecker service or their employee that renders poor service, or that is incapable of providing quality service because of inadequate equipment or personnel.

        (3)   Members who become aware that a wrecker service has intentionally violated Chapter II of the Michigan Vehicle Code shall inform their work site commander of the reported violations.

            a.   A work site commander who learns of intentional violations of Chapter II of the Michigan Vehicle Code shall ensure a thorough investigation into the incident and seek criminal prosecution if warranted.

            b.   A wrecker service who is found to have intentionally violated Chapter II for financial gain shall immediately have their contract canceled or be removed from the no-preference wrecker call list.

        (4)   Each wrecker service shall be held to identical standards of conduct or performance.

(5)   When a complaint is received concerning the performance or rate change of a wrecker service or the service is not adhering to the requirements established by this Order, the complaint shall be immediately investigated.

   a.   Unless extenuating circumstances exist, a wrecker service shall not have their contract cancelled or be removed from the no-preference wrecker call list without an investigation by the work site commander or their designee.

   b.   If it is found that the wrecker service failed to comply with the requirements of this Order, a written notice shall be sent describing the complaint and the action needed to maintain a position on the no-preference wrecker call list.

   c.   Wrecker services shall be notified in writing of any non-compliance with accepted standards of conduct in a timely manner, and advised that they have the right to an appeal in writing to the work site commander before administrative or disciplinary action can be taken.  The written notice shall indicate that additional complaints could result in removal from the list.

(6)   If an additional complaint is received concerning a wrecker service within a year, another investigation shall be conducted by the work site commander or their designee.

   a.   A copy of the report shall be sent to the Hazardous Materials and Investigation Unit commander, CVED, for further review and investigation.

   b.   The CVED shall notify the work site of the results of any investigation.

B.   Complaints from a Wrecker Service

   Complaints or concerns from a wrecker service shall be investigated by the work site commander or their designee.  If their complaint cannot be handled at the local work site, the information shall be forwarded to the Hazardous Materials and Investigation Unit commander, CVED Headquarters.  The CVED shall make contact with the MPSC when necessary.

## 48.4   ADMINISTRATIVE FEES AND OTHER CHARGES

A Michigan State Police post, multijurisdictional task force (MJTF), or other work site shall not profit from the towing of any vehicle.  This policy precludes the receiving of any type of administrative fee or other cost outside of a dollar for dollar cost reimbursement for expenses paid in advance by the Post, MJTF, or other work site in conjunction with the towing of a seized vehicle.  This section does not preclude proceeds which may be received as the result of a court ordered or administrative adjudication of the forfeiture process instituted by the post, MJTF, or other work site against a seized/towed vehicle.

## 48.5   REVISION RESPONSIBILITY

Responsibility for continued review and revision of this Order lies with the Field Services Bureau, Specialized Services Bureau (Intelligence Operations and Commercial Vehicle Enforcement divisions) and State Services Bureau (Training Division/Traffic Services), in cooperation with the Office of the Director.

DIRECTOR

# Exhibit 2

UD-41 (04/07)
MICHIGAN DEPARTMENT OF STATE POLICE

## REQUIREMENTS FOR WRECKER SERVICES TO CONTRACT
## OR BE PLACED ON NO-PREFERENCE WRECKER CALL LIST

Wrecker services interested in working with the Michigan State Police shall agree to abide by the following requirements for the duration of their association with the department. Failure to comply with all of these requirements may be cause for termination of the contract or removal from the no-preference wrecker call list as provided in Official Order No. 124.

1.    The wrecker service shall neither conceal nor misrepresent any material facts when applying for or performing services under this agreement.

2.    The wrecker service shall be legally established as a towing business (i.e., registered with the County Clerk as an assumed name business, or registered with the State of Michigan as a corporation) with operations within the post area.

   A.    Post office box numbers shall not be accepted.

   B.    All necessary equipment and storage facilities shall be located in the area to be served. Exceptions may be made for specialized equipment needs, as dictated by unique or emergency conditions.

3.    The wrecker service shall comply with this Order, all rules and regulations prescribed by the MPSC (as applicable), local ordinances, zoning requirements, and state laws pertaining to this type of business.

4.    Drivers and representatives of the wrecker service shall be professional and courteous in their dealings with the public.

5.    The wrecker service shall maintain an effective means of communication with their trucks and drivers at all times.

6.    Insurance

   A.    The wrecker service shall maintain adequate insurance coverage on its fleet and drivers.

   B.    The work site commander shall require that wrecker services provide a copy of their valid insurance policy, as well as copies of each renewal as long as their contract is in effect or they are list on the no-preference wrecker list.

   C.    If the wrecker service cannot provide proof of insurance coverage, they shall immediately have their contract canceled or be removed from all no-preference wrecker call lists until the work site commander is satisfied that the wrecker service is in compliance with insurance requirements.

7.    Indemnification

   The department shall not be held responsible for liabilities incurred while the wrecker service is providing service at a scene to which they were dispatched by the department. The wrecker service agrees that it is not acting as, nor will it represent itself as, an agent of the department while performing services.

8.    Storage Facilities

   The wrecker service shall own or have an exclusive, signed lease to a secure vehicle storage area of suitable size, properly zoned and adequately fenced, within the work site's assigned area. If the storage area is leased, the lease shall be valid through the term of the contract or no-preference list.

   A.    Documentation of zoning compliance and ownership or exclusive lease of the storage facility are required and shall be submitted with the wrecker service's application.

   B.    If the storage area location is different from the wrecker service's business location, it shall identify the physical location of the storage facility on the application.

   C,    The storage area shall only be accessible by the wrecker service.

2

D.   The storage area shall be capable of simultaneously holding a minimum of 20 passenger vehicles and at least four maximum-size tractor-trailer combinations if they are able to perform heavy-duty tows.

E.   If the wrecker service is unable to store a vehicle because there is insufficient storage area, they shall immediately notify the work site's on-duty supervisor. The wrecker service shall be financially responsible for any additional towing or storage charges associated with this situation.

F.   The wrecker service shall provide a separate area within their storage area for vehicles that have been identified as stolen or involved in criminal investigations, forfeitures, or other police-related matters.

G.   After having stored the vehicle for 20 days, the wrecker service agrees to contact the work site commander to initiate abandoned and unclaimed vehicle procedures specified in Section 11 below.

Under no circumstances shall the work site or department be charged for the storage of seized vehicles and vehicles held as evidence.

H.   The wrecker service shall be solely responsible for any damage or theft of vehicles and/or personal property while such vehicle and/or personal property stored on the wrecker service premises.

I.   When requested by a police agency, the wrecker service shall provide written notification identifying where a towed vehicle is physically being held.

9.   Equipment

A.   The wrecker service agrees to properly maintain its trucks and clearly mark them as required by state law. The trucks shall not bear markings which would suggest or indicate that they are police vehicles.

B.   The wrecker service shall ensure that its drivers and equipment used for department requests are qualified under the provisions of the Motor Carrier Safety Act, 1963 PA 181, and the Michigan Vehicle Code, 1949 PA 300, as amended.

(1)   The wrecker service shall maintain a minimum of two Class A-B-C trucks and two drivers on call to respond to requests for services under this contract 24 hours per day, 365 days per year.

(2)   The wrecker service shall provide the work site commander with the following information for each of their trucks:

a.   Vehicle class
b.   Make Year, Model and GVWR (rating of chassis)
c.   Number, capacity and type (i.e., fixed or moveable, manual or hydraulic) of booms
d.   Number and size of winches
e.   Size and quantity of cable for each winch
f.   Lift type(s) (i.e., sling, wheel lift, chassis lift, roll back)
g.   Rear wheel/axle configuration (i.e., duels, tandem duels)
h.   Any additional equipment
i.   Copy of each vehicle's registration
j.   If leased, a copy of each vehicle's lease agreement
k.   A copy of the last annual (periodic) certification inspection completed (shall be within the three months prior to the date of their application).

(3)   The wrecker service shall maintain all equipment in safe, legal operating condition at all times and shall equip all vehicles with rotating amber lights visible from 360 degrees.

(4)   If the wrecker service fails to maintain its equipment in good repair the work site commander may immediately cancel the contract or remove the service from the no-preference wrecker call list at any time during this contract.

10.   Response to Calls for Service

A.   Requests for service received from enforcement members shall receive first response priority.

| AUTHORITY: | 1935 PA 59 |
| COMPLIANCE: | Voluntary |

Resp.1st.Req_0202

B. The wrecker service shall be available by telephone 24 hours a day, 365 days per year, with at least one wrecker immediately available, unless another schedule is deemed appropriate by the work site commander.

C. Answering Telephone Calls

(1) The wrecker service shall answer telephone calls for service within 10 rings.

(2) If the wrecker service fails to answer its telephone after 10 rings, or if it indicates that it cannot immediately handle a call, the work site commander shall notify the wrecker service in writing of noncompliance with their agreement.

(3) Upon the occurrence of three such written notices within a 12-month period, the work site commander shall have the right to immediately cancel the contract or remove the service from the no-preference list.

D. Response time to calls from the department shall be reasonable, as determined by the work site commander.

E. The wrecker service shall abide by all laws when responding to a scene and/or towing vehicles for the department, including equipment and traffic laws.

F. The wrecker service shall not send a truck to a police incident outside the agreed upon geographical area unless requested by an enforcement member.

11. Abandoned and Unclaimed Vehicles

A. The wrecker service shall comply with all applicable provisions of MCL 257.252a-g as they apply to abandoned vehicles.

B. The wrecker service shall not remove an abandoned vehicle from private property in accordance with MCL 257.252a without first notifying their affiliated work site.

C. The wrecker service agrees to serve as the custodian of the vehicle to ensure disposal of unclaimed vehicles as outlined in MCL 257.252g.

D. Unclaimed vehicles shall be disposed of at public auction held by the work site commander or their designee, per the instructions in Official Order No. 49, Enclosure (14).

12. Charges

A. The wrecker service shall be paid by the registered owner of the serviced vehicle.

B. Basic and Special Service Charges

Reasonable rates based on local industry standards shall be used for all services provided. The wrecker service shall provide a written copy of its rates detailing charges for all basic and special services to the work site commander no later than January 31st of each year.

C. Storage Charges

(1) The wrecker service may charge reasonable fees in addition to the basic and/or special charges for services performed in addition to the basic service. These charges may vary based on the size of the vehicle stored.

(2) Vehicles Excluded from Storage Charges

In the event a vehicle is towed and/or stored but a court later determines that it was improperly moved, the department shall not be charged a fee by the wrecker service unless payment is required by court order under MCL 254.252f.

D. Mileage Charges

| AUTHORITY: | 1935 PA 59 |
| --- | --- |
| COMPLIANCE: | Voluntary |

4

    (1)  A local industry standard amount may be charged per mile for mileage driven in excess of five miles from the point of hook-up to the storage facility or other designated destination. All mileage charges shall be calculated based on one way mileage.

    (2)  The wrecker service shall provide a written copy of its mileage rates to the work site commander no later than January 31st of each year.

E.    Charges for Canceled Calls

    If a call requesting wrecker service is canceled prior to the service being provided (i.e., hooking up the vehicle), neither the work site nor the vehicle's owner/operator shall be obligated to compensate the towing company.

13.   Towing Documentation

    A.    Before towing any impounded vehicle from a scene as requested by an enforcement member, the wrecker service shall:

        (1)  Obtain the vehicle's identification number from the vehicle, or from the officer at the scene.

        (2)  Take an inventory listing the vehicle's contents.

           a.   Jointly sign this inventory with the enforcement member.

           b.   The wrecker service may also verify and sign an inventory taken by the enforcement member instead of completing their own.

    B.    The wrecker service shall not remove a wrecked vehicle from the scene of an accident without authorization by a law enforcement agency.

14.   Vehicle Redemption

    A.    The wrecker service shall allow for the redemption of vehicles from their storage area at least eight hours per day, five days per week, and shall make their facility reasonably available after normal business hours upon receiving a telephone call from the vehicle owner.

    B.    If there is a "hold" placed on a vehicle, the wrecker service shall not permit a vehicle owner to redeem an impounded vehicle or remove any of its contents without permission from the work site commander or their designee. Failure to comply with this section is grounds for termination of the contract or removal from the no-preference wrecker list.

15.   The wrecker service agrees that intentional violations of Chapter II of the Michigan Vehicle Code for financial gain will result in their immediate termination of the contract or removal from the no-preference wrecker list and criminal prosecution where applicable.

I understand and agree to adhere to the above requirements. Failure to comply with all of these requirements or misrepresented or falsified information shall be cause for termination of my contract with the Department of State Police or removal from the department's no-preference wrecker call list.

| Company Eagle Towing | Address 10255 US Hwy 31 |
|---|---|
| City Montague MI | Owner/Agent John Kreyoop |
| Signature _(signature)_ | Date 03/28/18 | Telephone number (include area code) (231) 894-5424 |

ORIGINAL – Worksite
PHOTOCOPY – Applicant

AUTHORITY: 1935 PA 59
COMPLIANCE: Voluntary

# Exhibit 3

JEFFREY J. WHITE, FIRST LIEUTENANT
02/05/2019                                                              Page 1

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE WESTERN DISTRICT OF MICHIGAN

 3

 4   JOHN HEYKOOP D/B/A EAGLE TOWING,

 5               Plaintiff,

 6        vs.                    Case No. 1:18-cv-00632

 7                               Hon. Robert J. Jonker

 8                               Mag. Phillip J. Green

 9   FIRST LIEUTENANT JEFFREY WHITE;

10   FIRST LIEUTENANT CHRIS MCINTIRE,

11               Defendants.

12   _____

13

14

15        The Deposition of FIRST LIEUTENANT JEFFREY J. WHITE,

16        Taken at 4151 Okemos Road,

17        Okemos, Michigan,

18        Commencing at 10:33 a.m.,

19        Tuesday, February 5, 2019,

20        Before Kathryn M. Standal, CSR-2966.

21

22

23

24

25
```

```
 1        and-a-half later I was back to Reed City.  I think
 2        20013 I promoted to lieutenant at the Hart post, I may
 3        have that year wrong, and then a year and-a-half later
 4        or so promoted to first lieutenant post commander at
 5        the Hart post.
 6   Q.   Okay.  So the same time you got the promotion to first
 7        lieutenant is when you became commander at the Hart
 8        post?
 9   A.   Correct.
10   Q.   And what year was that again?
11   A.   I think that was 2015.  Might have been '16.  I don't
12        remember exactly.
13   Q.   Okay.  Now, in your experience, at least not as an
14        undercover drug enforcement, I don't think you'd have
15        too much experience or reason to deal with towing
16        companies and abandoned vehicles in that capacity; is
17        that right?
18   A.   A little bit, you know.  We moved cars around and
19        things, but not to the extent a uniformed officer
20        does.
21   Q.   Right.  Right.  I imagine that the -- your work down
22        in south -- is it South Metro?
23   A.   Metro South.
24   Q.   Metro South --
25   A.   Yes, sir.
```

```
 1        know that Lieutenant McIntire had his deposition taken

 2        yesterday, right?

 3   A.   Yes, sir.

 4   Q.   Okay.  And you know who he is?

 5   A.   I do, yeah.

 6   Q.   Did you have an opportunity to speak with him after

 7        his deposition yesterday?

 8   A.   I did, yeah.

 9   Q.   When did you speak with him?

10   A.   5:00, 4:30.

11   Q.   Okay.  And just one time?

12   A.   No, twice.

13   Q.   Twice?

14   A.   Twice.

15   Q.   All right.

16   A.   No, no, no, it was earlier than that.  Probably

17        3:00 --

18   Q.   Okay.

19   A.   -- because 4:00 I talked with you, a little after 4:00

20        when you called, yeah.

21   Q.   Okay.  So you talked to McIntire about 3:00 and then

22        you talked to McIntire again later?

23   A.   Yeah, he called me back.

24   Q.   He called you back later in the afternoon?

25   A.   Yeah.
```

```
 1   Q.   Okay.  Now, I don't want you to tell me about things

 2        that you told your attorney because that would be

 3        privileged and you're entitled to not tell me, okay?

 4   A.   Yes, sir.

 5   Q.   But I would like to know what you and Lieutenant

 6        McIntire talked about?

 7   A.   He told me to pack a lunch is what he said.  He said

 8        pack a lunch.  I said well, you're calling me now.  He

 9        must have called me whatever time he got out.

10   Q.   Pretty much it was about 2:30 when we finished.

11   A.   Okay.  So that was about the time he called me.  I

12        said well, you ate lunch, right?  He said no, went

13        straight through.  So I think he said it was a little

14        over three hours, and he said went through all the

15        exhibits and I told him what I know, and then he had

16        called, you know, so I'd say we were on the phone

17        maybe five minutes.  He called back to tell me that he

18        had talked with -- well, I guess --

19   Q.   It's okay that he talked to --

20   A.   That he talked to Patrick and --

21   Q.   But what did he tell you as far as --

22               MR. MYERS:  Sorry, I'll let you finish.

23   BY MR. BRENNAN:

24   Q.   I'm not looking for privileged stuff.  I don't want

25        you to repeat what he told Patrick, because even
```

```
 1        trick you or anything.

 2   A.   Right.

 3   Q.   So I'd rather have you tell me how you really came to

 4        these answers or not, so that's fine.

 5   A.   I didn't believe that there were any that I could

 6        recall, but I have relied upon the 911 director.  So I

 7        called Ray Hasil and I said, Ray, this is one of the

 8        questions on my interrogatory and what's been added,

 9        so he told me.

10   Q.   Okay.

11   A.   So I reported what I was told just because I didn't

12        know, you know.

13   Q.   Well, that kind of leads me to a question.  In your

14        post you -- whatever the no-preference list is that's

15        being sort of held by -- when I talk about

16        Oceana-Mason 911 I'm just going to refer to it as

17        911 --

18   A.   Yes, sir.

19   Q.   -- so you and I are on the same page.

20             So that list is held by 911?

21   A.   Yes, sir.

22   Q.   Okay.  You don't have in your office an independent

23        list that you can refer to say here's who's on the

24        State Police's no-pref list for this post?

25   A.   Yeah, I don't.
```

```
 1   Q.   Okay.  Do you know whether you're supposed to keep

 2        that in-house?

 3   A.   I don't.

 4   Q.   Okay.  Fair enough.  And number 2 on page 2 there you

 5        stated that to your knowledge no towing company

 6        besides -- I'm going to refer to Eagle Towing instead

 7        of Plaintiff.

 8   A.   Okay.

 9   Q.   Besides Eagle Towing has been removed from the Hart

10        post no-preference list in the past ten years.  And as

11        a follow-up, is it fair then to say that you haven't

12        been involved in any investigation of towing

13        complaints for other companies that led to their being

14        removed from the list?

15   A.   Correct.

16   Q.   Okay.  Now, we're going to talk about official

17        number -- Official Order No. 48 later, but just

18        confirming that as far as you're concerned you

19        followed Official Order 48 when it comes to the towing

20        list?

21   A.   You know, that's -- I regret that language too because

22        everywhere I've worked it's different the way towing

23        companies -- Official Order 48 is a guideline for

24        towing and it's basically I think predicated on the

25        Metro Detroit area.  As you move into rural Michigan
```

```
 1   Q.   That makes sense to me.

 2   A.   It does.  It does.

 3   Q.   Okay.

 4   A.   In practice --

 5   Q.   In practice --

 6   A.   -- little different.

 7   Q.   Some people may not obey the orders the way they're

 8        supposed to?

 9   A.   And sometimes they're just not possible to.

10   Q.   Okay.

11   A.   Especially with the outdated -- at different times the

12        orders are outdated and they're constantly being

13        rewritten, thankfully.  I think Official Order 48 was

14        just recently rewritten within the last year.

15   Q.   Okay.  So -- but in any event, Official Order 48 like

16        any other official order you guys are expected to

17        comply with it, and if you don't there better be a

18        reason why you're not doing it?

19   A.   Yes, sir.

20   Q.   Okay.  Or a reason that's acceptable to your superiors

21        I would presume?

22   A.   Yes, sir.

23   Q.   Okay.  Okay.  So if you look at page -- page 3 your

24        answer to that question number 4 is that you checked

25        with 911 and they told you that your list contained
```

```
 1   A.   Okay.

 2   Q.   All right.  And if you would turn to what's marked as

 3        page 169 in that bundle they should be in order.

 4   A.   Yep.

 5   Q.   Okay.  That is a letter that you sent to Mr. John

 6        Heykoop on November 13th of 2017; is that right?

 7   A.   Yes, sir.

 8   Q.   Okay.  And that's your signature there; is that

 9        correct?

10   A.   Yes, sir.

11   Q.   Okay.  And this is your official notification to Mr.

12        Heykoop that he's been removed from the no-preference

13        list for the Hart post, and due to the quality and

14        type of service that Eagle Towing has provided within

15        the Hart post I presume?

16   A.   Post B area, yeah.

17   Q.   I figured as much.

18   A.   Somebody didn't proof that very well.

19   Q.   So now there's nothing in here -- well, let me first

20        ask this.  This is the only official notice that you

21        gave to Heykoop and/or Eagle Towing regarding your

22        investigation, is that correct, as far as in writing?

23   A.   Yeah, you know, I guess in writing.  I know we sent

24        out invitations to special meetings to address things.

25   Q.   Yeah, that would be the 911 special meetings?
```

```
 1          order that I know of, you know, putting the choice on
 2          the consumer.
 3    Q.    Okay.
 4    A.    So, you know, that's locally what everybody does there
 5          in Isabella, the post --
 6    Q.    Right.
 7    A.    -- the campus police, you know.
 8                So every one runs a little bit different.
 9    Q.    Actually I think Order 48 says you don't have to have
10          a no-pref list.
11    A.    Right.
12    Q.    So that would still be in compliance.  All I was
13          trying to figure out is as a general proposition it
14          would be -- well, it would be surprising to me anyway
15          if this order basically says this is what you have to
16          do unless you decide differently?
17    A.    Yeah, but I think this says -- this establishes a
18          policy and outlines procedures and gives guidelines
19          except where locally you do it differently as long as
20          it -- you know, I have never encountered a problem
21          with any of our wrecker lists where different areas
22          where I've worked.  That each area is a little bit
23          different.  And even within the post area there will
24          be different authorities.  So, yeah, I don't -- I've
25          always known Official Order 48 is there and, you know,
```

```
 1        as an official order you shouldn't cross it, but I've
 2        never worked exactly Official Order 48.
 3    Q.  Okay.
 4    A.  I mean, I know you're going to be asking me questions
 5        about Official Order 48 and I could kind of dance
 6        around it all day with answers, but, you know, what
 7        locally is established when you come to a work area as
 8        long as it's not illegal or immoral or fattening, you
 9        know, you continue to do it.  So this Mason-Oceana 911
10        center was established while I was gone, if you
11        remember in my background between 1994 and when I
12        returned, and they had a working order of how they
13        handle wreckers, and when I got here we just -- I just
14        picked up with that.
15    Q.  Okay.
16    A.  Yeah.
17    Q.  And you're not -- well, I'm going to actually get into
18        that later.  I'll talk about that local policy later.
19        So you can understand why I'm trying to figure out
20        what's going on?
21    A.  Yeah, right.
22    Q.  Hold on, hold on.
23    A.  Okay.
24    Q.  You know, I'm given this policy and I'm trying to
25        figure out whether this is just something that is just
```

```
 1        us.  The director of the 911 center receiving

 2        complaints about calls for service that we had handled

 3        had the same experience.  We held a special meeting

 4        through the 911 board to meet with the wrecker

 5        companies to specifically deal with communications and

 6        how service is provided.

 7   Q.   With several carriers, correct?

 8   A.   Correct.

 9   Q.   I guess what I'm asking is do you have any official,

10        you know, written complaints that you received that

11        you then acted upon with regard to professional and

12        courteous conduct where you conducted an investigation

13        and went through the procedures of Official Order 48?

14   A.   Not -- I don't know.  I didn't familiarize myself with

15        the procedures or an investigation through Official

16        Order 48 in conjunction with our partners in

17        Mason-Oceana 911, and as it regards to our

18        no-preference wrecker list we did consult with each

19        other.

20   Q.   Okay.  So with regard to official 48 the answer though

21        is no?

22   A.   Correct.

23   Q.   Okay.  All right.  Go ahead.

24   A.   And, you know, I don't know if LARA -- a lot of things

25        I can't -- insurance and things like that I don't look
```

```
 1   A.   Not that I'm aware of.

 2   Q.   Excuse me.  You don't have any personal knowledge that

 3        Eagle Towing was out of compliance with any of those

 4        conditions, correct?

 5   A.   E through K, not that I'm aware of, yes, sir.

 6   Q.   Now, with regard to L I know that there's been quite a

 7        bit of discussion about the rates which Eagle Towing

 8        has been charging, and so I'd like to talk a little

 9        bit about this section.  So section 2 says basic and

10        special service charges, and then it states reasonable

11        rates based on local industry standards shall be used

12        for all services provided.  How do you determine what

13        reasonable rates are or do you determine what

14        reasonable rates are?  I guess that's two questions in

15        one, so I'm going to rephrase that.  Are you the

16        person who determines what the reasonable rates are?

17   A.   No.

18   Q.   Okay.  Do you know how to determine what the

19        reasonable rates should be?

20   A.   I guess it's like the Supreme Court's definition of

21        pornography, you know, you know it when you see it,

22        but as far as is there a dollar amount, a penny over,

23        no.  Every -- every situation is different.  I could

24        see and have seen situations, you know, horrible

25        weather conditions, you know, the amount of line --
```

```
 1          you know, like it may be a car-deer accident, but that
 2          car may be so far off the road and, you know, and
 3          things like that, so every -- everything -- they're
 4          different.
 5     Q.   Okay.
 6     A.   Not everything is different but --
 7     Q.   No, I understand what you're saying.  I understand
 8          what you're saying.
 9     A.   Yeah, but there are conditions unforeseen that, you
10          know, I could never say well, this is a reasonable
11          car-deer accident because, my gosh, it could be all
12          kinds of things involved in it.
13     Q.   Okay.  So -- and let me ask, local industry standards,
14          what do you understand that to mean?
15     A.   You know, in layman's terms like a going rate, you
16          know, what typically does somebody pay for a service
17          in this area.
18     Q.   Okay.  And would that depend on the size, location,
19          qualifications of the towing company?
20     A.   I think it would depend more on the area of operation.
21     Q.   So it doesn't matter how much the towing company's
22          costs are, they have to be in line with what other
23          people are charging?
24     A.   You know, I guess it does matter if I had a company
25          and decided to hire my wife and pay her way too much
```

```
 1        money and that means I have to charge more, that's not

 2        typically a reason for me if -- I wouldn't be in

 3        business long I guess.

 4   Q.   Okay.

 5   A.   So could you be more specific with your question?

 6   Q.   Well, that's what I'm trying -- I'm asking you to be

 7        as specific as you think you can.

 8   A.   I think reasonable industry standards are localized

 9        and they depend on -- you know, if you have to

10        maintain the impound yard and you need half a city

11        block in downtown Los Angeles, that's one cost, you

12        know, as opposed to four acres in Elbridge Township.

13   Q.   So it might be factors like the cost that you spend to

14        get your equipment in good shape is a factor?

15              MR. MYERS:  Objection, calls for

16        speculation.

17              MR. BRENNAN:  I'm asking his understanding.

18   A.   Yeah, I don't know.

19   BY MR. BRENNAN:

20   Q.   Okay.  You don't know?  Okay.  You mentioned the cost

21        to keep an impoundment lot, the rental and what have

22        you.

23   A.   Uh-huh.

24   Q.   Those are costs that have to be covered by rates as

25        well, correct?
```

```
 1   A.   Yeah, or talk to somebody and have them tell you about

 2        it if they're willing to talk to you, yeah.

 3   Q.   Okay.  And I want to go back to what you said a few

 4        minutes ago.  So you were talking about how every

 5        incident is unique, right?

 6   A.   Yeah, just -- yeah.

 7   Q.   Okay.  So it wouldn't be -- it's not right to say, for

 8        example, well -- I'll use your example.  Car-deer

 9        accident.  No car-deer accidents are the same,

10        correct?

11   A.   No, a lot of them are similar.

12   Q.   I know from having been in one.

13   A.   Yeah.

14   Q.   So if a tow company A charges a certain amount for a

15        car-deer accident and tow company B says well, I

16        probably charge $100 less for my car-deer accident,

17        until you look at the specifics you really can't do a

18        comparison; is that correct?

19   A.   No, and I don't think for $100 --

20   Q.   Well, it (inaudible) --

21   A.   It wouldn't be a threshold -- but yeah, it wouldn't be

22        a threshold that's --

23   Q.   Yeah.  Forget about the actual amount.  Im just saying

24        that until you look at another set of facts that are

25        similar to the one that was performed by the prior
```

```
 1        towing company you can't really compare?

 2   A.   Right.

 3   Q.   Fair enough.  I'm showing you what's marked as

 4        Exhibit 4, and this is this one.

 5             MR. MYERS:  Oh, I'm sorry, I think I gave

 6        you two.  No, no, just look at that.  I'm going to

 7        need this one, yeah.

 8             THE WITNESS:  Okay.

 9             MR. MYERS:  Thank you though.

10   BY MR. BRENNAN:

11   Q.   As you can see, this has been pulled off the Michigan

12        State Police website and it refers to the regulatory

13        and credentialing section.  Are you familiar at all

14        with --

15   A.   Never heard of it.

16   Q.   Never heard of it?

17   A.   That section, yeah.

18   Q.   You've never heard of the certified of the CVED

19        section?

20   A.   Yes.

21   Q.   What's that?

22   A.   That's Commercial Vehicle Enforcement Division --

23   Q.   Okay.

24   A.   -- rather than a section.

25   Q.   All right.
```

1    A.  Yeah, yeah, I would, you know, be bringing in the

2        local working agreement, showing its foundation, how

3        we do things locally, that it meets with the spirit of

4        Official Order 48.  That would be my argument anyway.

5        You know, if I were ordered, absolutely I'd follow an

6        order.

7    Q.  Aren't you ordered?  Isn't this an order?

8    A.  And as I have read it, as I read it and in practice

9        it's except where local agreements need to be made, so

10       that's -- that's what I'm operating --

11   Q.  Just so that I'm absolutely sure, because if this goes

12       to court I want to make sure I'm not misstating

13       things, okay?  Please show me where in this order that

14       it says that if you make a local rule you can ignore

15       official order 48?

16   A.  I don't think it says that.

17   Q.  Okay.

18   A.  I don't think it says that you can ignore the order.

19   Q.  Okay.

20   A.  I'm saying --

21   Q.  And I thought I heard you say a minute ago, and

22       correct me if I'm wrong, that you're supposed to obey

23       this official order, and I think I asked you

24       specifically that if your local practice did something

25       in contrary to this order that you'd have to follow

1      the order.  Did you not testify -- I can have her read

2      it back.

3  A.  No, no.  That is if -- what I meant by in contrary is

4      if it was wrong, if it was not in the spirit of

5      providing good service, equitable good service.

6  Q.  Then we need to restate my question because you

7      apparently let --

8          MR. MYERS:  Could you just let him finish

9      his answer?

10         MR. BRENNAN:  Sure.

11 A.  And I think I had mentioned that.  I said we can dance

12     around Official Order 48.  I'll stipulate that I have

13     never worked in a work site that absolutely followed

14     Official Order 48 every step of the way.  Official

15     Order 48 is constantly revamped and redone, and what

16     ended up happening is there are local agreements that

17     work along with the spirit of this.  I'll stipulate

18     that right now.  We can, if you would like, quit

19     talking about it, but yeah, I'm not exactly in march

20     step with the Official Order 48, I agree.

21 BY MR. BRENNAN:

22 Q.  Okay.  And again, because I think that there was a

23     misunderstanding earlier, okay, if a local practice is

24     contrary to what official order number 48 states, and

25     I guess by practice I mean there is a policy, a

1      else, or whatever policy they have, but if they don't

2      require those documents, it's your testimony that

3      you're not required to have those documents --

4   A.  I'm saying --

5   Q.  -- at the Hart post?

6   A.  I'm saying that in practice I don't.

7   Q.  I'm not asking about practice.  I'm asking about what

8      you are required to do, which is very different.

9      Okay.  You guys want to talk about practice, I don't

10      care about practice.

11   A.  And we go back and I still -- you know, as I read it

12      where it says except as local -- as you work out

13      agreements locally, and I believe that I'm working

14      under a local agreement that is in the spirit of the

15      Official Order 48 but isn't necessarily in lock

16      step --

17   Q.  Okay.

18   A.  -- and I'll stipulate to that, and I don't

19      understand --

20   Q.  Just so that we're clear about this, okay -- okay.  On

21      page 142, section 48.3.1, work sites shall establish a

22      local policy for areas not covered by this order --

23      not covered by this order.  Are there areas not

24      covered by this order for which there are local

25      policies?

1    A.  Or where there are local --

2    Q.  No, I'm dividing this question up.  I'm dividing this

3        question up.

4    A.  I think that the order is comprehensive.

5    Q.  Just -- I get to ask the question.  If you don't

6        understand don't answer then.

7    A.  Go ahead.

8    Q.  My question is is there an area not covered by this

9        order for which there's a local policy established,

10       yes or no?

11   A.  Is there an area -- one more time.

12   Q.  Is there an area not covered by Official Order 48 that

13       is therefore covered by a local policy, that is 911 as

14       far as I understand?

15   A.  And when you say is there an area, what do you mean by

16       that?

17   Q.  Whatever you understand order -- I didn't draft this

18       order, okay?

19   A.  Are you asking me if I follow Official Order 48?

20   Q.  No, I'm not.

21   A.  Okay.

22   Q.  Items that are not covered by Official Order 48.  Not

23       covered.

24   A.  Okay.

25   Q.  Okay.  Documents are covered, right?

1    A.  Yes.

2    Q.  Okay.  UD41 is covered, right?

3    A.  Right.

4    Q.  Okay.  So I'm asking you are there local procedures

5        for areas not covered?

6    A.  Without being a subject matter expert on Official

7        Order 48 to every degree, you know, where the two

8        intersect or don't I'm not sure.

9    Q.  You don't know?

10   A.  No.

11   Q.  Okay.  And then the second part, or where local policy

12       development is required.  Okay.  Local policy

13       development is required.  What does that -- what does

14       that mean in your understanding?

15   A.  In areas like the metro post in Detroit they're the

16       only law enforcement on the freeways.  They're

17       responsible for the freeways and the conduct of, you

18       know, multi-million dollar businesses down there

19       working with the police on the freeways is covered.

20       In rural Michigan I work with several entities in the

21       exact same circumstances, and in order to work with

22       them efficiently and harmoniously I can't subject them

23       and everybody else to some of the things that -- I

24       guess I just -- so it's where you need to develop a

25       local policy is to work efficiently.

1    Q.  Okay.

2    A.  Yeah, so -- okay.

3    Q.  So there might be more details.  There might be more

4         explanations in terms of developing the policy,

5         correct?

6    A.  Sure.  Yes, sir.

7    Q.  Okay.  But this doesn't suggest that you can ignore

8         what the official order says, does it?

9    A.  Yeah, I don't feel -- I understand what you're saying

10        and it's stipulated and I'll say it again.  Am I

11        following Official Order 48 to the letter?  No.  I'm

12        working under a local agreement with our local folks.

13   Q.  Okay.

14   A.  I'll stipulate to that.  I don't know why we're --

15   Q.  So you'll stipulate that you're not in compliance with

16        Official Order 48?

17   A.  I would have to say that's true.

18   Q.  Okay.  And in that regard then you do not have at your

19        office or your post any of the documents from any

20        towing company that is currently on the Hart post

21        no-pref list?

22   A.  No, I don't.

23   Q.  And you don't have any copies of UD41?

24   A.  No.

25   Q.  And you've known that for as long as you've been a

1      head of the Hart post?

2   A.  Yes, sir.

3   Q.  Okay.  Are you aware whether any of your superiors are

4      aware of that?

5   A.  I am not.

6   Q.  Are you aware whether -- now, you know enough about

7      the 911 policies, you sit on the board, right?

8   A.  Yes.

9   Q.  Okay.  So are you aware whether 911 has copies of all

10      of these documents?

11   A.  I'm not sure what the documentation at 911 is.

12   Q.  So you don't know?

13   A.  The director holds those, so yeah, I don't know for

14      sure.

15   Q.  Okay.  Which means that you don't know whether these

16      towing companies are on the road, you have no idea

17      whether they're insured or not, correct?

18   A.  I don't.

19   Q.  Okay.  You don't know whether they're properly

20      registered or not?

21   A.  I don't.

22   Q.  You don't know whether they're in compliance with all

23      of these things we just looked at, A through K?

24   A.  A through K?

25   Q.  The ones you just looked at a few minutes ago.

1        conduct or performance.  Do you see that?

2    A.  Yes, sir.

3    Q.   Okay.  So Eagle Towing shouldn't be treated any

4        differently than the other ones that are on your tow

5        list, correct?

6    A.   I agree, yes, sir.

7    Q.   So if Eagle Towing has provided you with documentation

8        and the others have not, they should be required to

9        provide you with documentation, correct?

10           MR. MYERS:  Objection as to form.

11           What documentation?

12           MR. BRENNAN:  Sure.  I'll reask it.

13   BY MR. BRENNAN:

14   Q.   If Eagle Towing has provided you with the

15       documentation required under Official Order 48, the

16       other towing companies should provide you with that

17       documentation as well; is that correct?

18   A.   And we go back to just a few minutes ago I agreed with

19       you.  I stipulated that I'm not necessarily in lock

20       step with the Official Order 48.

21   Q.   Okay.

22   A.   But you can ask this question over and over and the

23       answer is going to be the same, that I'm not doing it.

24   Q.   But I'm asking whether you should do it, in your mind?

25   A.   And you've asked me that before --

1    Q.  Okay.

2    A.  -- and, you know, I agree with you, and I think

3        that -- I think that in Official Order 48 it says that

4        the post commander can enter into local agreements --

5    Q.  We're traveling -- I'm sorry, we're traveling far

6        afield here.  All I want to know is do you agree that

7        each wrecker service shall be held to identical

8        standards of conduct or performance if you are

9        complying with Official Order 48, yes or no?

10   A.  Why are you asking me if I'm complying with Official

11       Order 48?  I told you I'm not.

12           MR. BRENNAN:  Read the question back.  Read

13       the question back.

14           MR. MYERS:  I'm sorry, would you mind if we

15       just take a short break?  I think we can --  we might

16       be able to make sure that this goes smoothly.

17           MR. BRENNAN:  That would be awesome,

18       because I'm getting a little frustrated.

19           THE WITNESS:  I'm sorry, I just don't

20       understand.

21           (Recess taken at 12:31 p.m.)

22           (Back on the record at 12:43 p.m.)

23   BY MR. BRENNAN:

24   Q.  Okay.  So I'm just -- I don't even know if I remember

25       the last question, but I'm just going to reask it and

JEFFREY J. WHITE, FIRST LIEUTENANT
02/05/2019                                                                    Page 92

1       that I'm not happy about this bill?

2    A.  Yes, sir.

3    Q.  Okay.  And again, when you say bills, we are not

4       talking about quality and type of service, we're

5       talking about rates that they're charging; is that

6       correct?

7    A.  Sure.  Yes, sir.

8    Q.  Okay.

9    A.  That's the initial complaint from the -- from the

10      person.

11   Q.  What I'm trying to get at here is you stated in your

12      letter that you're taking them off the list due to the

13      quality and type of service, and you've said earlier

14      that's not -- that's not how much they were charging,

15      that's how they were performing their service.

16   A.  Yeah.  We would ask can we talk about this, can you

17      explain this?  And no, if they want to complain send

18      it to the Attorney General.  I don't have to talk to

19      you and I won't.

20   Q.  So are you basically saying that the reason that they

21      were taken off is because -- is because Eagle Towing

22      wouldn't respond to your questions?

23   A.  The same type of complaints were coming in and we

24      could get nowhere with Eagle Towing to discuss it with

25      them to find out hey, why is this, why is this person

1        charges?

2    A.  Correct.

3    Q.  So you didn't make any determination that they were

4        charging too much; is that your testimony?

5    A.  Yeah.  I don't think I'm qualified to say that.

6    Q.  Okay.

7    A.  Yeah.

8    Q.  All right.  And is there any reason why in this letter

9        of November 13, 2017 that you didn't indicate that the

10       reason that you were taking them out is because they

11       were being unresponsive?

12   A.  We held that special meeting with all the wrecker

13       companies and it was basically to speak to the issues

14       with Eagle Towing --

15   Q.  Let me ask you a question.  You had a meeting

16       scheduled with all the towing companies, but the real

17       reason was to address Eagle Towing?

18   A.  We wanted all the wrecker companies there to be

19       transparent and hear what we had to say, and we had

20       told Eagle Towing at that time that we continue to get

21       these complaints, we attempt contact with you, you're

22       rude and won't discuss it.  If the complaints continue

23       to come in and we're unable to resolve them we're left

24       with no other choice than to not use you anymore --

25   Q.  Okay.

1    A.  -- and that was --

2    Q.  And at the time you were working under a -- you said

3         before you were working -- you weren't using -- in

4         your testimony anyway you weren't using order number

5         28, you were using a local policy?

6    A.  48.  Yes, sir.

7    Q.  Okay.

8    A.  48.

9    Q.  I'm sorry, it was order 48.  Thank you.

10   A.  Yeah.

11   Q.  Is it not true that local policy at the time did not

12        address itself to the rates that towing companies were

13        charging?

14   A.  Yeah, I don't think so.  You know, I wasn't talking

15        about rates.

16   Q.  Well, you were saying that these customers were

17        complaining about how much they were being charged,

18        right?

19   A.  And the issue is when we reach out to find out like

20        what's your side of the story here, what's going on

21        here, there was no communication.

22   Q.  I understand that.

23   A.  Yeah.

24   Q.  I understand that's your testimony, but my question is

25        that the local policy that you are operating under at

1          the time did not address itself to the rates that the

2          towing companies were charging; isn't that correct?

3     A.   Yeah, I don't think so.  Yes, sir.

4     Q.   So there wouldn't be any reason for you to investigate

5          those rates if you were operating under the local

6          policy, because the local policy did not address

7          itself to rates; isn't that correct?

8     A.   And again, we were --

9     Q.   No.  Just say yes or no.

10    A.   Yes, sir.  Yes.

11    Q.   Okay.  In fact, my understanding is, and we'll

12         probably find this document later, but Mr. Hassle

13         himself indicated that the local policy did not

14         address itself to rates?

15    A.   Yeah, that could be -- I'm not sure.

16    Q.   You don't remember receiving a document like that?

17    A.   I probably did, but I don't remember its content,

18         so --

19    Q.   So what you're saying is that you wanted to

20         investigate rates, the questions about the rates that

21         were being charged?

22    A.   I didn't say that.

23    Q.   Okay.  Well, you were investigating regarding the

24         rates that -- complaints about the rates?

25    A.   Yeah, I didn't say that either.

1       referring to as it relates to removing Eagle Towing

2       from the list?

3    A.  Are you referring to 164?

4    Q.  163 and 164, yes.

5    A.  Yes, sir.

6    Q.  Okay.  Now, if you look at 164 the -- if you reviewed

7       this letter, this letter doesn't say anything about a

8       failure to -- of the failure of Eagle Towing to

9       communicate with the owner, does it?

10   A.  No, sir, they're isn't.

11   Q.  Okay.  But nevertheless, you just testified that this

12       was one of the complaints that you based your decision

13       on; am I wrong or am I right about that?

14   A.  You're right.

15   Q.  Okay.  And at the time do you know whether there was

16       an official local policy still in force at 911?

17   A.  Yes.

18   Q.  As far as you remember that was in force, and that was

19       the policy that, as you said earlier, didn't have

20       anything about rates included in it, correct?

21   A.  You know, without having it in front of me I'm

22       agreeing.  If you're telling me it's not in there I

23       agree.

24   Q.  Okay.

25   A.  Yep.

1    Q.  Okay.  We can move along.  This is Exhibit 8 and this

2        is the cover letter on this exhibit.  This exhibit is

3        multi pages.  It was produced by you.  Multi pages in

4        which you're copied, I'm copied, but basically it

5        looks as though there is an attempt to submit

6        documents regarding Eagle Towing in order to be put on

7        the no-preference list.  Do you recall receiving this

8        packet?

9    A.  I know I did, yeah.  I don't recall specific.  I think

10       I received more than one over time, but yes, I recall

11       it.

12   Q.  Okay.  Okay.  I don't think I have -- okay.  So do

13       those -- and take as much time as you want to look

14       this over, but do these documents appear to be

15       documents that would put Eagle Towing in compliance

16       with the document requirement for Official Order 48?

17   A.  Yes, sir, it does appear that way.

18   Q.  Okay.  And what did you do with this document when you

19       received it?

20   A.  Forwarded it to Lansing at the direction of our legal

21       counsel team.  Thy had said don't respond to anything.

22       Let me copy -- send me anything you get.

23   Q.  Okay.  All right.  So you didn't make an evaluation

24       that they were -- that these documents put them in

25       compliance with Official Order 48; is that right?

1    A.  I did not.

2    Q.  And you don't have packets like this from other towing

3         companies in your -- in your post?

4    A.  I do not.

5    Q.  Okay.  Is the only reason that you didn't respond to

6         this was because there was litigation between yourself

7         and Eagle Towing?

8    A.  Yes, sir, and under advice of --

9    Q.  Counsel?

10   A.  -- counsel.

11            I just do whatever...

12   Q.  Okay.  All right.  That was 9, right?

13   A.  Yes, sir.  8.  That was 8.

14   Q.  8?  Oh, 9 we already looked at.

15   A.  Yep.

16   Q.  Yeah, just set it in that pile there.  This is

17        Exhibit 10.

18   A.  Thank you.

19   Q.  Take a look at that, let me know when you're ready.

20   A.  Yeah, I remember this.

21   Q.  Okay.  And so this is an e-mail from Ray Hasil to the

22        TAC committee.  Apparently you were on that committee;

23        is that correct?

24   A.  Yes, sir.

25   Q.  Okay.  And it says I e-mailed a save the date and copy

1        right.

2    Q.  Yeah, meaning Ray Hasil?

3    A.  Yes, sir.

4    Q.  Okay.  And you don't know to what extent Ray Hasil

5        investigated the details of these invoices either; is

6        that correct?

7    A.  To the extent that he reported to us, which is

8        basically --

9    Q.  Which we've already gone over?

10   A.  Yeah.  He never got any farther, as I recall.

11   Q.  Okay.  Do you recall whether there was a meeting of

12       the 911 board in which it was voted on and decided

13       that wrecker companies' rates would be monitored and

14       approved by the board?

15   A.  The specific language?

16   Q.  Or language to that effect.

17   A.  No.  I know that we had discussed -- and I know it's a

18       concern and a valid concern for the wrecker companies.

19       They have a proprietary interest in their -- in their

20       fee schedule, and that was one of the things they were

21       worried about is everybody knowing what they charge,

22       and we made a promise that no, we will keep this under

23       wraps and this is just to compare to what you say you

24       will charge I guess.

25   Q.  Okay.

1    A.  But yeah, that was the discussion.  I know that's got

2        to be in the minutes --

3    Q.  Okay.

4    A.  -- of anything like that, you know, where we would

5        keep it, we would respect the proprietary interest --

6    Q.  Okay.

7    A.  -- of the wrecker companies, yeah.

8    Q.  Okay.  And was one of the concerns that the -- those

9        records not be subject to a FOIA request?

10   A.  Right.  I believe so.

11   Q.  But you don't recall any voting in which the statement

12       that Mr. Hasil makes that we already talked about on

13       the bottom of page 253, the rates that wrecker

14       companies charge is not mentioned in 911's policy, and

15       you didn't make them part of 911's policy by a vote of

16       the board is what I'm trying to figure out, as far as

17       you know?

18   A.  Yeah, I don't recall ever doing that.  As far as I

19       know you're right, sir.

20   Q.  Okay.  Okay.  Then there's a -- next page is page 259

21       from Ray Hasil dated May 9th of 2013, and am I right

22       in presuming that the recipients of this e-mail were

23       the board members?

24   A.  No, this looks like -- this looks like the wrecker

25       company owners and --

1    Q.   Okay.  They all have mason-ocean911.org as their

2         e-mail addresses.  Do all the owners have --

3    A.   Oh, wait a minute.  I'm looking at McGahan.  There may

4         be a McGahan that works at -- Josh McGahan.  Yeah, as

5         soon as I saw McGahan I thought wrecker companies, but

6         yeah, this looks like all the 911 employees I guess.

7    Q.   Okay.

8    A.   I don't know back in 2013 exactly who was, but I

9         would -- that would be my best guess is this was

10        dispatchers.

11   Q.   Okay.

12   A.   Yeah.

13   Q.   And now if you look at the body of the e-mail it says

14        the wrecker services met with 911, MSP and both

15        sheriffs this morning.  911 will be confidentially

16        housing their rate schedule, which I believe you and I

17        just confirmed?

18   A.   Yes, sir.

19   Q.   And then it says the 911 board will determine if a

20        company's rates are in the ballpark of others for this

21        area.  Is that something that the board decided on by

22        vote to do that?

23   A.   No, and I -- yeah, I don't like his language there.  I

24        wouldn't have liked it back then.  I don't like it

25        now.

 1     Q.  Okay.

 2     A.  Yeah.

 3     Q.  So you don't -- I guess what I'm saying is you

 4         disagree that that accurately states the board's

 5         position?

 6     A.  Right.

 7     Q.  Okay.  Fair enough.  It's probably not the first time

 8         that ever happens?

 9     A.  No, not at all.  Yes.

10     Q.  And it says if not, they will be asked to adjust or be

11         taken out of the rotation.  Again, is that -- that's

12         not something that the board actually voted on; is

13         that correct?

14     A.  No.  No, sir.

15     Q.  Okay.  So this is Mr. Hasil sort of understanding what

16         he thought happened at that meeting?

17     A.  His hopes and dreams probably, yes, but -- yeah.  No,

18         that isn't what happened.

19     Q.  Okay.  So the rest of this -- would that be true with

20         the rest of the sentence, if there is a complaint that

21         the towing companies have been unusually high, the

22         companies' rates will be referenced to help determine

23         if somebody -- someone was charged unusually high

24         rates, cases where unusually high rates are charged

25         can get companies taken out of that rotation.  Is it

1      also true that the board never actually voted on that?

2   A.   Correct.

3   Q.   Again, this goes back to what Mr. Hasil was hoping for

4      or --

5   A.   Yeah, you know, it was evolving at that time and I

6      think he was thinking this is the direction it could

7      go and I didn't ever think that.  Yeah, this was

8      his --

9   Q.   His take?

10  A.   -- interpretation.

11  Q.   Okay.

12  A.   Yes, sir.

13  Q.   Okay.  If you look on page 62, again, this is produced

14     by you folks, it says May 2013 911 board meeting

15     minutes excerpt on old business, and it states there

16     that Sheriff Farber reported about the recent wrecker

17     meeting.  The meeting was called to lay out the ground

18     rules for wrecker ground rules and policy rotation

19     requirements, specifically to have all the wrecker

20     companies keep in line with reasonable charges.  He

21     stated the meeting went well.  Jeff White MSP,

22     assistant post commander, told the wrecker

23     representatives that if any want to charge

24     unreasonable rates they will be removed from the

25     rotation list, and that that wrecker companies were

1        asked to send their updated rate list.  Do you

2        remember saying that at that meeting?

3    A.  You know, yeah, I do, but I think the way I explained

4        it is if there -- if there's an unreasonable bill and

5        it can't be explained -- what is reasonable I don't

6        know.  Everything is reasonable with an explanation,

7        unless you don't have an explanation for it.

8    Q.  Okay.

9    A.  So I think -- I think that's a little

10       misrepresentative.  It's not -- I don't know what --

11   Q.  Could you have said that --

12   A.  -- unreasonable one is, but reason can be made.

13   Q.  Could you have said that, you know, if we have

14       problems with rates this may lead to a change in

15       policy where people can be removed from the list?

16   A.  Yeah, I don't think I said that.  I don't think I was

17       that keyed in on policy.

18   Q.  But in any event, as assistant post commander you

19       weren't advising the wreckers that this was the 911

20       policy?

21   A.  Right.  And just so to be known at that time I was the

22       assistant post commander and I believe the post

23       commander was -- I should have kept my mouth shut at

24       that meeting.  You know what I mean?  But yeah, you

25       know, it was what he wanted to do, you know, and I --

1       yeah.

2    Q.  Fair enough.  Fair enough.  You were not?

3    A.  He was on vacation.

4    Q.   Just so we're all clear, you were not articulating

5        what the 911 board policy was?

6    A.  No.  Nor was I a voting member.  The post commander

7        casts the vote.

8    Q.   Yeah.  Okay.  The next page, page 5 -- excuse me, page

9        263, carrying over to 264, my understanding of this is

10       this is the excerpt from the 911 policy as it existed

11       at least as of this packet date?

12   A.   Right.

13   Q.   Is that also your understanding?

14   A.   Yeah, and I believe the revision date on this was well

15       before.  I mean, it's nothing that was developed at

16       that moment or that time as I recall, this policy, and

17       it hasn't been changed.

18   Q.  Okay.  Okay.

19   A.  Yeah.

20   Q.   Okay.  So it states that in removal from the

21       non-preference wrecker call list that police agencies

22       and fire departments operating within Mason-Oceana

23       County are encouraged to report to their immediate

24       supervisors the name of any wrecker service or

25       individual who renders poor service or is incapable of

1    providing quality service because of inadequate

2    equipment or inadequately trained personnel, and that

3    forms shall be provided to report problems observed by

4    on-scene personnel.  I guess my first question on that

5    is did you ever receive any reports on the form that's

6    referred to there about Eagle Towing relating to

7    inadequate equipment or inadequately trained

8    personnel?

9  A.  No, sir.

10  Q.  Okay.  And then it says in B when a complaint is

11    received concerning the performance of a wrecker

12    service or that the service is not adhering to the

13    requirements established by this policy, that the

14    complaint shall be investigated by the 911 director

15    and the following procedures shall take place, and on

16    the next page is all the procedures, correct?

17  A.  Yes, sir.

18  Q.  Okay.  Do you know whether the 911 director sent a

19    copy to -- of the complaint to -- the two complaints

20    that were referred to there to Mr. Heykoop?

21  A.  I do not.

22  Q.  Okay.  And it states that the director is supposed to

23    confer with the complainant and the record company

24    owner and the wrecker driver, and I believe there's

25    been some discussion today that Mr. John Heykoop, the

```
 1        wrecker company owner, he was unable to make contact

 2        with him; is that correct?

 3    A.  Correct.

 4    Q.  Do you know whether Ray Hasil ever wrote to Mr.

 5        Heykoop?

 6    A.  I do not.

 7    Q.  Okay.  He was directed by Andrew to do that as far as

 8        you know, is that correct, or don't you know?

 9    A.  I think what the letter said was Andrew said I could

10        send him a letter.

11    Q.  Okay.  You don't know whether that was done?

12    A.  No.

13    Q.  And you don't know whether Hasil wrote him a letter;

14        is that correct?

15    A.  Or Andrew did, no.

16    Q.  You don't know.  Okay.  Now, as far as the third step

17        is concerned, it's true that Eagle Towing has never

18        admitted that it violated 911 policy; is that right?

19    A.  Yes.

20    Q.  In B it says if the complaint is denied by the owner,

21        911 director shall set the complaint for hearing.  Do

22        you know if any hearing involving Eagle Towing was

23        ever set by the 911 director at any time for any

24        alleged complaint that you are aware of?

25    A.  For -- I don't think so.
```

1    Q.  You would have been part of that, right?

2    A.  Yeah, yeah, I don't think there was ever a hearing

3        held.

4    Q.  Well, actually I could be wrong about that.  It says

5        that the 911 director who shall hear the answer to the

6        complaint and thereafter decide whether disciplinary

7        action is warranted, and then the director shall then

8        carry out the same applicable procedures set forth in

9        subsection A above.  So you may not have been part of

10       that hearing, correct, if it was held?

11   A.  Possibly, yes, but I probably would have heard of one

12       and I never did.

13   Q.  You never heard of one?

14   A.  No, sir.

15   Q.  And maybe more importantly, none was ever reported to

16       the board?

17   A.  That I recall, no.

18   Q.  Okay.  In C it says in the absence of extenuating

19       circumstances a wrecker service shall not be removed

20       from the non-preference wrecker call list without

21       first following the procedures established in this

22       policy.  Do you know whether that -- did anyone ever

23       explain to you that there were extenuating

24       circumstances regarding Eagle Towing?

25   A.  Beyond the lack of contact, no.

1                    CERTIFICATE OF NOTARY

2      STATE OF MICHIGAN )

3                    ) SS

4      COUNTY OF OAKLAND )

5

6              I, KATHRYN M. STANDAL, certify that this

7      deposition was taken before me on the date

8      hereinbefore set forth; that the foregoing questions

9      and answers were recorded by me stenographically and

10     reduced to computer transcription; that this is a

11     true, full and correct transcript of my stenographic

12     notes so taken; and that I am not related to, nor of

13     counsel to, either party nor interested in the event

14     of this cause.

15

16

17

18

19

20

21

22              KATHRYN M. STANDAL, CSR-2966

23              Notary Public,

24              Oakland County, Michigan.

25     My Commission expires:  February 15, 2020

Exhibit 4



STATE OF MICHIGAN
DEPARTMENT OF STATE POLICE
Hart Post

RICK SNYDER
GOVERNOR

COL. KRISTE KIBBEY ETUE
DIRECTOR

Monday, Nov 13 2017

Mr. John Heykoop
Eagle Towing
10255 Old Highway 31
Montague, MI 49437

Re: Hart Post No Preference Wrecker List

Dr. Mr. Heykoop,

Please be advised that as of this date, Monday November 13 2017, Eagle Towing is being removed from the No Preference Wrecker list for the Hart Post. This is due to the quality and type of service that Eagle Towing has provided within the Hart Post are.

Sincerely,

F/Lt Jeffrey White

# Exhibit 5



Craig Mast <mastc@oceanasheriff.net>

## Eagle Towing
1 message

**Craig Mast** <mastc@oceanasheriff.net>                          Thu, Nov 9, 2017 at 3:41 PM
To: "deputies@oceanasheriff.net" <deputies@oceanasheriff.net>, Ray Hasil <rhasil@mason-oceana911.org>, Jeff White
<whitej25@michigan.gov>, Joseph Bizon <oceanaprosecutor@gmail.com>

Please see the attached documents. Eagle Towing is no longer on the Oceana County Sheriff's non-preference rotation
list. Ray Hasil from Central Dispatch is also aware of this.   If a driver requests Eagle Towing, please make that
arrangement for them but other than that, they are not on our non-preference list until further notice.
--

*Sheriff Craig Mast*
Oceana Co. Sheriff's Office
216 Lincoln St.
Hart, MI 49420
(231)873-6763

> Scan0015.pdf
> 1358K



# OCEANA COUNTY SHERIFF'S OFFICE

**CRAIG MAST, SHERIFF**
216 LINCOLN ST., P.O. BOX 32     •     HART, MI 49420     •

**RYAN SCHILLER, UNDERSHERIFF**
PHONE: (231) 873-2121
FAX: (231) 873-0154

November 9, 2017

Mr. John Heykoop
Eagle Towing
10255 Old Highway 31
Montague, MI  49437

Re:   Car/Deer Accident Tow
       October 27, 2017

Dear John:

Please be advised that it has been brought to my attention that some of Eagle Towing's business practices are not consistent with what I want to see with regard to the citizens of and individuals traveling through Oceana County.  You will see attached hereto the most currently complaint brought to my attention regarding these practices, which I don't view as reasonable and do not approve of.

For this reason and similar prior incidents, I am removing Eagle Towing from the Oceana County Sheriff's Office wrecker rotation through Mason-Oceana Central Dispatch effective immediately.

Sincerely,

Craig Mast
Sheriff

CM:vh

Oceana Sherriff Mast

261 Lincoln ST.

Hart, MI 49420

November 9, 2017

On October 27, 2017 Eagle Towing's Truck arrived to tow my damaged small car **at the request** of the **Oceana Sherriff** department after I called the department to report hitting a deer on US 31. I first requested to be towed to the Betten Chevy auto mechanic's garage in **Muskegon**. The tow truck driver said "that is not how it works. We will tow you to our storage yard and your insurance adjuster will look at your car there". He said he was not taking me to Muskegon after the car was loaded up on the flatbed and I was in his tow truck waiting to go. I did not know there was a certain process to accident repairs so I did not agrue. **He also did not give me a list of his fees** and I had always had a fair and just tow truck driver who never charged me more than $100 per tow. I assumed I would be charged a reasonable fee. I had **No idea** I was being charged the **highest prices in the State of Michigan**. They charged me over **$1300.00 for a simple 10 mile tow**. There was no accident clean up to charged me for, because the deer I hit flew off the road onto the shoulder and into the woods. These unfair prices drive up the cost of Michigan's auto insurance prices for everyone! These costs are already high enough

This company must be stopped for its unfair charging practices and over charging fees. Private Citizens and Insurance companies should not the Sheriff of Oceana colluding with a company who charges anything but usual and customary towing and storage fees. The Oceana Sheriff's Department needs to take this towing company's name out of their rotation list ASAP! **How can the Sherriff send this tow truck out to citizens who are experiencing vehicular accidents and breakdowns knowing that this company over charges usual and customary fees by 400 percent? The Sheriff's department should be a protector of the citizenship, so I ask, how can you continue to send this tow truck company when they charge $1300.00 for a simple 10 mile tow? Participating with companies who have unfair practices is not protecting the people you serve!**

**A copy of this letter will also be sent to the Attorney General State of Michigan and local new sources.**

Sincerely,

**Anne Barton Dempsey**

Anne Barton - Dempsey

FAX - 855 -417- 2484

**EAGLE TOWING & RECOVERY**
10255 Old US Hwy 31 • Montague, MI 49437 • 231-894-5424

Accident

| DATE 10-27-17 | TIME | AM PM | MEMB.# | P.O. NO. | |
|---|---|---|---|---|---|
| NAME ☒ ANN BARTON - DEMPSEY | | | | PHONE | |
| ADDRESS ☒ (AUTO-OWNERS) | | | | | |
| CITY ☒ | | | STATE | ZIP | |

| LOCATION OF VEHICLE US 31 S. MM 141 | DRIVER | |
|---|---|---|
| YEAR, MAKE, MODEL 2013 Hyundi Alantia GT COLOR Silver | | |
| STATE LIC. PLATE NO. VEHICLE I.D. NO. | REGISTERED OWNER | |

| MILEAGE | SERVICE TIME | EXTRA PERSON |
|---|---|---|
| FINISH_____ | FINISH_____ | FINISH_____ |
| START_____ | START_____ | START_____ |
| TOTAL_____ | TOTAL_____ | TOTAL_____ |

| REASON FOR TOW | | | SPECIAL EQUIPMENT |
|---|---|---|---|
| ☒ ACCIDENT | ☐ ABANDONED | ☐ FLAT TIRE | ☐ SINGLE LINE WINCHING |
| ☐ ARREST | ☐ STOLEN CAR | ☐ OUT OF GAS | ☐ DUAL LINE WINCHING |
| ☐ UNREGISTERED | ☐ BREAKDOWN | ☐ IMPOUNDED | ☐ SNATCH BLOCKS |
| ☐ TOW ZONE | ☐ LOCK OUT | ☐ STUCK | ☐ SCOTCH BLOCKS |
| ☐ SNOW REMOVAL | ☐ START | ☐ | ☐ DOLLY |

Oceana Sheriff

| | | FIRST TOW Montague Storage |
|---|---|---|
| ☐ SLING/HOIST TOW | ☐ STATE POLICE | |
| ☒ FLAT BED RAMP | ☒ LOCAL POLICE | SECOND TOW |
| ☐ WHEEL LIFT | ☒ OWNER | |
| ☐ | ☐ DEALER | |

| | TOWING CHARGES | 861.18 |
|---|---|---|
| 10-27 TO 1-7 ___ DAYS @ $ 50.00 | MILEAGE CHARGE | |
| DRIVER'S☐ CASH ☐ CHECK LIC. NO. | EXTRA PERSON | |
| ☐ CREDIT CARD ☐ MC ☐ VISA ☐ AMEX EXP DATE | SPECIAL EQUIP. | |
| CC# | LABOR CHARGE | |
| OPERATOR'S SIGNATURE DATE | STORAGE | 600.00 |
| TRUCK NO. | | |
| AUTHORIZED SIGNATURE DATE | SUB-TOTAL | |
| VEHICLE RELEASED TO DATE | TAX | |
| | TOTAL | 1461.18 |

Not responsible for loss or damage to vehicle in case of
fire, theft or any other cause beyond our control

*Thank You!*

Thank You! 461.18

# STATE OF MICHIGAN TRAFFIC CRASH REPORT

Authority: 1949 PA 300, Sec.257.622
Compliance: Required MSP UD-10E
Penalty: $100 and/or 90 days (Rev 01/2016)

External # 192998  Crash ID

Page 1
File Class : 93001
Incident #
1716404121
Reviewer
Sergeant SCOTT BOSLEY (14)

| ORI: | MI6416400 | Department Name | | Oceana County Sheriff's Office | | |
|---|---|---|---|---|---|---|
| Crash Date 10/27/2017 | Crash Time 15:38 | No. of Units 01 | Crash Type Single | Special Circumstances ○None ○Fleeing Police ○Hit and Run ○Unknown ○School Bus ○Deer | Special Checks ○ Fatal ○ Non-Traffic Area ○ ORV/Snowmobile | |
| County 64 - OCEANA | Traffic Control None | | Relation to Roadway On the Road | Weather Cloudy | Area All Other Freeway Areas | |
| City/Twsp 15 - SHELBY TWP | Contributing Circumstances 1st None | 2nd | | Light Daylight | Road Surface Condition Dry | Total Lanes 02 | Speed Limit 75 | Posted Yes |
| Work Zone (if applicable) Type | Workers Present No | | Activity | | Location | |

**LOCATION**

| Prefix | Primary Road Name U.S 31 | Road Type | Suffix | Divided Roadway S |
|---|---|---|---|---|
| Distance/Direction 0.25 Miles N | | Trafficway Divided Hwy w/o/Barrier | | |
| Prefix W | Intersecting Road Name STONY RD | Road Type RD | Suffix | Divided Roadway |

**DRIVER**

| Unit Number 01 | Unit Known Yes | State MI | Driver License Number B635067115242 | Date of Birth (Age) 03/26/1957 (60) | License Type ● Operator ○Chauffer ○Moped | Endorsements ○Cycle ○Farm ○Recreation | Sex F | Total Occupants 01 | Hazardous Action None |
|---|---|---|---|---|---|---|---|---|---|

| Unit Type MV | Driver Information ANNE CHRISTINE BARTON-DEMPSEY 3950 WESTBROOK DR MUSKEGON MI 49444 | Driver is Owner O | Injury | Position Front - Left | Restraint Shoulder & Lap Belt |
|---|---|---|---|---|---|

| Driver Condition at Time of Crash 1st Appeared Normal | 2nd | Driver Distracted By Not Distracted | Ejected No | Trapped No | Airbag Deployed Not Deployed |
|---|---|---|---|---|---|

| Hospital None | | Ambulance None | | |
|---|---|---|---|---|

| Alcohol Suspected No | Contributing Factor No | Alcohol Test Type ○Breath ○Blood ○Urine ○Field ○PBT ○Refused ● Not Offered | Alcohol Test Results ○Pending Test Results: | Interlock Device No |
|---|---|---|---|---|
| Drug Suspected No | Contributing Factor No | Drug Test Type ○Blood ○Urine ○Field ○Refused ● Not Offered | Drug Test Results ○Pending Test Results: | Citation Issued ○Hazardous ○Other |

**VEHICLE**

| Vehicle Registration 6LHC12 | State MI | Vehicle Description | Year 2013 | Make HYUNDAI | Model ELANTRA | Color SIL |
|---|---|---|---|---|---|---|
| VIN KMHD35LE4DU032649 | | Vehicle Type Passenger Car, SUV, Van | | Special Vehicles None | Private Trailer Type | Vehicle Defect |

| Insurance Company HOME OWNERS | Insurance Policy # 4820935802 | Towed By EAGLE TOWING | Towed To EAGLE TOWING |
|---|---|---|---|
| Location of Greatest Damage 01 | First Impact 01 | Extent of Damage (Power Unit and/or Trailers) Disabling Damage | Vehicle Direction S | Vehicle Use Private | Action Prior Going Straight Ahead |
| Sequence of Events (● indicates MOST harmful event) | First 20 - Animal | Second | Third | Fourth |

**PASSENGERS**

| Passenger Information | Date of Birth (Age) | Sex | Position | Restraint |
|---|---|---|---|---|
| | Injury | Ejected | Trapped | Airbag Deployed |
| Hospital | | Ambulance | | |
| Passenger Information | Date of Birth (Age) | Sex | Position | Restraint |
| | Injury | Ejected | Trapped | Airbag Deployed |
| Hospital | | Ambulance | | |
| Passenger Information | Date of Birth (Age) | Sex | Position | Restraint |
| | Injury | Ejected | Trapped | Airbag Deployed |
| Hospital | | Ambulance | | |

**TRUCK/BUS**

| Carrier Information | USDOT | MC | MPSC |
|---|---|---|---|
| | Driver's CDL Type | Endorsements ○H ○P ○T ○N ○S ○X | CDL Exempt ○Farm ○Other |
| GVWR/GCWR ○10,000 lbs. or Less ○10,001 - 26,000 lbs. ○Greater than 26,000 lbs. | Vehicle Configuration | Cargo Body Type | Medical Card | Hazardous Material ○Placard ○Cargo Spill | ID # | Class # |

**OWNERS**

| Owner Information | Owner Information |
|---|---|
| Damaged Property | Public | Owner & Phone |

| Unit Number | Unit Known | State | Driver License Number | | Date of Birth(Age) | | License Type | Endorsements | Sex | Total Occupants | Hazardous Action |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | ○Operator ○Chauffer ○Moped | ○Cycle ○Farm ○Recreation | | | |
| Unit Type | Driver Information | | | | | | Driver is Owner | Injury | Position | | Restraint |

| Driver Condition at Time of Crash | | Driver Distracted By | | Ejected | Trapped | Airbag Deployed |
| --- | --- | --- | --- | --- | --- | --- |
| 1st | 2nd | | | | | |

| Hospital | Ambulance |
| --- | --- |

| Alcohol Suspected | Contributing Factor | Alcohol Test Type | | | | Alcohol Test Results | | Interlock Device |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Breath Field | Blood PBT | Urine Refused | Not Offered | Pending | Test Results: | |

| Drug Suspected | Contributing Factor | Drug Test Type | | | | Drug Test Results | | Citation Issued |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Blood Field | Urine Refused | Not Offered | | Pending | Test Results: | Hazardous Other |

| Vehicle Registration | | State | Vehicle Description | Year | Make | | Model | | Color |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

| VIN | | Vehicle Type | | Special Vehicles | | Private Trailer Type | | Vehicle Defect |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |

| Insurance Company | | Insurance Policy # | | Towed By | | Towed To |
| --- | --- | --- | --- | --- | --- | --- |

| Location of Greatest Damage | First Impact | Extent of Damage (Power Unit and/or Trailers) | Vehicle Direction | Vehicle Use | Action Prior |
| --- | --- | --- | --- | --- | --- |

| Sequence of Events | First | Second | Third | Fourth |
| --- | --- | --- | --- | --- |
| (● indicates MOST harmful event) | | | | |

| Passenger Information | Date of Birth (Age) | | Sex | Position | | Restraint |
| --- | --- | --- | --- | --- | --- | --- |
| | Injury | Ejected | Trapped | Airbag Deployed | | |

| Hospital | Ambulance |
| --- | --- |

| Passenger Information | Date of Birth (Age) | | Sex | Position | | Restraint |
| --- | --- | --- | --- | --- | --- | --- |
| | Injury | Ejected | Trapped | Airbag Deployed | | |

| Hospital | Ambulance |
| --- | --- |

| Passenger Information | Date of Birth (Age) | | Sex | Position | | Restraint |
| --- | --- | --- | --- | --- | --- | --- |
| | Injury | Ejected | Trapped | Airbag Deployed | | |

| Hospital | Ambulance |
| --- | --- |

| Carrier Information | USDOT | | MC | MPSC |
| --- | --- | --- | --- | --- |
| | Driver's CDL Type | Endorsements OH  OP  OT ON  OS  OX | CDL Exempt ○Farm ○Other | |
| GVWR/GCWR ○10,000 lbs. or Less    ○10,001 - 26,000 lbs.    ○Greater than 26,000 lbs. | Vehicle Configuration | Cargo Body Type | Medical Card | Hazardous Material ○Placard ○Cargo Spill | ID # | Class # |

| Owner Information | Owner Information |
| --- | --- |

| Witness Information | Witness Information |
| --- | --- |

| Investigated at Scene. Yes | Reported Date (Time) 10/27/2017 (16:38) | 1st Investigator Name (Badge) Deputy Mark Hiddema (25) | 2nd Investigator Name (Badge) | Photos No |
| --- | --- | --- | --- | --- |

| Narrative | Diagram |
| --- | --- |
| Barton-Dempsey was traveling south on U.S.31 near Stony Lake Rd. Barton-Dempsey could not avoid hitting a deer that ran in front of her vehicle. | |

# Exhibit 6

3) Officers calling 911 for a non-preference wrecker shall not request a wrecker service which is not on the non-preference call list nor direct a wrecker service be called other than pursuant to this policy or out of a different geographical area. The only exception is if the particular service required is only available through the equipment or wrecker service requested.

4) If a wrecker service has been contacted by 911 and it cannot or does not respond, 911 may call another wrecker service in accordance with this policy.

5) Exceptions to the above may be made by 911 in the following emergency and other situations:

    i. If immediate and critical wrecker service is required, such as time constraints of a police investigation, an injured person is pinned in the wreck or when the danger of fire or explosion is evident.

    ii. Traffic conditions are such that immediate removal of a vehicle is necessary for the expeditious flow of traffic.

    iii. If, in the opinion of the investigating officer on scene, the preferred wrecker is based a considerable distance from the scene to make it impractical to wait for its arrival, the provisions for a non-preference wrecker shall be followed.

## 6. REMOVAL FROM THE NON-PREFERENCE WRECKER CALL LIST

A. Police agencies and fire departments operating within Mason/Oceana County are encouraged to report to their immediate supervisors the name of any wrecker service or individual who renders poor service or is incapable of providing quality service because of inadequate equipment or inadequately trained personnel. Forms shall be provided to report problems observed by on scene personnel.

B. When a complaint is received concerning the performance of a wrecker service, or that the service is not adhering to the requirements established by this policy, the complaint shall be investigated by the 911 Director or designee, the following procedures shall be followed:

1. When a written complaint is received, the 911 Director shall send a copy to the affected wrecker company informing them that an investigation of the complaint will be conducted.

2. The 911 Director shall then proceed to informally investigate the complaint by conferring with at least the following:

   a. The complainant (unless the 911 Director has already had direct contact with the complainant in step 1 above).

   b. The wrecker company owner (if different than the wrecker driver).

   c. The wrecker driver.

3. After completion of steps 1 and 2 above, the 911 Director shall proceed as follows:

   a. If the substance of the complaint is admitted by the wrecker company, then the 911 Director shall consider the complaint well-founded, decide appropriate disciplinary action, reduce the decision to writing, file the complaint and decision in official 911 records, and then send copies of the decision to the wrecker owner, the wrecker driver (if different than the owner), and the complainant. Disciplinary action shall be limited to warnings or removal from the non-preference call list for a specified duration of time or until specified remedial action has been taken by the wrecker company or driver.

   b. If the complaint is denied by the owner, the 911 Director shall set the complaint for hearing no less than five (5) and not more than ten (10) working days at the office of the 911 Director, who shall hear the answer to the complaint and thereafter decide whether disciplinary action is warranted. The 911 Director shall then carry out the same applicable procedures set forth in sub-section "a" above.

   c. In the absence of extenuating circumstances, a wrecker service shall not be removed from the non-preference wrecker call list without first following the procedures established in this policy.

# Exhibit 7



...LE TOWING
...5 OLD US HWY 37
...TAGUE, MI 49437

UNC

Ref 3-5
2nd 3-10
Ref 3-20

CERTIFIED MAIL

7016 0910 0002 1155 5908

1000

49341

U.S. POSTAGE
PAID
MONTAGUE, MI
49437
MAR 01 18
AMOUNT
**$3.95**
R2305K138611-11

UNITED STATES
POSTAL SERVICE

LT MCINTIRE
345 NORTHLAND DR NE

NIXIE      482    CE 1          2203/22/18

RETURN TO SENDER
UNCLAIMED
UNABLE TO FORWARD

BC: 49437958255      *1364-08481-01-42

UNC

49437>9595



UD-41 (04/07)
**MICHIGAN DEPARTMENT OF STATE POLICE**

### REQUIREMENTS FOR WRECKER SERVICES TO CONTRACT
### OR BE PLACED ON NO-PREFERENCE WRECKER CALL LIST

Wrecker services interested in working with the Michigan State Police shall agree to abide by the following requirements for the duration of their association with the department. Failure to comply with all of these requirements may be cause for termination of the contract or removal from the no-preference wrecker call list as provided in Official Order No. 124.

1.  The wrecker service shall neither conceal nor misrepresent any material facts when applying for or performing services under this agreement.

2.  The wrecker service shall be legally established as a towing business (i.e., registered with the County Clerk as an assumed name business, or registered with the State of Michigan as a corporation) with operations within the post area.

    A.  Post office box numbers shall not be accepted.

    B.  All necessary equipment and storage facilities shall be located in the area to be served.  Exceptions may be made for specialized equipment needs, as dictated by unique or emergency conditions.

3.  The wrecker service shall comply with this Order, all rules and regulations prescribed by the MPSC (as applicable), local ordinances, zoning requirements, and state laws pertaining to this type of business.

4.  Drivers and representatives of the wrecker service shall be professional and courteous in their dealings with the public.

5.  The wrecker service shall maintain an effective means of communication with their trucks and drivers at all times.

6.  Insurance

    A.  The wrecker service shall maintain adequate insurance coverage on its fleet and drivers.

    B.  The work site commander shall require that wrecker services provide a copy of their valid insurance policy, as well as copies of each renewal as long as their contract is in effect or they are list on the no-preference wrecker list.

    C.  If the wrecker service cannot provide proof of insurance coverage, they shall immediately have their contract canceled or be removed from all no-preference wrecker call lists until the work site commander is satisfied that the wrecker service is in compliance with insurance requirements.

7.  Indemnification

    The department shall not be held responsible for liabilities incurred while the wrecker service is providing service at a scene to which they were dispatched by the department.  The wrecker service agrees that it is not acting as, nor will it represent itself as, an agent of the department while performing services.

8.  Storage Facilities

    The wrecker service shall own or have an exclusive, signed lease to a secure vehicle storage area of suitable size, properly zoned and adequately fenced, within the work site's assigned area.  If the storage area is leased, the lease shall be valid through the term of the contract or no-preference list.

    A.  Documentation of zoning compliance and ownership or exclusive lease of the storage facility are required and shall be submitted with the wrecker service's application.

    B.  If the storage area location is different from the wrecker service's business location, it shall identify the physical location of the storage facility on the application.

    C.  The storage area shall only be accessible by the wrecker service.

2

D.   The storage area shall be capable of simultaneously holding a minimum of 20 passenger vehicles and at least four maximum-size tractor-trailer combinations if they are able to perform heavy-duty tows.

E.   If the wrecker service is unable to store a vehicle because there is insufficient storage area, they shall immediately notify the work site's on-duty supervisor. The wrecker service shall be financially responsible for any additional towing or storage charges associated with this situation.

F.   The wrecker service shall provide a separate area within their storage area for vehicles that have been identified as stolen or involved in criminal investigations, forfeitures, or other police-related matters.

G.   After having stored the vehicle for 20 days, the wrecker service agrees to contact the work site commander to initiate abandoned and unclaimed vehicle procedures specified in Section 11 below.

Under no circumstances shall the work site or department be charged for the storage of seized vehicles and vehicles held as evidence.

H.   The wrecker service shall be solely responsible for any damage or theft of vehicles and/or personal property while such vehicle and/or personal property stored on the wrecker service premises.

I.   When requested by a police agency, the wrecker service shall provide written notification identifying where a towed vehicle is physically being held.

9.   Equipment

A.   The wrecker service agrees to properly maintain its trucks and clearly mark them as required by state law. The trucks shall not bear markings which would suggest or indicate that they are police vehicles.

B.   The wrecker service shall ensure that its drivers and equipment used for department requests are qualified under the provisions of the Motor Carrier Safety Act, 1963 PA 181, and the Michigan Vehicle Code, 1949 PA 300, as amended.

(1)   The wrecker service shall maintain a minimum of two Class A-B-C trucks and two drivers on call to respond to requests for services under this contract 24 hours per day, 365 days per year.

(2)   The wrecker service shall provide the work site commander with the following information for each of their trucks:

a.   Vehicle class
b.   Make Year, Model and GVWR (rating of chassis)
c.   Number, capacity and type (i.e., fixed or moveable, manual or hydraulic) of booms
d.   Number and size of winches
e.   Size and quantity of cable for each winch
f.   Lift type(s) (i.e., sling, wheel lift, chassis lift, roll back)
g.   Rear wheel/axle configuration (i.e., duels, tandem duels)
h.   Any additional equipment
i.   Copy of each vehicle's registration
j.   If leased, a copy of each vehicle's lease agreement
k.   A copy of the last annual (periodic) certification inspection completed (shall be within the three months prior to the date of their application).

(3)   The wrecker service shall maintain all equipment in safe, legal operating condition at all times and shall equip all vehicles with rotating amber lights visible from 360 degrees.

(4)   If the wrecker service fails to maintain its equipment in good repair the work site commander may immediately cancel the contract or remove the service from the no-preference wrecker call list at any time during this contract.

10.   Response to Calls for Service

A.   Requests for service received from enforcement members shall receive first response priority.

| AUTHORITY: | 1935 PA 59 |
| COMPLIANCE: | Voluntary |

3

B.   The wrecker service shall be available by telephone 24 hours a day, 365 days per year, with at least one wrecker immediately available, unless another schedule is deemed appropriate by the work site commander.

C.   Answering Telephone Calls

(1)   The wrecker service shall answer telephone calls for service within 10 rings.

(2)   If the wrecker service fails to answer its telephone after 10 rings, or if it indicates that it cannot immediately handle a call, the work site commander shall notify the wrecker service in writing of noncompliance with their agreement.

(3)   Upon the occurrence of three such written notices within a 12-month period, the work site commander shall have the right to immediately cancel the contract or remove the service from the no-preference list.

D.   Response time to calls from the department shall be reasonable, as determined by the work site commander.

E.   The wrecker service shall abide by all laws when responding to a scene and/or towing vehicles for the department, including equipment and traffic laws.

F.   The wrecker service shall not send a truck to a police incident outside the agreed upon geographical area unless requested by an enforcement member.

11.   Abandoned and Unclaimed Vehicles

A.   The wrecker service shall comply with all applicable provisions of MCL 257.252a-g as they apply to abandoned vehicles.

B.   The wrecker service shall not remove an abandoned vehicle from private property in accordance with MCL 257.252a without first notifying their affiliated work site.

C.   The wrecker service agrees to serve as the custodian of the vehicle to ensure disposal of unclaimed vehicles as outlined in MCL 257.252g.

D.   Unclaimed vehicles shall be disposed of at public auction held by the work site commander or their designee, per the instructions in Official Order No. 49, Enclosure (14).

12.   Charges

A.   The wrecker service shall be paid by the registered owner of the serviced vehicle.

B.   Basic and Special Service Charges

Reasonable rates based on local industry standards shall be used for all services provided. The wrecker service shall provide a written copy of its rates detailing charges for all basic and special services to the work site commander no later than January 31st of each year.

C.   Storage Charges

(1)   The wrecker service may charge reasonable fees in addition to the basic and/or special charges for services performed in addition to the basic service. These charges may vary based on the size of the vehicle stored.

(2)   Vehicles Excluded from Storage Charges

In the event a vehicle is towed and/or stored but a court later determines that it was improperly moved, the department shall not be charged a fee by the wrecker service unless payment is required by court order under MCL 254.252f.

D.   Mileage Charges

| AUTHORITY: | 1935 PA 59 |
|---|---|
| COMPLIANCE: | Voluntary |

4

        (1)   A local industry standard amount may be charged per mile for mileage driven in excess of five miles from the point of hook-up to the storage facility or other designated destination. All mileage charges shall be calculated based on one way mileage.

        (2)   The wrecker service shall provide a written copy of its mileage rates to the work site commander no later than January 31st of each year.

  E.   Charges for Canceled Calls

      If a call requesting wrecker service is canceled prior to the service being provided (i.e., hooking up the vehicle), neither the work site nor the vehicle's owner/operator shall be obligated to compensate the towing company.

13.  Towing Documentation

  A.   Before towing any impounded vehicle from a scene as requested by an enforcement member, the wrecker service shall:

        (1)   Obtain the vehicle's identification number from the vehicle, or from the officer at the scene.

        (2)   Take an inventory listing the vehicle's contents.

            a.   Jointly sign this inventory with the enforcement member.

            b.   The wrecker service may also verify and sign an inventory taken by the enforcement member instead of completing their own.

  B.   The wrecker service shall not remove a wrecked vehicle from the scene of an accident without authorization by a law enforcement agency.

14.  Vehicle Redemption

  A.   The wrecker service shall allow for the redemption of vehicles from their storage area at least eight hours per day, five days per week, and shall make their facility reasonably available after normal business hours upon receiving a telephone call from the vehicle owner.

  B.   If there is a "hold" placed on a vehicle, the wrecker service shall not permit a vehicle owner to redeem an impounded vehicle or remove any of its contents without permission from the work site commander or their designee. Failure to comply with this section is grounds for termination of the contract or removal from the no-preference wrecker list.

15.  The wrecker service agrees that intentional violations of <u>Chapter II of the Michigan Vehicle Code</u> for financial gain will result in their immediate termination of the contract or removal from the no-preference wrecker list and criminal prosecution where applicable.

---

I understand and agree to adhere to the above requirements. Failure to comply with all of these requirements or misrepresented or falsified information shall be cause for termination of my contract with the Department of State Police or removal from the department's no-preference wrecker call list.

| Company | Address |
|---|---|
| Eagle Towing | 10255 US Hwy 31 |

| City | Owner/Agent |
|---|---|
| Montague, MI | Joh Veytoop |

| Signature | Date | Telephone number (include area code) |
|---|---|---|
| | 03/28/18 | (231) 894-5424 |

ORIGINAL – Worksite
PHOTOCOPY - Applicant

| AUTHORITY: | 1935 PA 59 |
|---|---|
| COMPLIANCE: | Voluntary |

 **ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
2/19/2018

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

**IMPORTANT:** If the certificate holder is an **ADDITIONAL INSURED**, the policy(ies) must be endorsed.  If **SUBROGATION IS WAIVED**, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Misty Riley | |
|---|---|---|
| Kapnick Insurance Group<br>P.O. Box 1801<br>Adrian MI 49221-7801 | PHONE (A/C, No, Ext): 517-266-6543 | FAX (A/C, No): 517-263-6658 |
| | E-MAIL ADDRESS: misty.riley@kapnick.com | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : Central Mutual Insurance Co. | 20230 |

| INSURED | EAGLTOW-01 | |
|---|---|---|
| John Heykoop dba Eagle Towing<br>dba Heykoop Auto Sales<br>Eagle Towing & Recovery<br>10255 Old US Hwy 31<br>Montague MI 49437 | INSURER B : | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES  CERTIFICATE NUMBER: 1677274639  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **COMMERCIAL GENERAL LIABILITY**<br>☐ CLAIMS-MADE ☒ OCCUR<br><br><br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>☒ POLICY ☐ PRO-JECT ☐ LOC<br>☐ OTHER: | X | | CLP 9764650 | 11/30/2017 | 11/30/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 3,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 3,000,000 |
| | | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY**<br>☒ ANY AUTO<br>☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS<br>☒ HIRED AUTOS ☒ NON-OWNED AUTOS | | | BAP 9764626 | 11/30/2017 | 11/30/2018 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB ☐ OCCUR<br>☐ EXCESS LIAB ☐ CLAIMS-MADE<br>☐ DED ☐ RETENTION $ | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | AGGREGATE | $ |
| | | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ Y/N<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | N/A | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Garagekeepers Cargo/On Hook | | | CLP 9764650 | 11/30/2017 | 11/30/2018 | See Notes Per Truck | 100,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES** (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Motor Truck Cargo (Non-Auto in Tow) Deduct: $1,000

Garagekeepers' (Includes Autos in Tow) Liability:
Location 1: 10255 Old US Hwy 31, Montague, MI 49437 - $100,000
Location 2: 152 First Street, Shelby, MI 49455 - $100,000
Location 3: 2844 South Mill Iron Street, Muskegon, MI 49444 - $100,000

Garagekeepers' Comp Deduct: $500 per auto; $2,500 max per claim
See Attached...

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| <br>Michigan State Police<br>7150 Harris Drive<br>Dimondale MI 48821 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*James D Kapnick* |

© 1988-2014 ACORD CORPORATION.  All rights reserved.

**ACORD 25 (2014/01)**     The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: EAGLTOW-01

LOC #: _____

## *ACORD* ADDITIONAL REMARKS SCHEDULE

Page __1__ of __1__

| AGENCY | NAMED INSURED |
|---|---|
| Kapnick Insurance Group | John Heykoop dba Eagle Towing dba Heykoop Auto Sales |
| **POLICY NUMBER** | Eagle Towing & Recovery 10255 Old US Hwy 31 Montague MI 49437 |
| **CARRIER**                    **NAIC CODE** | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** ___25___ **FORM TITLE:** CERTIFICATE OF LIABILITY INSURANCE

Garagekeepers' Coll Deduct: $500

AUTOMATIC STATUS POLICY FORMS (WHEN REQUIRED BY WRITTEN CONTRACT OR WRITTEN AGREEMENT WITH NAMED INSURED, PER POLICY TERMS & CONDITIONS)

GENERAL LIABILITY

--Additional Insureds
----8-1889 (07/14) - General Liability Plus Endorsement
----Additional Insured - Owners, Lessees, or Contractors - Automatic Status
----Additional Insured - Managers or Lessors of Premises - Automatic Status
----Additional Insured - Lessor of Leased Equipment - Automatic Status
----Additional Insured - Vendors - Automatic Status

--Primary and Non Contributory - Per Form 8-1889 (07/14)
--Waiver of Subrogation - Per Form 8-1889 (07/14)

AUTO LIABILITY

--Additional Insureds
----3-2546 (03/10) - BAP Plus Coverage Endorsement - Additional Insured - Automatic Status

--Waiver of Subrogation - Per Form 3-2546 (03/10)

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

○ USDOT Number   ○ MC/MX Number   ○ Name

Enter Value: [ 1711644 ]

[ Search ]

**Company Snapshot**
**EAGLE TOWING & RECOVERY**
USDOT Number: 1711644

### ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating

| Other Information for this Carrier |
| --- |
| ♥ SMS Results |
| ♥ Licensing & Insurance |

**Carriers:** If you would like to update the following ID/Operations information, please complete and submit form MCS-150 which can be obtained online or from your State FMCSA office. If you would like to challenge the accuracy of your company's safety data, you can do so using FMCSA's DataQs system.

**Carrier and other users:** FMCSA provides the Company Safety Profile (CSP) to motor carriers and the general public interested in obtaining greater detail on a particular motor carrier's safety performance then what is captured in the Company Snapshot. To obtain a CSP please visit the CSP order page or call (800)832-5660 or (703)280-4001 (Fee Required).

For help on the explanation of individual data fields, click on any field name or for help of a general nature go to **SAFER General Help**.

**The information below reflects the content of the FMCSA management information systems as of 02/20/2018.**

| | | | |
| --- | --- | --- | --- |
| **Entity Type:** | CARRIER | | |
| **Operating Status:** | AUTHORIZED FOR Property | **Out of Service Date:** | None |
| **Legal Name:** | EAGLE TOWING & RECOVERY | | |
| **DBA Name:** | | | |
| **Physical Address:** | 10255 US HWY 31<br>MONTAGUE, MI 49437 | | |
| **Phone:** | (231) 861-8988 | | |
| **Mailing Address:** | 10255 US HWY 31<br>MONTAGUE, MI 49437 | | |
| **USDOT Number:** | 1711644 | **State Carrier ID Number:** | |
| **MC/MX/FF Number(s):** | MC-53889 | **DUNS Number:** | 11-746-7225 |
| **Power Units:** | 7 | **Drivers:** | 9 |
| **MCS-150 Form Date:** | 12/16/2017 | **MCS-150 Mileage (Year):** | 50,000 (2017) |

**Operation Classification:**

| | | |
| --- | --- | --- |
| x Auth. For Hire | Priv. Pass.(Non-business) | State Gov't |
| Exempt For Hire | Migrant | Local Gov't |
| x Private(Property) | U.S. Mail | Indian Nation |
| Priv. Pass. (Business) | Fed. Gov't | |

**Carrier Operation:**

| | | |
| --- | --- | --- |
| x Interstate | Intrastate Only (HM) | Intrastate Only (Non-HM) |

**Cargo Carried:**

| | | |
| --- | --- | --- |
| General Freight | Liquids/Gases | Chemicals |
| Household Goods | Intermodal Cont. | Commodities Dry Bulk |
| Metal: sheets, coils, rolls | Passengers | Refrigerated Food |
| x Motor Vehicles | Oilfield Equipment | Beverages |
| Drive/Tow away | Livestock | Paper Products |
| Logs, Poles, Beams, Lumber | Grain, Feed, Hay | Utilities |
| Building Materials | Coal/Coke | Agricultural/Farm Supplies |
| Mobile Homes | Meat | Construction |
| x Machinery, Large Objects | Garbage/Refuse | Water Well |
| Fresh Produce | US Mail | |

### ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating

**US Inspection results for 24 months prior to: 02/20/2018**

Total Inspections: 0
Total IEP Inspections: 0

**Note:** Total inspections may be less than the sum of vehicle, driver, and hazmat inspections. Go to Inspections Help for further information.

Inspections:

| Inspection Type | Vehicle | Driver | Hazmat | IEP |
|---|---|---|---|---|
| Inspections | 0 | 0 | 0 | 0 |
| Out of Service | 0 | 0 | 0 | 0 |
| Out of Service % | 0% | 0% | 0% | 0% |
| Nat'l Average % (2009- 2010) | 20.72% | 5.51% | 4.50% | N/A |

**Crashes reported to FMCSA by states for 24 months prior to: 02/20/2018**

**Note:** Crashes listed represent a motor carrier's involvement in reportable crashes, without any determination as to responsibility.

Crashes:

| Type | Fatal | Injury | Tow | Total |
|---|---|---|---|---|
| Crashes | 0 | 0 | 0 | 0 |

**ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating**

**Canadian Inspection results for 24 months prior to: 02/20/2018**

Total inspections: 0

**Note:** Total inspections may be less than the sum of vehicle and driver inspections. Go to Inspections Help for further information.

Inspections:

| Inspection Type | Vehicle | Driver |
|---|---|---|
| Inspections | 0 | 0 |
| Out of Service | 0 | 0 |
| Out of Service % | 0% | 0% |

**Crashes results for 24 months prior to: 02/20/2018**

**Note:** Crashes listed represent a motor carrier's involvement in reportable crashes, without any determination as to responsibility.

Crashes:

| Type | Fatal | Injury | Tow | Total |
|---|---|---|---|---|
| Crashes | 0 | 0 | 0 | 0 |

**ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating**

*The Federal safety rating does not necessarily reflect the safety of the carrier when operating in intrastate commerce.*

Carrier Safety Rating:

**The rating below is current as of: 02/20/2018**

**Review Information:**

| Rating Date: | None | Review Date: | None |
|---|---|---|---|
| Rating: | None | Type: | None |

SAFER Home | Feedback | Privacy Policy | USA.gov | Freedom of Information Act (FOIA) | Accessibility | OIG Hotline | Web Policies and Important Links | Plug-ins

Federal Motor Carrier Safety Administration
1200 New Jersey Avenue SE, Washington, DC 20590 • 1-800-832-5660 • TTY: 1-800-877-8339 • Field Office Contacts

https://safer.fmcsa.dot.gov/query.asp                                                                                                    2/2

## Unified Carrier Registration

| | |
|---|---|
| **Receipt number:** | **2018501010479** |
| **Registration Year:** | 2018 |
| **Expiration Date:** | 12/31/2018 |
| **Legal Name:** | **EAGLE TOWING & RECOVERY** |
| **USDOT Number:** | 1711644 |
| **MC Number:** | 53889 |
| **Telephone Number:** | 2318618988 |
| **Base State:** | MI |
| **Business Address:** | 10255 Us Hwy 31 |
| | Montague , MI  49437 |
| **Mailing Address:** | 10255 Us Hwy 31 |
| | Montague , MI  49437 |
| **Classification:** | Motor Carrier |

### Payment Details

| Transaction Type | Total Vehicles | Certified By | Fee Paid | Amount | Convenience Fee | Fee Paid Date | PLN |
|---|---|---|---|---|---|---|---|
| REGISTRATION | 7 | JOHN HEYKOOP | Yes | $410.00 | $3.75 | 01/06/2018 | 18UC0016208 |

**Note:**
**If Fee Paid is 'Payment Error', please contact your financial organization OR contact 317-615-7350.**

Auto Data Direct My Account

## Account Information

### User Account for **ANDREW HEYKOOP**
CONTACT USER
Login name: **aheykoop**
Email Address: **andrew@eagletowing.us** CHANGE
Personal Phone: **231-736-9821**   Personal Fax: **231-861-0579**
Password: ************* CHANGE

### **EAGLE TOWING & RECOVERY 3**                                    UPDATE INFORMATION
DBA Name: **EAGLE TOWING & RECOVERY**
Phone: **231-894-5424**   Fax: **231-861-0579**
Company Type: **TOW**

**Physical Address:**           **Mailing Address:**
10255 US HWY 31              10255 US HWY 31
MONTAGUE, MI 49437   MONTAGUE, MI 49437

## Current Active Users

### User Account for **ANDREW HEYKOOP**
CONTACT USER
Login name: **aheykoop**
Email Address: **andrew@eagletowing.us**
Personal Phone: **231-736-9821**   Personal Fax: **231-861-0579**

© 2000-2018 Auto Data Direct, Inc. (850) 877-8804

*NMVITS*

STATE OF MICHIGAN
RUTH JOHNSON, SECRETARY OF STATE
DEPARTMENT OF STATE
LANSING

DUPLICATE-08-07-17        **CONFIRMATION OF ENROLLMENT**

January 15, 2015

Eagle Towing
10255 Old Hwy 31
Montague, MI  49437

This letter confirms that you are enrolled in the Abandoned Vehicle Program in accordance with
Michigan law [MCL 257.252a(7) and MCL 257.252g(2)(c)]. By setting up an Electronic Funds Transfer
(EFT) account with the Michigan Department of State, you agree:

1. To submit the disposition of every abandoned vehicle in your custody by means of the *Michigan
   Auto Lost and Found* Web site at www.Michigan.gov/sos.
2. To remit by EFT $25 of the $40 abandoned vehicle fee for vehicles in your custody that have
   been redeemed by the vehicle owner or sold at auction.
3. To remit the remaining $15 to the towing agency.
4. To be responsible for the accuracy, authenticity and validity of all information submitted.
5. To vouch for the identity and authority of any individual that you may designate to submit any
   information required as part of the Abandoned Vehicle Program.
6. To hold the state of Michigan harmless for all use made of the information submitted through the
   department's Web site, including any information required to allow the $25 EFT from your
   designated account.
7. To immediately notify the department in writing of any change in the information you have
   provided, including the name, address or telephone number of your business.  This information
   may be submitted by e-mail to SOSWebmaster@michigan.gov or fax at (517) 322-3928.  Please
   include the phrase "Abandoned Vehicle" in the subject line of your e-mail.
8. That any violation of state law or the policies or procedures of either the department or local law
   enforcement authorities may result in your removal from the Abandoned Vehicle EFT Program.

To report an abandoned vehicle disposition online, you will need the following three numbers:

- Your Custodian Identification (CID) Number, which is **1918**
- Your Electronic Funds Transfer (EFT) Number, which is **V2396**.
- Your Personal Identification Number (PIN), which will be sent to you under separate cover.

For your protection, please keep these numbers confidential.  Only individuals with the authorization to
submit abandoned vehicle dispositions online should have access to them.  If you have any questions
about your EFT account or submitting a vehicle disposition online, please call (517) 636-5234.

**MUSKEGON COUNTY TREASURER**   **DELINQUENT TAX RECEIPT**   **000356837D**

| | |
|---|---|
| TONY MOULATSIOTIS | TAX YEAR: **2016** |
| 173 E APPLE AVE SUITE 104 | DATE PAID: 02/01/18 |
| MUSKEGON MI 49442        (231) 724-6261 | INTEREST DATE: 02/01/18 |

CHECKS ARE ACCEPTED AS CONDITIONAL PAYMENT.   IF NOT HONORED BY THE BANK, THE TAX IS CONSIDERED UNPAID AND THE RECEIPT IS VOID.   THE TREASURER IS NOT RESPONSIBLE FOR PAYMENT ON THE WRONG PARCEL.   APPLICATION MADE TO PAY THE YEAR'S TAX OR ITEM OF TAX APPEARING ON THIS RECEIPT AND NO OTHER.

**PARCEL: 02-009-300-0020-10**

UNIT:  MONTAGUE TOWNSHIP

HEYKOOP JOHN

290 FERRY
SHELBY            MI 49455

AMOUNT PAID:  2,957.54

CHECK NO:     1493

CASHIER NO:   LundholmN

COMMENTS:

| | PREV. AMT DUE | PAYMENT | DUE IF PAID THIS MONTH |
|---|---|---|---|
| BASE TAX | 2,536.67 | 2,536.67 | 0.00 |
| INTEREST | 304.40 | 304.40 | |
| ADMIN FEE | 101.47 | 101.47 | |
| EXPENSE OF SALE | | | |
| OTHER | | | |
| OVER/UNDER | | | |
| PA123 FEES | 15.00 | 15.00 | |
| TOTAL | 2,957.54 | 2,957.54 | 0.00 |

LEGAL DESCRIPTION:                          PROPERTY ADDRESS: 10255 US 31
MONTAGUE TOWNSHIP SEC 9 T12N R17W THE E 600 FT OF E 1/2 OF SW 1/4 EXC THE N       2100 FT THEREOF ALSO EXC THE S 330 FT
THEREOF AND ALSO EXC THE E 125FT THEREOF TAKEN FOR HIGHWAY PURPOSES

CHECK YOUR DESCRIPTION:
The Treasurer is not responsible for payment on the wrong parcel.
If you pay on the wrong description,
  we are not permitted to make adjustments later.                     County Treasurer

OCEANA COUNTY

OCEANA COUNTY
MARY LOU PHILLIPS
PO BOX 227
HART MI 49420
231-873-3980

**DELINQUENT TAX RECEIPT**
RECEIPT NO: 0000096590
DATE PAID: 02/01/18
TAX YEAR: 2016

---

**DELINQUENT TAX RECEIPT**
UNIT:    VILLAGE OF SHELBY
PARCEL: 046-107-042-50



RECEIVED OF: HEYKOOP JOHN & CAROL

296 FERRY
SHELBY        MI    49455

| | PREV. AMT DUE | PAYMENT | DUE IF PAID THIS MONTH |
|---|---|---|---|
| BASE TAX | 1,755.76 | 1,755.76 | |
| INTEREST | 210.69 | 210.69 | |
| ADMIN FEE | 70.23 | 70.23 | PAID IN FULL |
| EXPENSE OF SALE | | | |
| OTHER | | | |
| OVER/UNDER | | | |
| RECONVEYANCE FEES | 15.00 | 15.00 | |
| TOTAL | 2,051.68 | 2,051.68 | |

LEGAL DESCRIPTION:
WD956613 MLC959237 QC-L2006P18587 LOTS 43, 44, 45, 46, 47, 48, 49 & 50 & S 38    FT OF LOT 42 BLOCK 7 SHELBY VILLAGE
VILLAGE OF BARNETT.

CHECK YOUR DESCRIPTION:
The Treasurer is not responsible for payment on the wrong parcel.
If you pay on the wrong description, we are not permitted to make adjustments later.

COPY

_Mary Lou Phillips_
County Treasurer

---

**DELINQUENT TAX RECEIPT**
UNIT:   VILLAGE OF SHELBY
PARCEL: 046-107-042-50

    HEYKOOP JOHN E & CAROL D

    290 FERRY ST
    SHELBY MI 49455

RECEIPT NO:       0000096590
DATE PAID:        02/01/18
TAX YEAR:         2016
AMOUNT PAID:         2,051.68
CHECK NO:         1495
CASHIER:          TAX

| | PREV. AMT DUE | PAYMENT | DUE IF PAID THIS MONTH |
|---|---|---|---|
| BASE TAX | 1,755.76 | 1,755.76 | |
| INTEREST | 210.69 | 210.69 | |
| ADMIN FEE | 70.23 | 70.23 | PAID IN FULL |
| EXPENSE OF SALE | | | |
| OTHER | | | |
| OVER/UNDER | | | |
| RECONVEYANCE FEES | 15.00 | 15.00 | |
| TOTAL | 2,051.68 | 2,051.68 | |

## MONTAGUE TOWNSHIP
## APPLICATION TO PLANNING COMMISSION FOR SITE PLAN REVIEW

Note: This application form is intended for use for all requests for site plan review as set forth in Article 8 of the Montague Township Zoning Ordinance. A copy of Section 8 is attached to this application form.

1. Name and Address of Applicant(s): _Eagle Towing_
   _10255 Old Hwy 31 Montague, MI 49437_

2. Applicant's telephone Number: _231- 894 - 5424_

3. Name(s) and address(es) of owners of the property, if other than the applicants as set forth in paragraph 1:_____

4. Property Address: _10255 Old Hwy 31 Montague_

5. Property legal description: Attach to this application a copy of the deed, land contract memorandum, title insurance policy, or other document indicating the full and correct legal description of the property for which a conditional use permit is sought. Also attach a copy of a survey (if the Applicant has one).

6. Property Tax Identification Number: _02-009-300-0020-10_
   (May be obtained from property tax bill or notice)

7. Projected construction start-up date for project, if the site plan is approved: _immediately_

## 8. Checklist: *Has the Applicant submitted with this application the following*:

   a. Payment of the $75.00 site application fee (checks made payable to Montague Township)? _X_ Yes ___ No

   b. Has the Applicant submitted the document(s) and information as required by Section 8.04 of the Zoning Ordinance and by paragraph 5 of this application?: _X_ Yes ___ No

9. Additional Statements. If there is any additional information that the applicant believes is important, set forth the information on an additional sheet and attach it to this application.

Date: _____

Date: 27 OCT 16

*John Heywood*
Applicant*

Owner*

*If the Applicant is not the Owner of the property, then both the Applicant and the Owner must sign this application.

*****************************************************************************************

## DECISION OF PLANNING COMMISSION

The recommendation of Planning Commission is:

_____ a.    Approved, for the following reasons (attach additional sheets as necessary):_____

_____

_____

_____ b.    Denied, for the following reasons (attach additional sheets as necessary):

_____

_____

_____

✓ c.    Approved, subject to the following additional terms and conditions. Attach additional sheets if necessary): *Exhibit 1*

_____

_____

Dated: Nov 4, 2016

*Stuart B. Scholl*
Planning Commission Chairperson

Jay move   yes
Charley 2nd   yes
Scholl   yes
Korthase   yes

## MONTAGUE TOWNSHIP
## APPLICATION FOR ZONING PERMIT

1. State the names of <u>all</u> owners of the land for which a zoning permit is requested:

John Heycoop

2. State the address at which the owner(s) may be contacted: 10255 Old 45
Hwy 31 Montague, MI 49437

3. Telephone number of applicant: 231-894-5424

4. Fax number (if any) of applicant: 300-0020-10

5. Tax ID # of parcel: 61-02-900-251-0169-00

6. Address of parcel (if different than paragraph 2): _____

7. Legal Description: *Attach to this permit application the legal description of the parcel*. You may satisfy this provision by attaching a copy of your tax bill, deed or land contract. Have you attached such document?✓ Yes ___No

8. In acres or square feet (as applicable) state the area of the parcel: 3 Acres

9. Parcel frontage/width in feet: 300

10. Parcel depth in feet: 1200

11. Describe the structure, building, or use that is proposed: Storage of
Automobiles / Towing along w/ General office use
(Also see 9/1/2014 permit which is still ongoing)

12. Describe any buildings or other structures already located on the parcel:
Office and Storage Building

13. State for any proposed structure or building: N/A existing Buildings

A. The distance between the **nearest street right-of-way line** and the building or structure:_____

B. The distance between the **rear lot line** and the proposed building or structure: _____

C. The distance between the **nearest side lot line** and the proposed building or structure: _____

D. The distance between the **most distant side lot line** and the proposed building or structure: _____

14. What will be the size of the proposed structure or building: _____ N/A

15. What will be the height of the proposed structure or building: _____ N/A

16. Do you intend to excavate or engage in any construction within:

| | | | |
|---|---|---|---|
| a. | A designated flood plain? | ____ Yes | __ No |
| b. | A designated wetland? | ____ Yes | __ No |
| c. | Within 500 feet of any lake, river or stream? | ____ Yes | __ No |

If the answer is yes, then the Township cannot grant you a zoning permit until you have approval from the proper state department. For a designated flood plain or for a designated wetland contact the DEQ at 616-356-0500. For soil erosion (within 500 feet of any lake, river or stream) contact the Muskegon County Department of Public Works at 231-724-6411.

17. Is there an existing driveway that abuts a street? X Yes ___ No

a. Does the driveway abut a: ___ Private Street X Public Street

18. Have you obtained an approved driveway permit from the Muskegon County Road Commission? X Yes ___ No ___ N/A (**If yes, attach a copy hereto**).

Amended 06/13/14                                                    2

19. Checklist: **_Has the Applicant submitted with this application the following_**:

a. Payment of the $25.00 zoning permit application fee (checks made payable to Montague Township)? ___Yes ___ No

b. A site plan signed and dated by the applicant, consistent with the Township Zoning Ordinance (showing the location of abutting streets, the location of all existing and proposed structures, and the setbacks of the proposed buildings or structures)? ___Yes ___ No

c. A legal description of the parcel (see #7 above)? ___Yes ___ No

d. A copy of the approved driveway permit? ___Yes ___ No ___N/A

20. Additional Statements. If there is any additional information that the applicant believes is important, set forth the information on an additional sheet and attach it to this application.

**Signature of at least one owner:**

Print Name: _John Fence_

Date: _2706+16_

**PERMIT**

* * * * * * * * * * * *

**The foregoing application is approved. This permit becomes null and void in the event that there has not been undertaken, on a material and substantial basis, commencement of construction on the project within one (1) year of issuance of said permits.**

**Approved.**

_Rachael M. Swode_
Zoning Administrator

Date: _Nov 4, 2016_

Zoned: _C - Commercial_

Amended 06/13/14

3

| MONTAGUE TOWNSHIP | 2016 Summer | Bill #: |

## MESSAGE TO TAXPAYER

INTEREST RATE CALCULATION: SEPT 15-30 1% OCT 2%
NOV 3% DEC 4% JAN 5% FEB 1- 16 6%. ON MARCH 1
ALL UNPAID TAXES ARE RETURNED TO MUSKEGON COUNTY
TREASURER AS DELINQUENT. IF YOU HAVE ANY
QUESTIONS, CALL TWP TREASURER AT 231-894-9255.
IF YOU REQUEST A RECEIPT, PLEASE ENCLOSED A SELF-
ADDRESSED, STAMPED ENVELOPE.

### PAYMENT INFORMATION

This tax is due by:  09/14/2016

Pay by mail to:   MONTAGUE TOWNSHIP
C/O 10941 HENDERSON ROAD
MONTAGUE, MI 49437
OR DIRECT AT COMERICA BANK, MONTAGUE
OR AT TWP HALL, TUESDAYS 10-4

### PROPERTY INFORMATION

Property Assessed To:
EAGLES TOWING
10255 US 31
MONTAGUE, MI 49437

009-300-0020

Prop #: 61-02-900-251-0169-00    School: 61180
Prop Addr:  10255 US 31

MICH BUS TAX COMM PERSONAL EXEMPTION

Legal Description:
CITY OF MONTAGUE

61180.MONTAGUE PUBL

### TAX DETAIL

| | | |
|---|---|---|
| Taxable Value: | 1,300 | COMMERCIAL PERSONA |
| State Equalized Value: | 1,300 | Class: 251 |
| PRE/MBT %: | 100.0000 | |
| | | Mort Code: |

Taxes are based upon Taxable Value.
1 mill equals $1.00 per $1000 of Taxable Value.
Amounts with no millage are either Special
Assessments or other charges added to this bill.

| DESCRIPTION | MILLAGE | AMOUNT |
|---|---|---|
| STATE EDUCATION | 6.00000 | 7.80 |
| COUNTY OPERATING | 5.69840 | 7.40 |

### OPERATING FISCAL YEARS

The taxes on bill will be used for governmental
operations for the following fiscal year(s):
County:      OCTOBER 1 - SEPTEMBER 30
Twn/Cty:        JULY 1 - JUNE 30
School:         JULY 1 - JUNE 30
State:       OCTOBER 1 - SEPTEMBER 30
Does NOT affect when the tax is due or its amount

| | | |
|---|---|---|
| Total Tax | 11.69840 | 15.20 |
| Administration Fee | | 0.15 |
| TOTAL AMOUNT DUE | | 15.35 |

---

Please detach along parforation. Keep the top portion.

Mort Code

Bill #

PLEASE RETURN THIS PORTION WITH PAYMENT. THANK YOU.

Pay this tax to:
MONTAGUE TOWNSHIP
C/O 10941 HENDERSON ROAD
MONTAGUE, MI 49437
OR DIRECT AT COMERICA BANK, MONTAGU
OR AT TWP HALL, TUESDAYS 10-4

This tax is due by:  09/14/2016
After  09/14/2016  additional interest and fees apply

2016 Summer    Tax for Prop #:  61-02-900-251-0169-00

TAXPAYER NOTE: Is your name & mailing address correct?
If not, please make corrections below. Thank You.

Property Addr:  10255 US 31

Make Check Payable To: MONTAGUE TOWNSHIP

TOTAL AMOUNT DUE:        15.35

Amount Remitted: _____

To:  EAGLES TOWING
JOHN HEYKOOP
10255 US 31
MONTAGUE MI 49437



**EXHIBIT 1**

The following criteria were discussed by the Planning Commission Members pursuant to Section 8.06 of the Montague Township Zoning ordinance:

1. That there is a proper relationship between the existing streets in the vicinity and proposed deceleration lanes, service drives, entrance and exit driveways and parking areas to assure the safety and convenience of pedestrian and vehicular traffic.

**PC Comment: There is an existing business on the site. There are no other driveways or entrances since the original building has been there. This is the same as the original site plan. This criteria is met**

2. That the building or structure and entryways thereto proposed to be located upon the lot are so situated and designed as to minimize adverse effects therefrom upon owners and occupants of adjacent properties, the neighborhood, and the traveling public.

**PC Comment: The business has been a good neighbor. There is an existing berm on the property. This criteria is met.**

3. That as many natural features of the landscape shall be retained as possible where they furnish a barrier or buffer between the project and adjoining properties used for dissimilar purposes and where they assist in preserving the general appearance of the neighborhood or help control erosion or the discharge of storm waters.

**PC Comment: There are no changes being made to the property. This criteria is met.**

4. That any adverse effects of the proposed development and activities emanating therefrom upon adjoining residents or owners shall be minimized by appropriate screening, fencing or landscaping.

**PC Comment: There is a berm and a fence between the hotel and Heykoops. There is a fence on the North side of Heykoop's property. There are no problems with this criteria (i.e. no adverse effects).**

5. That all provisions of the Township Zoning Ordinance are complied with unless an appropriate variance therefrom has been granted.

**PC Comment: This criteria is met as long as applicant meets the conditions set forth in the site plan as approved by the Planning Commission.**

6. That any building or structure is accessible to emergency vehicles.

**PC Comment: This criteria is met.**

7. That the plan, as approved, is consistent with the intent and purpose of zoning to promote public health, safety, morals and general welfare; to encourage the use of lands in accordance with their character and adaptability; to avoid the overcrowding of population; to lessen congestion on the public and private streets; to reduce hazards to life and property; to facilitate adequate provisions for a system of transportation, sewage disposal, safe and adequate water supply, education, recreation, and other public requirements; and to conserve the expenditure of funds for public improvements and services; to conform with the most advantage uses of land, resources and properties; to conserve property values and natural resources; and to develop each lot according its peculiar suitability for particular uses and the general and appropriate trend and character of land, building and population development.

**PC Comment:** There is a privacy fence; all other criteria are met.

**Condition to Granting of Site Plan:**

1. Vehicles towed to the site shall be stored in the building or behind the building in the fenced in area. If a vehicle is brought to the front of the building for another company to retrieve, said vehicle shall only remain in the front of the building for a period of 12 hours, or picked up the same day the vehicle is brought to the front of the building.



February 26, 2018

John Heykoop
151 First Street
Shelby, MI 49455

To Whom It May Concern:

The storage facility located at 151 First Street, Shelby MI 49455, is grandfathered into the current Village of Shelby Zoning Ordinances and therefore does not violate any Village Ordinances. This facility offers storage units as well as uncovered storage for vehicles or other equipment. This business is required to follow State law and Village Ordinances as it pertains to the sale of any vehicle on this property.

If you have any questions, please do not hesitate to contact me at your convenience at 861-4400.

Sincerely,

Chelsea Stratil
Village Administrator

Village Clerks Office
Ph: 231-861-4400  Fax: 231-861-7449
E-mail: clerk@shelbyvillage.com

The Village of Shelby is an equal
opportunity employer

Village Administrators Office
Ph: 231-861-4400  Fax: 231-861-7449
E-mail: villageofshelby@gmail.com

BCS/CD-500 (Rev. 03/07)

## MICHIGAN DEPARTMENT OF LABOR & ECONOMIC GROWTH
## BUREAU OF COMMERCIAL SERVICES

(FOR BUREAU USE ONLY)

Date Received

This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.

Tran Info#1 14755593-1 03/09/09
Chk# 1045    Amt# $60.00
To:  EAGLE TOWING

**FILED**

MAR 1 2 2009

Administrator
BUREAU OF COMMERCIAL SERVICES

Name    John  Heykoop
Address  89  Pine  St.
City  Shelby    State  MI    ZIP Code  49455

Document will be returned to the name and address you enter above.
If left blank document will be mailed to the registered office.

EFFECTIVE DATE:

## ARTICLES OF INCORPORATION          **02269M**
### For use by Domestic Profit Corporations
(Please read information and instructions on the last page)

*Pursuant to the provisions of Act 284, Public Acts of 1972, the undersigned corporation executes the following Articles:*

### ARTICLE I

The name of the corporation is:

EAGLE  Towing  and  Recovery  Inc.

### ARTICLE II

The purpose or purposes for which the corporation is formed is to engage in any activity within the purposes for which corporations may be formed under the Business Corporation Act of Michigan.

Towing  of  Vehicles

### ARTICLE III

The total authorized shares:

1. Common Shares  60,000

   Preferred Shares  None

2. A statement of all or any of the relative rights, preferences and limitations of the shares of each class is as follows:

   None

### ARTICLE IV

1. The name of the resident agent at the registered office is:  John  Heykoop

2. The address of the registered office is:

   89  Pine  St.    Shelby    , Michigan  49455
   (Street Address)    (City)    (ZIP Code)

3. The mailing address of the registered office, if different than above:

   Same    , Michigan
   (Street Address or P.O. Box)    (City)    (ZIP Code)

**STOP** \*\*DO NOT COMPLETE THIS FORM FOR A **LIMITED LIABILITY COMPANY (LLC) OR CORPORATION (INC).** THOSE TYPES OF BUSINESSES MUST BE FILED WITH THE STATE OF MICHIGAN. IT IS THE RESPONSIBILITY OF THE UNDERSIGNED TO DETERMINE IF THE NAME OF THE BUSINESS BELOW IS FILED IN ANY OTHER FORM IN ANOTHER JURISDICTION.\*\*

## BUSINESS REGISTRATION CERTIFICATE
## PERSON CONDUCTING BUSINESS UNDER ASSUMED NAME, OR PARTNERSHIP
## County of Oceana, Office of County Clerk

THE UNDERSIGNED hereby certifies, under the provisions of P.A. No. 101, P.A. of MI, for the year 1907, as amended, that the following person (or persons) now owns, carries on, conducts or transacts, or intends to own, carry on, conduct, or transact, a business, or maintain an office or place of business, in the County of Oceana, State of Michigan, under the name, designation or style set forth below:

*(Right margin, vertical text):* Dissolved____ | Certificate Filed 1-28-14 | Certificate Exp. 1-28-19 | D.B.A. File No. 6691

### FILING FEE -- $10.00

1. Name of Business _____
2. Full Address of Business _____

   Mailing Address if different _____

3. NAME OF PERSON OR PERSONS, owning, conducting, transacting, or composing the above business, and the home post office address of each.

   | NAME OF PERSON | RESIDENCE ADDRESS (Street, City, State) |
   |---|---|
   | (Print) _____ | _____ |
   | (Print) _____ | |
   | (Print) _____ | |
   | (Print) _____ | |

4. PARTNERSHIP CERTIFICATE. The Undersigned hereby certify under the provisions of P.A. No. 164, P.A. of MI for the year 1913, as amended, that:
   (a) The Business mentioned herein (Insert "IS" or "IS NOT") _____ a Partnership.
   (If the Business IS a Partnership, fill in the blank line under (b) below.)
   (b) Length of Time General Partnership is to continue.  (Insert either the Term agreed on by the Partners, or the statement "not limited". _____

5. **SIGNATURES OF ALL PERSONS LISTED ABOVE** -(Signature) _____
   **Acknowledged before a NOTARY PUBLIC**
   (Signature) _____
   (Signature) _____
   (Signature) _____

STATE OF MICHIGAN   Subscribed and sworn to before me this 28th day of January A.D., 2014 by all persons listed above.

(Signature) Colleen K. Reyna

**COLLEEN K. REYNA**
Notary Public, Oceana County, MI   (Print) Colleen K. Reyna
My Commission Expires 04/12/18   Notary Public, Oceana County, Michigan  (Acting in Oceana County)
Acting in the County of Oceana   My Commission expires: 4-12-18

STATE OF MICHIGAN   I, Rebecca J. Griffin, Clerk of the County of Oceana and the Circuit Court thereof, do hereby certify
COUNTY OF OCEANA   that I have compared the foregoing copy of Business Registration Certificate with the original of record in my office, and that the same is a correct transcript therefrom, and of the whole of such original.

I HEREBY CERTIFY this to be a true and correct copy of the document on file with this office.
COUNTY CLERK. 3-28-18 DATE
This Certified Copy VALID Only When SEAL and RED SIGNATURE Are Affixed.
Roberta S. Dempert, Oceana County Chief Deputy Clerk
Oceana County Clerk

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Circuit, at the City of ___ this 28th day of January A.D., 2014.

By: Robin Eadie Deputy
OCEANA COUNTY CLERK/DEPUTY COUNTY CLERK

**STOP **DO NOT COMPLETE THIS FORM FOR A LIMITED LIABILITY CORPORATION (LLC) OR CORPORATION (INC). THOSE TYPES OF BUSINESSES MUST BE FILED WITH THE STATE OF MICHIGAN.**

## BUSINESS REGISTRATION CERTIFICATE
## PERSON CONDUCTING BUSINESS UNDER ASSUMED NAME, OR PARTNERSHIP
### County of Oceana, Office of County Clerk

THE UNDERSIGNED hereby certifies, under the provisions of P.A. No. 101, P.A. of MI, for the year 1907, as amended, that the following person (or persons) now owns, carries on, conducts or transacts, or intends to own, carry on, conduct, or transact, a business, or maintain an office or place of business, in the County of Oceana, State of Michigan, under the name, designation or style set forth below:

Dissolved _____
Certificate Filed 5-11-07
Certificate Exp. 5-11-12
D.B.A. File No. 4651

### FILING FEE -- $10.00

1. Name of Business _E 9616 Fame?_____

2. Full Address of Business _8 a p i n e_____
   Mailing Address if different _Shelby mi 49455_____

3. NAME OF PERSON OR PERSONS, owning, conducting, transacting, or composing the above business, and the home post office address of each.

   NAME OF PERSON — RESIDENCE ADDRESS (Street, City, State)

   (Print) _John Hegtcy_    _296 Ser 14 56078_

   (Print) _____

   (Print) _____

   (Print) _____

4. PARTNERSHIP CERTIFICATE. The Undersigned hereby certify under the provisions of P.A. No. 164, P.A. of MI for the year 1913, as amended, that:
   (a) The Business mentioned herein (Insert **"IS"** or **"IS NOT"**) _IS N°C_ a Partnership.
   (If the Business **IS** a Partnership, fill in the blank line under (b) below.)
   (b) Length of Time General Partnership is to continue. (Insert either the Term agreed on by the Partners, or the statement "not limited". _____

5. SIGNATURES OF ALL PERSONS LISTED ABOVE - (Signature) _____
   Acknowledged before a Notary Public
   (Signature) _____
   (Signature) _____
   (Signature) _____

STATE OF MICHIGAN    Subscribed and sworn to before me this _11th_ day of _MAY_ A.D., 2007 by all persons listed above.
   (Signature) _Gail L Schulte_
   (Print) _GAIL L Schulte_
   Notary Public, Oceana County, Michigan (Acting in Oceana County)
   My Commission expires: _4/22/2012_

STATE OF MICHIGAN
COUNTY OF OCEANA

I, Rebecca J. Griffin, Clerk of the County of Oceana and the Circuit Court thereof, do hereby certify that I have compared the foregoing copy of Business Registration Certificate with the original of record in my office, and that the same is a correct transcript therefrom, and of the whole of such original.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of said Circuit, at the City of Hart, this _11th_ day of _May_ A.D., 2007.

By: _Robin Eadie Deputy_
OCEANA COUNTY CLERK/DEPUTY COUNTY CLERK

I HEREBY CERTIFY this to be a true and correct copy of the document on file with the office of COUNTY CLERK Rebecca J. Griffin, Oceana County Clerk Robin Eadie, Deputy Oceana County Chief Deputy Clerk and RED SIGNATURE Are Affixed.

_Rebecca J Griffin_
Oceana County Clerk

OFFICE OF THE MUSKEGON COUNTY CLERK
**Nancy A Waters, County Clerk**
990 Terrace St., 1st Floor, Muskegon, MI 4944
Phone: (231) 724-6221

DBA2014-00366      DBA
07/15/2014 03:07:10 PM  Page: 1 of 1
Nancy A. Waters, County Clerk, Muskegon County MI

Certificate Expires _JULY 14, 2019_

**CERTIFICATE OF ASSUMED NAME**
FILING FEE $10.00

The undersigned, hereby certifies that the following person (or persons) now own, intend to own, conduct or transact business in the County of Muskegon, State of Michigan, under the name, designation or style stated below:

1. This is an Original __X__ (or) a Renewal _____ Certificate (check one)
2. NAME OF BUSINESS _Eagle Towing_
3. PRINCIPAL ADDRESS OF BUSINESS _1025 Old Hwy 31._
   CITY, STATE, ZIP CODE _Montague MI 49437_ TELEPHONE NO. _231-894-8104_
4. MAILING ADDRESS (if different) _____
5. **FULL LEGAL NAME(S) OF PERSON(S)** owning, conducting, transacting or composing the above business and residence address(es) of each.

   NAME OF PERSON                    RESIDENCE ADDRESS
   (Print) _John Heskoop_           _290 Ferry St. Shelby, MI 49455_
   (Print) _Edward_
   (Print) _____
   (Print) _____

6. If anyone listed in #5 IS NOT an individual person, please examine the reverse side before signing.
7. **SIGNATURES OF ALL PERSONS LISTED ABOVE** *to be signed before a Notary Public*
   (Signature) _____          (Signature) _____
   (Signature) _____          (Signature) _____

**STATE OF MICHIGAN**
**COUNTY OF MUSKEGON**

Subscribed and sworn to before me this _15th_ day of _July_ 20_14_ by all the persons listed above.

(Signature) _Doris A. VanDyke_
(Print Name) _DORIS A. VANDYKE_ Notary Public _Muskegon_ County, MI
Acting in _Muskegon_ County, MI
My Commission Expires: _September 29, 2018_

I, Nancy A. Waters, Clerk of Muskegon County and the Circuit Court, thereof, do hereby certify that I have compared the within copy of Assumed Name Certificate with the original of record filed in my office, and that the same is a true and correct copy thereof and of the whole of such certificate.

In Testimony Whereof, have hereunto set my hand and affixed the seal of said Circuit Court, this _15th_ day of _July_, 20_14_

Nancy A. Waters, Muskegon County Clerk

By: _Doris A. VanDyke_ Deputy County Clerk

I HEREBY CERTIFY this to be a true and correct copy of the original on file with the office of COUNTY CLERK.
This Certified Copy VALID Only When SEAL and RED SIGNATURE Are Affixed.

_Nancy A. Waters_

MUSKEGON COUNTY CLERK



**MICHIGAN**
**INTERNATIONAL FUEL TAX AGREEMENT**
**Michigan Department of Treasury**
**Special Taxes Division, IFTA Unit**
**PO Box 30474**
**Lansing, MI 48909-7974**
**2018 IFTA LICENSE**
**NOT TRANSFERABLE**

| Effective Date |
| --- |
| 01/06/2018 |
| Expiration Date |
| 12/31/2018 |

Motor Carrier Account: 34270
Control Number: 00CXTX6

IFTA License Number
MI36264605000

Additional Identifier
TR2533526

JOHN EDWARD HEYKOOP
EAGLE TOWING & RECOVERY
10255 OLD US HWY 31
MONTAGUE, MI 49437

THIS LICENSE IS ISSUED UNDER THE TERMS OF THE INTERNATIONAL FUEL TAX AGREEMENT AND IS VALID FOR VEHICLES OPERATED BY THE LICENSEE IN ALL IFTA JURISDICTIONS
**A COPY OF THIS LICENSE MUST APPEAR IN EACH MOTOR VEHICLE**

Cut here                                                                                                                      Cut here

### International Fuel Tax Agreement (IFTA) License and Decals Enclosed

Attached is your IFTA License. Each vehicle licensed under the IFTA agreement must carry a copy of this license and display the current year decals. You may make as many photocopies of the license as necessary.

One decal must be placed on the lower rear exterior portion of the cab's passenger side and the matching decal must be placed on the driver's side of the vehicle in a similar position.

To order additional decals, please visit the MI IFTA IPC website at https://mi.iftaipc.com, access your online IFTA account, click on the link "Work on IFTA", and then click on the link for "Order Additional Decals".

To cancel your IFTA license, you must submit form 4460 (www.michigan.gov/IFTA) and return any unused decals to:

Michigan Department of Treasury

Special Taxes Division - IFTA

P. O. Box 30474

Lansing, MI 48909-7974

You will remain liable for the filing of IFTA tax returns and the payment of any taxes that are due until you receive notice that your IFTA license has been cancelled by Treasury.

If you need additional information or assistance, please call the Department of Treasury, IFTA Section, at **517-636-4580**, Monday through Friday, 8:30 a.m. to 4:30 p.m.; or email us at IFTA_Licensing@michigan.gov.

**MICHIGAN REGISTRATION**  Ruth Johnson
Secretary of State

Plate: BA02941   Expires: 02/28/2019

2011  FORD   WRECKER

Vehicle No.: 1FD0X4HT0BEA86431   Fee Cat. or Wt.: 16500

County:  MUSKEGON

EAGLE TOWING
10255 OLD US 31
MONTAGUE MI 49437

License Fee:  200.00*

- WRC  0.00 SERV FEE  200.00 PLATE FEE

01162018   G016 297 A02170  020000

**MICHIGAN REGISTRATION**  Ruth Johnson
Secretary of State

Plate: BA02941   Expires: 02/28/2019

2011  FORD   WRECKER

Vehicle No.: 1FD0X4HT0BEA86431   Fee Cat. or Wt.: 16500

County:  MUSKEGON

EAGLE TOWING
10255 OLD US 31
MONTAGUE MI  49437

License Fee:  200.00*

- WRC  0.00 SERV FEE  200.00 PLATE FEE

01162018   G016 297 A02170  020000

(Detach Here)

**Two copies of your vehicle registration are provided for your convenience.**

## TAB REMOVAL INSTRUCTIONS

# 2019

- **Do not** remove this tab until you are ready to place it on your license plate.
- Please allow form to reach room temperature <u>before</u> removing license plate tab.
- Be sure your license plate is clean and dry. Apply the tab to the plate on the rear of your vehicle as follows:   All plates **except** motorcycle: upper right corner.
  Motorcycle plates: lower right corner.
- Fold form on dotted line to separate tab from form.
- Your new license plate tab shows both the month and year of expiration.
- A "P" will print on the top and bottom of your tab if you purchased a Recreation Passport.
- If you also renewed your driver's license or personal identification card by mail, you will receive it in a separate mailing 10 business days after receipt of this registration.



211

**MICHIGAN REGISTRATION**

RUTH JOHNSON
Secretary of State

Plate: BB34709    Expires: 02/28/2019
RENEWAL OF BB34709
2004    FORD    WRECKER
Vehicle No.: 1FDAX57P34EA88451
C    Fee Cat. or Wt.: 008000
    County: MUSKEGON

EAGLE TOWING
10255 OLD US HIGHWAY 31
MONTAGUE    MI    49437

License Fee:    0.00

01292018 S6 G029 297 0517    0.00

|||||||||||||||||||||||
BB34709 E

---

**MICHIGAN REGISTRATION**

RUTH JOHNSON
Secretary of State

Plate: BB34709    Expires: 02/28/2019
RENEWAL OF BB34709
2004    FORD    WRECKER
Vehicle No.: 1FDAX57P34EA88451
C    Fee Cat. or Wt.: 008000
    County: MUSKEGON

EAGLE TOWING
10255 OLD US HIGHWAY 31
MONTAGUE    MI    49437

License Fee:    0.00

01292018 S6 G029 297 0517    0.00

|||||||||||||||||||||||
BB34709 E

**2019**

**IMPORTANT**

BEND AT DOTTED LINE AND CAREFULLY PEEL
UNTIL TAB IS FULLY REMOVED.

1. Do not remove this tab until ready to place it on your license plate.
2. Your new license plate tab shows both the month and year of expiration.
3. Be sure your license plate is clean and dry, then apply your tab as follows:
   All plates **except** motorcycle: upper right corner.
   Motorcycle plates: lower right corner.

A "P" WILL
PRINT ON
THE TOP AND
BOTTOM OF YOUR
TAB IF YOU
PURCHASED A
RECREATION
PASSPORT.

YOUR PLATE
NUMBER IS
PRINTED ON YOUR
TAB. MATCH YOUR
TAB TO THE
CORRECT PLATE.

220

## MICHIGAN REGISTRATION

Ruth Johnson
Secretary of State

Plate: BA95908    Expires: 02/28/2019

2011 FREIGHTLINER WRECKER

Vehicle No.: 1FVACWDT6BDAW7675    Fee Cat. or Wt.: 15500

County: MUSKEGON

EAGLE TOWING
10255 OLD US 31
MONTAGUE MI 49437

License Fee: 200.00*

• WRC 0.00 SERV FEE 200.00 PLATE FEE

01162018   G016 297 A02171   020000

---

## MICHIGAN REGISTRATION

Ruth Johnson
Secretary of State

Plate: BA95908    Expires: 02/28/2019

2011 FREIGHTLINER WRECKER

Vehicle No.: 1FVACWDT6BDAW7675    Fee Cat. or Wt.: 15500

County: MUSKEGON

EAGLE TOWING
10255 OLD US 31
MONTAGUE MI 49437

License Fee: 200.00*

• WRC 0.00 SERV FEE 200.00 PLATE FEE

01162018   G016 297 A02171   020000



**MICHIGAN REGISTRATION**

RUTH JOHNSON
Secretary of State

Plate: BB34721    Expires: 02/28/2019
RENEWAL OF BB34721
2008   CHEVROLET    WRECKER
Vehicle No.: 1GBE5C1908F411174
C
                    Fee Cat. or Wt.: 008001
                    County: MUSKEGON

EAGLE TOWING
10255 OLD HIGHWAY 31
MONTAGUE          MI   49437
                              License Fee:
                    200.00           200.00

BB34721 E

02222018 YN G053 342 0253   200.00

TR-11

**MICHIGAN REGISTRATION**

RUTH JOHNSON
Secretary of State

Plate: BB34721    Expires: 02/28/2019
RENEWAL OF BB34721
2008   CHEVROLET    WRECKER
Vehicle No.: 1GBE5C1908F411174
C
                    Fee Cat. or Wt.: 008001
                    County: MUSKEGON

EAGLE TOWING
10255 OLD HIGHWAY 31
MONTAGUE          MI   49437
                              License Fee:
                    200.00           200.00

BB34721 E

02222018 YN G053 342 0253   200.00

TR-11

**MICHIGAN REGISTRATION**

RUTH JOHNSON
Secretary of State

Plate: BB60901    Expires: 02/28/2019
TRANSFER REGISTRATION
2011   FORD      WRECKER R
Vehicle No.: 1FDUF5HT8BEB58700
C

Fee Cat. or Wt.: 161000
County: MUSKEGON

EAGLE TOWING
10255 OLD HWY 31
MONTAGUE      MI   49437

BB60901 E

License Fee:    13.00

03012018 CN G060 342 0149   928.00

TR-1L

---

**MICHIGAN REGISTRATION**

RUTH JOHNSON
Secretary of State

Plate: BB60901    Expires: 02/28/2019
TRANSFER REGISTRATION
2011   FORD      WRECKER R
Vehicle No.: 1FDUF5HT8BEB58700
C

Fee Cat. or Wt.: 161000
County: MUSKEGON

EAGLE TOWING
10255 OLD HWY 31
MONTAGUE      MI   49437

BB60901 E

License Fee:    13.00

03012018 CN G060 342 0149   928.00

TR-1L

# MICHIGAN REGISTRATION

RUTH JOHNSON
Secretary of State

Plate: BB38410          Expires:   02/28/2019
ORIGINAL REGISTRATION
2007    FREIGHTLINER          WRECKER
Vehicle No.: 1FVHCYDC77HX50623
C
                                    Fee Cat. or Wt.: 008001
                                    County: MUSKEGON

JOHN HEYKOOP DBA EAGLE TOWING
10255 OLD HWY 31
MONTAGUE                     MI    49437

10202017 P3 F293 268 0057 7415.00      License Fee:      200.00

BB38410 J

---

# MICHIGAN REGISTRATION

RUTH JOHNSON
Secretary of State

Plate: BB38410          Expires:   02/28/2019
ORIGINAL REGISTRATION
2007    FREIGHTLINER          WRECKER
Vehicle No.: 1FVHCYDC77HX50623
C
                                    Fee Cat. or Wt.: 008001
                                    County: MUSKEGON

JOHN HEYKOOP DBA EAGLE TOWING
10255 OLD HWY 31
MONTAGUE                     MI    49437

10202017 P3 F293 268 0057 7415.00      License Fee:      200.00

BB38410 J



**MICHIGAN REGISTRATION**

Ruth Johnson
Secretary of State

Plate: BA85081        Expires: 02/28/2019

2007  FORD        WRECKER

Vehicle No.: 1FDAW57P17EB48816        Fee Cat. or Wt.: 10000

County:  MUSKEGON

EAGLE TOWING
10255 OLD HWY 31
MONTAGUE MI 49437

License Fee:  200.00*

- WRC  0.00 SERV FEE  200.00 PLATE FEE

01162018    G016 297 A02173    020000

**MICHIGAN REGISTRATION**

Ruth Johnson
Secretary of State

Plate: BA85081        Expires: 02/28/2019

2007  FORD        WRECKER

Vehicle No.: 1FDAW57P17EB48816        Fee Cat. or Wt.: 10000

County:  MUSKEGON

EAGLE TOWING
10255 OLD HWY 31
MONTAGUE MI 49437

License Fee:  200.00*

- WRC  0.00 SERV FEE  200.00 PLATE FEE

01162018    G016 297 A02173    020000

(Detach Here)

**Two copies of your vehicle registration are provided for your convenience.**

## TAB REMOVAL INSTRUCTIONS

**2019**

- **Do not** remove this tab until you are ready to place it on your license plate.
- Please allow form to reach room temperature before removing license plate tab.
- Be sure your license plate is clean and dry. Apply the tab to the plate on the rear of your vehicle as follows:   All plates **except** motorcycle: upper right corner.
                                                  Motorcycle plates: lower right corner.
- Fold form on dotted line to separate tab from form.
- Your new license plate tab shows both the month and year of expiration.
- A "P" will print on the top and bottom of your tab if you purchased a Recreation Passport.
- If you also renewed your driver's license or personal identification card by mail, you will receive it in a separate mailing 10 business days after receipt of this registration.



**MICHIGAN REGISTRATION**  Ruth Johnson
Secretary of State

Plate: CA23713   Expires: 02/28/2019

2007  FORD      PICKUP

Vehicle No.: 1FTSW21P87EB36839   Fee Cat. or Wt.: 28

County:  MUSKEGON

EAGLE TOWING
10255 OLD US HIGHWAY 31
MONTAGUE MI  49437

License Fee:  133.00

01162018   G016 297 A02169  013300

**MICHIGAN REGISTRATION**  Ruth Johnson
Secretary of State

Plate: CA23713   Expires: 02/28/2019

2007  FORD      PICKUP

Vehicle No.: 1FTSW21P87EB36839   Fee Cat. or Wt.: 28

County:  MUSKEGON

EAGLE TOWING
10255 OLD US HIGHWAY 31
MONTAGUE MI  49437

License Fee:  133.00

01162018   G016 297 A02169  013300

(Detach Here)

**Two copies of your vehicle registration are provided for your convenience.**

## TAB REMOVAL INSTRUCTIONS

# 2019

- **Do not** remove this tab until you are ready to place it on your license plate.
- Please allow form to reach room temperature <u>before</u> removing license plate tab.
- Be sure your license plate is clean and dry. Apply the tab to the plate on the rear of your vehicle as follows:   All plates **except** motorcycle: upper right corner.
  Motorcycle plates: lower right corner.
- Fold form on dotted line to separate tab from form.
- Your new license plate tab shows both the month and year of expiration.
- A "P" will print on the top and bottom of your tab if you purchased a Recreation Passport.
- If you also renewed your driver's license or personal identification card by mail, you will receive it in a separate mailing 10 business days after receipt of this registration.



② LIFT EDGE & PEEL LABEL

① FOLD ON DOTTED LINE SEPARATING LABEL EDGE FROM CARRIER

251

# Eagle Towing & Recovery
## Rates for Heavy Duty Services
**November 1, 2017**

## ROAD SERVICE
Lock out / Jump Start / Fuel delivery (Fuel is extra)

**$95/Hour Port to Port + Mileage at $4.00 per mile one way**

## TOWING
Includes: Hookup, Air supply, Driveshaft removal and/or replacement, Axle removal, Fairings, Tow light

| | | |
|---|---|---|
| **Medium Duty** | **(10,000 to 26,000 GVWR)** | **$150/Hour Port to Port** |
| **Heavy Duty** | **(26,000 to 33,000 GVWR)** | **$150/Hour Port to Port** |
| **Super Heavy Duty** | **(Loaded Mixer or Straight truck or T/T Combo)** | **$250/Hour Port to Port** |
| **Heavy Duty Fragile** | **(Large Motorhomes/Coaches)** | **$350/Hour Port to Port** |

## WINCHING

| | | |
|---|---|---|
| **Medium Duty** | **(10,000 to 26,000 GVWR)** | **$175/Hour Port to Port** |
| **Heavy Duty** | **(26,000 to 33,000 GVWR)** | **$225/Hour Port to Port** |
| **Super Heavy Duty** | **(Loaded Mixer or Straight truck or T/T Combo)** | **$350/Hour Port to Port** |

## IMPOUND

**Add $500.00 to the invoice**

## ACCIDENT

| | | |
|---|---|---|
| **Medium Duty** | **(No Haz Mat)** | **$500/Hour Port to Port** |
| **Heavy Duty** | **(No Haz Mat)** | **$750/Hour Port to Port** |
| | | |
| **Life safety / Rescue request** | **Multiply by 2** | |
| **Haz Mat** | **Multiply by 2** | |
| **Explosive** | **Multiply by 4** | |

**Fuel surcharge is added to all charges currently 5% of invoice**

**Other charges may apply**

# Eagle Towing & Recovery

## Rates for Light Duty Services

*Short Form Customer Direct Pay*
*No long form required*
November 1, 2017

## ROAD SERVICE

*Lock out / Jump Start / Fuel delivery (Fuel is extra)*
**$75.00**

## TOWING

*Includes: Hookup & Tow light*
**Minimum charge is $75.00**
**$75.00 hookup + $4.00 per mile towed**

## WINCHING

**Minimum charge is $75.00**

## IMPOUND

**Minimum charge is $154.00**
**$150.00 hookup + $4.00 per mile towed**

## ACCIDENT

**Minimum charge is $150.00**
**+ $4.00 per mile towed**
**Battery disconnect $25.00**

## Extra fee's

**Dolly $50.00**
**Remove Driveshaft $50.00**
**Tire or ball joint skate $25.00**
**Motorcycle rack $25.00**
**Off road $25.00**

02/21/18
6:11 PM

*Long form Rate Sheet*
*That readies Detailed Break down*
*int Detailed Job description*

# Eagle Towing & Recovery
## Item Price List
### February 21, 2018

| Item | Description | Preferred Vendor | Price |
|------|-------------|------------------|-------|
| ACCIDENT | ACCIDENT TOW | | 0.00 |
| Admin Fee | ADMINISTRATIVE FEE - 10% | | 10% |
| BARRELS | 55gal. BARRELS FOR WASTE REMOVAL | | 65.00 |
| Battery | Battery Disconnect | | 35.00 |
| Biohazard | Biohazard Surcharge - 13.0% | | 13% |
| CC FEE | | | 0.00 |
| CHAINSAW | Chainsaw $95.00/HR - 4 HR MINIMUM | | 95.00 |
| Crash Bag | Crash Bag - 35.00 Each - Debris Containment Bag | | 35.00 |
| Credit Card FEE | Credit Card Use FEE - 4% | | 4% |
| CruseLoop | Cruse Loop - WreckMaster Certified | | 175.00 |
| Dive Robot | Advanced Underwater Video ROV | | 225.00 |
| Diver | Certified HAZMAT Diver $375.00/HR - 4 HR MINIMUM | | 375.00 |
| DOLLIES | DOLLIES | | 50.00 |
| DOLLIES | DOLLIES | | 50.00 |
| DRIVESHAFT | DRIVE SHAFT REMOVAL | | 100.00 |
| DUMP | DISPOSAL SERVICE | | 495.00 |
| Emergency Response1 | EMERGENCY RESPONSE - LIGHT DUTY $495/HR... | | 695.00 |
| Emergency Response 2 | EXTREME EMERGENCY RESPONSE - LIGHT DUT... | | 295.00 |
| FLATBED | TRANSPORT UNIT $295/HR - 2 HR MINIMUM | | 295.00 |
| FLOORDRY | GRANULAR ABSORBENT $35 PER BAG | | 35.00 |
| Fuel Surcharge | Fuel Surcharge - 8% | | 8% |
| Gate | GATE FEE | | 36.00 |
| Generator | Power Generator $85/HR - 4HR MINIMUM | | 35.00 |
| Hazmat-Add on | HAZMAT Technician - 2 HR MINIMUM | | 85.00 |
| Headsets | Advanced On-Scene Communications Headsets $15... | | 150.00 |
| Heavy Duty | HEAVY DUTY RECOVERY UNIT $695/HR - 2 HR... | | 695.00 |
| Inclement Weather | Inclement Weather Surcharge - 11.0% | | 11% |
| LABOR | ADDITIONAL PERSONNEL $125/HR - 2 HR MINIM... | | 125.00 |
| LDUTY | LIGHT DUTY RECOVERY UNIT $295/HR - 2 HR MI... | | 295.00 |
| LDUTY | Scene Support Light Towers - $125/HR - 4HR MINIM... | | 125.00 |
| Lights | Little Wonder HP Vacuum $175/HR - 4HR MINIMUM | | 175.00 |
| Little Wonder | MEDIUM DUTY RECOVERY UNIT $425.00/HR - 2... | | 425.00 |
| Medium Duty | PLEASE MAKE CHECKS PAYABLE TO EAGLE TO... | | 0.00 |
| MEMO | TOW MILEAGE $4.00 Loaded Mile | | 4.00 |
| MILEAGE | MILEAGE | | 9% |
| Night/Weekend Differential | Night/Weekend Differential Surcharge - 9.0% | | 5% |
| PPE | PPE (Personnel Protective Equipment) OSHA Mand... | | 50.00 |
| Reclamation Fee | RECLAMATION FEE - 7.0% | | 7% |
| SEED | GRASS SEED | | 250.00 |
| SERTRUCK | SERVICE TRUCK $250/HR - 2 HR MINIMUM | | 85.00 |
| Signage | Advance Warning Signage IAW MUTCD - $85.00/HR... | | 35.00 |
| Skates | Wheel Skates | | 100.00 |
| SOIL | TOP SOIL | | 66.00 |
| STORAGE-I | INSIDE STORAGE $65.00 PER DAY ACCRUES FR... | | 50.00 |
| STORAGE-O | OUTSIDE STORAGE $50.00 PER DAY ACCRUES ... | | 275.00 |
| Supervisor | WreckMaster Certified Safety Supervisor $275.00/H... | | 35.00 |
| Tarp | Plastic Broken Windows | | 50.00 |
| TOW | TOWING HOOK UP FEE BASE RATE $50 | | 50.00 |
| TOW | FRONT END LOADER $375/HR - 4 HR MINIMUM | | 375.00 |
| Tractor | Traffic Control/Safety Unit $275/HR - 2 HR MINIMUM | | 275.00 |
| Trailer | Incident Management Trailer / Scene Mitigation Trail... | | 225.00 |

6:11 PM
02/21/18

# Eagle Towing & Recovery
## Item Price List
### February 21, 2018

| Item | Description | Preferred Vendor | Price |
|------|-------------|------------------|-------|
| Truck#250 | Advance Warning/Service/Incident Management/Traf... | | 375.00 |
| WINCHING | WINCHING | | 75.00 |
| Wood | 4"x6"x12' Wood Beams | | 0.00 |
| Charge Terms | Late payments will be charged a $50.00 late fee incl... | | 0.00 |
| Fin Chg | Finance Charges on Overdue Balance | | 12% |
| NSF Fee | NSF Fee | | 25.00 |
| Multi-Vehicle | Multi-Vehicle involved | | -50% |

| Unit # | Year | Make | Model | Class | GVWR | Type | Winch | Rear Axle | Addl. Equip |
|--------|------|------|-------|-------|------|------|-------|-----------|-------------|
| 210 | 2011 | Ford | F450 | C | 18500 | WheelLift | 2-3/8-150Ft | Duels | Dollies |
| 211 | 2004 | Ford | F550 | C | 18500 | WheelLift | 2-3/8-150Ft | Duels | Dollies |
| 220 | 2011 | Frightliner | M2 | B | 26000 | Flatbed | 1-3/8-75FT | Duels | N/A |
| 221 | 2008 | Chevrolet | C5500 | C | 26000 | Flatbed | 1-3/8-75FT | Duels | N/A |
| 222 | 2011 | Ford | F550 | C | 21000 | Flatbed | 2-3/8-150FT | Duels | Side Puller |
| 240 | 2007 | Frightliner | M2 | A | 58000 | WheelLift | 2-1/2-250FT | Tandem | N/A |
| 250 | 2007 | Ford | F550 | C | 14500 | Trailer | N/A | Duels | N/A |
| 251 | 2007 | Ford | F250 | C | 14500 | Trailer | N/A | Duels | N/A |

Booms

10  1-Hydro-Movable-12k
11  1-Hydro-Movable-12k
20  N/A
21  N/A
22  N/A
40  1-Hydro-Movable-40k
50  N/A
51  N/A

# Exhibit 8

```
 1              IN THE DISTRICT COURT OF THE UNITED STATES

 2               FOR THE WESTERN DISTRICT OF MICHIGAN

 3

 4

 5  JOHN HEYKOOP D/B/A

 6  EAGLE TOWING,

 7            Plaintiff,

 8       vs.                     Case No. 1:18-cv-00632

 9                               Hon. Robert J. Jonker

10

11  FIRST LIEUTENANT JEFFREY WHITE;

12  FIRST LIEUTENANT CHRIS

13  MCINTIRE,

14            Defendants.

15  _____

16

17

18     The Deposition of FIRST LIEUTENANT CHRIS MCINTIRE,

19     Taken at 4151 Okemos Road,

20     Okemos, Michigan,

21     Commencing at 10:34 a.m.,

22     Monday, February 4, 2019,

23     Before Rebecca L. Russo, CSR-2759, RMR, CRR.

24

25
```

1    Q.  You understand what the case is about?

2    A.  I do.

3    Q.  Okay.  I'm going to -- the first thing I want to do

4        is, I want to go over some of the answers that you

5        gave in your interrogatories and clarify a few things.

6    A.  Okay.

7    Q.  Okay.

8            MR. BRENNAN:  So if you could mark that for

9    me, please?

10           MARKED FOR IDENTIFICATION:

11           DEPOSITION EXHIBIT 1

12           10:38 a.m.

13   BY MR. BRENNAN:

14   Q.  So I'm showing you what's been marked as Exhibit 1,

15       and if you could, just page through that.

16           When I show you documents, take as much

17       time as you want to.  Just make sure you're familiar

18       with the documents.

19   A.  Sure.

20   Q.  I don't care about time or silence, it's not a big

21       deal.

22   A.  Okay.

23   Q.  I'm not going to ask you questions about Lieutenant

24       White's portion of it --

25   A.  Okay.

1          IN THE DISTRICT COURT OF THE UNITED STATES

2            FOR THE WESTERN DISTRICT OF MICHIGAN

3

4

5     JOHN HEYKOOP D/B/A

6     EAGLE TOWING,

7          Plaintiff,

8     vs.            Case No. 1:18-cv-00632

9                    Hon. Robert J. Jonker

10

11    FIRST LIEUTENANT JEFFREY WHITE;

12    FIRST LIEUTENANT CHRIS

13    MCINTIRE,

14          Defendants.

15    _____

16

17

18        The Deposition of FIRST LIEUTENANT CHRIS MCINTIRE,

19        Taken at 4151 Okemos Road,

20        Okemos, Michigan,

21        Commencing at 10:34 a.m.,

22        Monday, February 4, 2019,

23        Before Rebecca L. Russo, CSR-2759, RMR, CRR.

24

25

MCINTIRE, FIRST LIEUTENANT CHRIS
02/04/2019                                                                    Page 15

1      complaint?

2   A.  I don't.  It was back in I think 2000 ...

3   Q.  '17?

4   A.  No.  I don't know, '14 or so, '13, '14 or '15.

5   Q.  Okay.  So the only complaint that you received that

6       you're aware of was 2014?

7   A.  Correct.

8   Q.  Okay.  And do you know what you did in response to

9       that complaint?

10  A.  I listened to the complainant's complaint, and then I

11      talked to Mr. Heykoop about it and resolved it.

12  Q.  Okay.  And do you know what the complaint was about?

13  A.  The guy thought he was overcharged.

14  Q.  Okay.  And you resolved it; how did you resolve it?

15  A.  Talked to Mr. Heykoop about the overcharging.  First I

16      took, and I can't remember the dollar amount the guy

17      said that he actually was, thought he was overcharged,

18      but it was several thousands of dollars.

19          I took that information from him, and I

20      went to some of the companies in Muskegon County, I

21      can't remember which ones I went to, and just asked

22      them what they would charge for the type of incident

23      the person was involved with, and the two places that

24      I talked to were right around four to five hundred

25      dollars.

1   Q.  Okay.  Now, what complaint are you referring to that

2        established the unacceptable service that you're

3        talking about here in this letter?

4   A.   Well, it would be a combination of a couple different

5        things.  It would be a combination of the complaint

6        that I received back in 2014, and then it's known in

7        the law enforcement community and at least in my

8        county, Muskegon County, that I service -- well, I

9        service three counties, but while Eagle's been working

10       in Muskegon County, it's known or heard of that Eagle

11       Towing overcharges people.  Not just from the

12       complaint that I had, there was also, I guess, an

13       exposé, is the best way to put it, from one of the

14       news stations that covers Muskegon County that -- they

15       did a part on companies that were overcharging

16       citizens, and they highlighted two companies in the

17       Muskegon County area, one of them being Eagle Towing

18       and one of them being a company that I can't remember

19       who they were.

20   Q.  I've seen that.

21   A.   That information was out there.  And then because, you

22        know, I'm a different agency than the other agencies,

23        obviously, in Muskegon County, everybody else had

24        kicked him off the list.  The most important to me

25        would be the Muskegon County Sheriff's Department,

 1    because we have kind of concurrent jurisdiction where

 2    we work.

 3         They kicked him off quite some time ago,

 4    and I didn't because I didn't have, I didn't have the

 5    due process that I have to go through in order to make

 6    that happen.  I can't speak to what other departments

 7    can do and why they would or wouldn't remove somebody

 8    from the list, but I was the last agency that had them

 9    on the list.

10         I knew that the Hart post was going through

11    some things with wrecker companies in Oceana County,

12    and in particular Eagle Towing, and Lieutenant White

13    had conducted an investigation for some things that he

14    had happen up in Oceana County, and at the conclusion

15    of his investigation he made the decision then to

16    remove them from the no-preference list in Oceana

17    County.

18         And I took a look at the investigation that

19    another State Police agency did that basically

20    bordered my jurisdiction in regards to a company that

21    was operating in Muskegon County, as well.  I felt

22    comfortable then that there was, there was enough

23    through his investigation to remove them through the

24    policies and procedures of our official orders, and

25    then I removed him, as well.

1    Q.   Okay.  So your removal was basically a result of, I

2         would say, hearsay that you had from news reports and

3         from what other investigators -- investigations that

4         were conducted, is that --

5    A.   Investigations and news report, and the complaint I

6         received in 2014.

7    Q.   Right, which you said you resolved, correct?

8    A.   I resolved.

9    Q.   Okay.  So there was no specific complaint raised

10        within your post area since 2014 regarding Eagle

11        Towing's service or rates, is that correct?

12   A.   No.  Not to me personally, no.

13   Q.   Okay.  Do you remember when that news report was?

14   A.   I don't.

15   Q.   Okay.

16            MR. BRENNAN:  Do you remember when it was?

17            JOHN HEYKOOP:  2015.

18   BY MR. BRENNAN:

19   Q.   Would that refresh your recollection at all, that it

20        was 2015?

21   A.   Could be.

22   Q.   Could have been?  Okay.  So this would be two years

23        after that, is that correct?

24   A.   Yes.

25   Q.   Okay.  And did you take a look -- or tell me what you

MCINTIRE, FIRST LIEUTENANT CHRIS
02/04/2019                                                                Page 32

1        Exhibit 1 --

2    A.  Okay.

3    Q.   -- all right?  Before I do that, when you testified a

4        couple minutes ago that you had -- you were

5        explaining, you know, kind of why you, the basis for

6        your letter on December 14th, and you made reference

7        to Lieutenant White's from the Hart post

8        investigation.  Do you recall that?

9    A.   I do.

10   Q.   Okay.  Did you review specific documents or was that

11       just a conversation that you had with Lieutenant

12       White?

13   A.   Just a conversation.

14   Q.   Okay.  So you've never really seen the documents that

15       he -- well, you don't even know if he had documents or

16       not, is that correct?

17   A.   Correct.

18   Q.   Okay.  All right, then number 8 says:  Please identify

19       all the individuals involved in the determination to

20       remove the wrecker from the list.

21           And you state that pursuant to Order 48,

22       you made the determination to remove Plaintiff from

23       the Rockford no-preference list.  So, basically,

24       you're taking ownership for that decision, is that

25       correct?

1    A.  Yes.

2    Q.  -- where it says "Statewide Wrecker Policy and

3        Procedures," is it fair to say that you're familiar

4        with them?

5    A.  I've read this.

6    Q.  Okay.  And if you had any doubts about how you were to

7        comply with this order, as you mentioned, this is on

8        the internet as a resource for you to do that, is that

9        correct?

10   A.  That's correct.

11   Q.  Okay.  And this does set the department's official

12       policy as it relates to the use of wrecker services,

13       correct?

14   A.  That's correct.

15   Q.  Okay.  If you look at 48.3.1, where it says

16       "General" --

17   A.  Yes.

18   Q.  -- it states that "Worksites shall establish a local

19       policy for areas not covered by this order."

20           Worksites refers to your post?

21   A.  That's correct.

22   Q.  Okay.  And did the Rockford post have a local policy

23       in addition to Order 48?

24   A.  No.

25   Q.  Okay.  All right, on page 12 --

MCINTIRE, FIRST LIEUTENANT CHRIS
02/04/2019                                                                    Page 48

1          maintained at the worksite for the year the wrecker

2          service is removed from the no-preference wrecker call

3          list plus two years.

4                 Do you see that?

5     A.  I do.

6     Q.  Okay.  So you are required to maintain this form, is

7          that right?

8     A.  By the order, I am, yes.

9     Q.  Okay.  And not just the order, not just the form, but

10         also other required documents, it states there, is

11         that right?  It says the original signed form and

12         other required documents; do you see that?

13    A.  I do.

14    Q.  Okay.  And, in fact, you have to keep it two years

15         beyond the time that they would have been removed from

16         the list, is that right?

17    A.  That's what it says, yes.

18    Q.  Okay.  How many wrecking companies in your post do you

19         have a UD-041?

20    A.  I don't know.

21    Q.  You did research your records to comply with the

22         document request, correct?

23    A.  I did what?

24    Q.  Well, you got a document request, right, the

25         Exhibit 1?  I had you go through these responses to

1    the document request.  Do you see that?  And in

2    response to that request, you gave us the UD-041 that

3    Eagle Towing had submitted, but I didn't see any

4    other, I didn't see any other forms from other towing

5    companies.

6         I guess all I'm trying to find out is, if

7    you didn't give me one, that means you don't have one.

8    Is that right?

9    A.  I don't know if I have one or not.

10   Q.  So you didn't look?

11   A.  For the UD-041?

12   Q.  Right, for the -- I asked for all documents relating

13      to applications.  I don't know if I used that exact

14      language, but we asked for all documents that relate

15      to applications to be put on the no-preference list,

16      and I didn't get any UD-041s from you, and I presume

17      in order to comply with that request, you would say,

18      "All right, guys, somebody get the file with the

19      UD-041s, I need all of them"?

20   A.  I didn't look for them.

21   Q.  You didn't look for them?

22   A.  No.

23   Q.  Okay.  Is there any reason you did not look for them?

24   A.  I didn't know I had to keep those.

25   Q.  Oh, so you just -- you forgot that you had to keep

MCINTIRE, FIRST LIEUTENANT CHRIS
02/04/2019                                                    Page 60

1          if I want to -- if it's necessarily an investigation,

2          but when you received information about the television

3          report and what the word on the street was at other

4          posts and sheriff departments about Eagle Towing, did

5          you do anything to investigate the bills or invoices

6          from other towing companies?

7    A.   I never received any complaints about other towing

8          companies.

9    Q.   Right.  But it states that, it states that:  Each

10         wrecker service shall be held to identical standards

11         or conduct of performance.

12              So my question is, did you look to see if

13         other companies were charging about the same as Eagle

14         Towing?

15   A.   Yes.

16   Q.   I'm not talking about rates, I'm talking about

17         invoices.  Did you look at invoices?

18   A.   No.

19   Q.   Okay.

20   A.   Did not look at their invoices.

21   Q.   You did not look at their invoices?

22   A.   Correct.

23   Q.   Okay.  I mean, it's one thing to state a rate.  It's

24         something else to find out how much they're actually

25         charging to somebody, is what I'm trying to get at

MCINTIRE, FIRST LIEUTENANT CHRIS
02/04/2019                                                              Page 64

1    A.  Correct.

2    Q.  Okay.

3    A.  But I did tell him, if I find more circumstances of

4        overcharging happening, then I may have to make the

5        decision to remove him from the list.

6    Q.  Okay.  And that would be because complaints are coming

7        to you?

8    A.  Correct.

9    Q.  Just like the other one, right?

10   A.  Correct, yes.

11   Q.  And there were no other complaints?

12   A.  Not to me, personally.

13   Q.  Okay.  Not to your post?

14   A.  Yes to my post.  I told you that Trooper Marshall had

15       told me that there was people that had said they were

16       overcharged but didn't want to make a formal complaint

17       to me.

18   Q.  Okay.  So that would tell me that's not a complaint,

19       then.

20   A.  Okay, fair enough.

21   Q.  I'm trying to figure out what formal complaints.

22   A.  Right.  I had one formal complaint to me.

23   Q.  In 2014?

24   A.  Correct.

25   Q.  And one formal complaint to your post?

MCINTIRE, FIRST LIEUTENANT CHRIS
02/04/2019                                                                          Page 65

1     A.   To me.

2     Q.   Well, is that the same thing or --

3     A.   I can't speak to every trooper out there.

4     Q.   Okay.  But you would have handled the complaints, is

5          that correct?

6     A.   If they were brought to my attention, I would have

7          handled it.

8     Q.   Okay.  Was there anyone else in charge of handling

9          those complaints at your post?

10    A.   No, just me.

11    Q.   Okay.  So no other complaints other than the 2014

12         complaint came to your post that was handled by you, a

13         formal complaint, is that correct?

14              MR. MYERS:  Objection, asked and answered.

15    A.   Right.

16              MR. BRENNAN:  Yeah, but there's some

17         dancing going on, and I want to make sure the record

18         is clear about it.

19    BY MR. BRENNAN:

20    Q.   All right.  So 5(b) says:  If it is found that the

21         wrecker service failed to comply with the requirements

22         of this order, a written notice shall be sent

23         describing the complaint and the action needed to

24         maintain a position on the no-preference wrecker call

25         list.

MCINTIRE, FIRST LIEUTENANT CHRIS
02/04/2019                                                                                          Page 72

 1   Q.  All right, because you didn't tell them?

 2   A.  I didn't tell them, no.

 3   Q.  Okay.  And you acknowledge that you didn't follow any

 4       of the procedures outlined here in 48.3.12, is that

 5       correct?

 6            MR. MYERS:  Objection, misstates prior

 7       testimony.

 8   A.  I do not acknowledge that.

 9   BY MR. BRENNAN:

10   Q.  I'm sorry?

11   A.  I don't acknowledge that I didn't --

12   Q.  Okay, which parts of 48.3.12 do you think that you

13       complied with in connection with your decision on

14       December 14th, 2017?

15   A.  I reported to my supervisor, which would be Captain

16       Roesler.

17   Q.  Which one are you --

18   A.  A(2).

19   Q.  A(2)?

20   A.  Mmm-hmm.

21   Q.  Okay.  So with regard to -- and maybe I'd better make

22       sure that we've got the same premise here.

23   A.  Okay.

24   Q.  I'm not talking about 2014.  I'm talking about --

25   A.  You're saying I didn't comply with anything in this.

1        your office, is that correct?

2    A.  That's correct.

3    Q.  Okay.  They may exist in some storage facility or some

4        other place that as a result of the merger between

5        your office and, was it the --

6    A.  Grand Haven post.

7    Q.  Grand Haven office?

8    A.  Yes.

9    Q.  But you don't know for sure?

10   A.  That's correct.

11   Q.  Okay.  And is it -- I would -- and that merger

12       happened?

13   A.  About five years ago.

14   Q.  Five years ago.  So if there are UD-041s in those

15       files, they're going to be about five years old, is

16       that correct?

17   A.  Right.

18   Q.  Okay.  And the updating that's supposed to happen

19       every January 31st, as far as you know, that has not

20       happened since you've been on -- in the last five

21       years?

22   A.  Correct.

23   Q.  Okay.

24            MR. BRENNAN:  Off the record.

25

MCINTIRE, FIRST LIEUTENANT CHRIS
02/04/2019                                                                    Page 74

1      understanding is, tell me if I'm wrong, but you didn't

2      get any formal complaints; you're talking about things

3      that you heard from other people?

4  A.   2014 I received a formal complaint.

5  Q.   Okay.  Again, we're not talking about 2014.

6  A.   I kicked Eagle Towing off because of the 2014

7      incident, the exposé on the TV, what I had heard from

8      people in the law enforcement community, as well as

9      the investigation done by the Hart post.  All those

10     things played in my determination to kick them off.

11     Not just '14, and not just the exposé, and not just

12     things I heard, and not just Lieutenant White's

13     investigation.

14  Q.   Okay.

15  A.   All those things.

16  Q.   I understand that.  But all those other things, none

17     of those were a formal complaint that was received by

18     your office.  Is that correct?

19  A.   Correct.

20  Q.   Okay.  So if you had contacted Eagle Towing, for

21     example, to say, "Look, I'm going to take you off the

22     list because I have a complaint," and he said, "Well,

23     where's the complaint; did someone file something,"

24     you would say, "I don't have anything"?

25  A.   Correct.

MCINTIRE, FIRST LIEUTENANT CHRIS
02/04/2019                                                                      Page 78

1       that your understanding?

2    A.  It looks like it from this document.

3    Q.  Except for -- except they don't fall under the carrier

4       of household goods designation, is that correct?

5    A.  I don't know.

6    Q.  Okay.

7              MARKED FOR IDENTIFICATION:

8              DEPOSITION EXHIBIT 5

9              12:29 p.m.

10   BY MR. BRENNAN:

11   Q.  Okay, I'm showing you what's been marked as Exhibit 5.

12       Take a look at that.  I'm going to represent that it's

13       a copy off of a Michigan legislature website regarding

14       this particular statute.

15   A.  Okay.

16   Q.  Are you familiar at all with this section 257.252a of

17       the Michigan Vehicle Code?

18   A.  No.

19   Q.  Do you not do any work with abandoned vehicles in your

20       office?

21   A.  My post does, yes.

22   Q.  Okay.  And are you not familiar with the procedures

23       that relate to abandoned vehicles or vehicles that are

24       removed from the highway because of safety issues, and

25       that kind of thing?

1    A.   Personally?  No.

2    Q.   Okay.

3    A.   Only because I don't deal with them, personally.

4    Q.   I see.  Are you aware under this statute that the

5         owner of a vehicle who is towed involuntarily has the

6         right to appeal the costs of the towing fee and

7         storage fees?

8    A.   No.

9    Q.   You're not aware that they can post a bond and have

10        that heard in court?

11   A.   No.

12   Q.   You've never heard of any towing company in your

13        jurisdiction that has gone through that process?

14   A.   No.  To be clear, I don't want to sound inept, either,

15        I have a sergeant who does all my abandoned vehicles

16        for me, so I don't -- it gets done and it's dealt

17        with.  So it isn't as though I just don't know things.

18        I don't want to dive into things I don't interest

19        myself with.

20   Q.   No one knows everything.

21   A.   Thank God.

22   Q.   Yeah.  So you don't know whether you've ever referred

23        complainants to this statute or whether your post does

24        when they think that they have been overcharged for

25        towing services?

# Exhibit 9



**STATE OF MICHIGAN**
**DEPARTMENT OF STATE POLICE**
LANSING

RICK SNYDER
GOVERNOR

COL. KRISTE KIBBEY ETUE
DIRECTOR



December 14, 2017

Mr. John Heykoop
EAGLE TOWING
10255 Old Highway 31
Montague, MI 49437

RE: Rockford Post 61 No Preference Wrecker List

Dear Mr. Heykoop,

Please be advised that as of this date, December 14, 2017, Eagle towing has been removed from the Michigan State Police Rockford Post 61 No Preference Wrecker list. Your removal from the list is a direct result of the unacceptable service that you have provided within the post area.

Sincerely,

F/Lt. Chris McIntire, Post Commander
Michigan State Police
Rockford Post 61

cc: File

